HARBOUR PROPERTIES, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Harbour Properties, Inc. v. Commissioner
Docket Nos. 4437-68 thru 4455-68
United States Tax Court
T.C. Memo 1973-134; 1973 Tax Ct. Memo LEXIS 149; 32 T.C.M. (CCH) 580; T.C.M. (RIA) 73134; June 25, 1973, Filed *149 Held: The transfers of real estate by Gould and by Hunter, Louis and Rosen to various corporations receiving notes in return, and the conveyances by several of these corporations to other corporations were not sales evidenced by debt obligations but rather were equity contributions controlled by the nonrecognition provisions of sec. 351. Therefore, distributions received by the transferors are taxable as dividends to the extent of the corporate distributors' earnings and profits. Held further: The gain recognized by Gould on the sale of the Clin Clara property to Shore is taxable at capital gain rates. The property was held for investment. Held further: Taladen Co. was formed for no reason other than to obtain tax benefits, and its income must be reported by Gould. Alternatively, even if such were not the case, the income reported by Talden was earned by Gould and therefore under the "assignment of income" doctrine must be reported by him. Held further: While we determined the income to be additional compensation from Coral Glade Co., Coral Way Co. and Darlington Manor, Inc. to Gould, sec. 267(a) (2) denies the corporations a deduction to the extent payments were not made within *150 2-1/2 months after the close of the year in which earned. Held further: Since the debt instruments were determined to be stock the over 50 percent requirements of sec. 267(b) (2) are satisfied. Held further: The advances by Gould to Peat Corp. are determined to be bona fide debts. Held further: Gould need not first allocate repayments to interest, as the parties have stipulated that the debtor characterized such payments differently. Held further: The surtax exemptions claimed by Coral Way Co. and Sans Souci Co. are disallowed under the provisions of sec. 1551. Held further: One of the surtax exemptions claimed by either Southern Rock and Fill Co. or Housing Engineers of Florida, Inc. is disallowed under the provisions of sec. 269. Held further: The petitioner corporations are determined not to be a controlled group as defined in sec. 1563, and therefore are not limited to one surtax exemption as required in sec. 1561. This decision is based on the conclusion that while the debt instruments were held to be stock such stock must be characterized as non-voting and limited and preferred as to dividends and therefore excluded under sec. 1563(c) (1) (A) when determining stock ownership. *151 Held further: Peat Corp. is determined to be a personal holding company since the repayment of the supposed debts were held to be dividend distributions to the extent of the distributors' earnings and profits. 3 Held further: The debt instruments issued by Darlington Manor, Inc., though determined to be stock for other provisions of the Code, do not, under decisions of this Court, represent a second class of stock for purposes of the subchapter S provisions. Therefore the corporation was, during 1960, a valid small business corporation as defined in sec. 1371. Held further: Coral Glade Co. and the Goulds are not liable as transferees for the deficiency of Coral Way Co. and Peat Corp. is not liable as the transferee of Camden Corp. The notes issued by the transferee corporations to the transferors, though determined to be equity for tax purposes, would under Florida law be held a valid debt. Thus, the conveyances in return would be held a repayment of pre-existing obligations. Held further: The parties are not liable for an additional tax under sec. 6651(a). Leonard L. Silverstein and Robert E. Falb, for the petitioners. Andrew H. Weinstein, for the respondent. STERRETT
MEMORANDUM *152 FINDINGS OF FACT AND OPINION STERRETT, Judge: These consolidated cases involve deficiencies in the Federal income tax of Emil and Estelle Gould and a series of corporations in which the Goulds, one or both, have varying degrees of stock interest. Respondent determined the following deficiencies: [2] Petitioner and Docket Taxable Deficiency
Additions to Tax under Number
Year
Sec. 6651(a) [3] *153 Harbour Properties, Inc.
8/31/60
$6,399.78
Docket No. 4437-68
8/31/61
6,081.90
8/31/64
2,595.96
8/31/66
1,223.58
Coral Glade Company
8/31/60
1,222.57
1,049.67
Transferee of the assets of Coral Way Land Co.
8/31/62
133,772.35
Docket No. 4438-68
8/31/63
74,225.37
Sunrise Harbour, Inc.
2/29/60
1,255.07
Docket No. 4439-68
2/28/61
6,254.46
2/28/62
184.15
2/28/63
313.10
Peat Corporation
12/31/60
12,467.48
Docket No. 4440-68
12/31/61
9,392.63
12/31/62
309.26
12/31/63
19.285.29
12/31/64
6,828.14
12/31/65
708.12
Estelle Gould, Transferee of the assets of Coral Way Land Co.
8/31/60
1,222.57
1,049/67
8/31/62
133,772.35
Docket No. 4441-68 [4]
8/31/63
74,225.37
Harbour Development Co.
3/31/60
3,821.22
Docket No. 4442-68
3/31/61
3,665.23
3/31/62
2,630.19
Trenton Corporation
9/30/59
12,518.69
Docket No. 4443-68
9/30/60
926.55
9/30/61
4,765.93
9/30/62
7,257.06
9/30/63
1,772.28
Housing Engineers of Florida, Inc.
4/30/60
$ 5,562.21
Docket No. 4444-68
4/30/61
1,418.87
4/30/62
4,520.41
4/30/63
413.15
Dalton Corporation
8/31/60
8,811.34
Docket No. 4445-68
8/31/61
9.979.71
8/31/62
315.83
8/31/63
575.05
8/3164
2,108.17
8/31/65
884.11
8/31/66
5,257.06
Sans Souci Company
2/29/60
47,601.96
Docket No. 4446-68
2/28/61
25,696.68
2/28/62
3,182.89
2/28/65
1,210.02
Emil J. Gould and Estelle Gould
12/31/59
87,287.11
12/31/60
78,734.39
Docket No. 4447-68
12/31/61
234,631.80
12/31/62
154,184.38
12/31/63
77,870.57
12/31/64
117,326.27
12/31/65
25,335.62
Southern Rock and Fill Company
3/31/60
5,419.72
3/31/61
2,632.83
Docket No. 4448-68
3/31/63
571.04
Coral Glade Company
3/31/60
159,727.43
Docket No. 4449-68
3/31/61
20,251.79
3/31/62
24,801.55
3/31/63
81,944.28
3/31/64
1,982.21
3/31/65
18,299.17
3/31/66
29,200.47
Sunrise Properties, Inc.
2/29/60
41,500.66
Docket No. 4450-68
2/28/61
16,849.18
2/28/62
164.91
2/28/63
1,739.08
Luxor Corporation
7/31/60
$916.80
Docket No. 4451-68
7/31/61
9,197.83
7/31/62
811.59
7/31/63
1,905.55
7/31/64
871.76
7/31/65
1,465.11
7/31/66
1,886.48
Peat Corporation,
9/30/59
7,614.41
Transferee of the assets of Camden Corporation
9/30/60
4,050.76
9/30/63
4,481.99
Docket No. 4452-68
9/30/64
1,953.65
Darlington Manor, Inc.
12/31/60
371,469.94
Docket No. 4453-68
12/31/61
[5] (718.30)
12/31/62
(969.64)
12/31/65
956.52
Bay Homesites, Inc.
5/31/61
4,149.92
Docket No. 4454-68
5/31/63
12.85
5/31/64
5,237.09
5/31/66
2,817.84
Emil J. Gould, Transferee of the assets of Coral Way Land Co.
8/31/60
[6] 1,222.57
1,049.67
8/31/62
133,722.35
8/31/63
74,225.37
Docket No. 4455-68 7 Several issues raised in the pleadings have been settled by the parties and can be given effect in the Rule 50 computations. There are however numerous issues remaining to be decided. (1) Whether the transfers of property, including both land and stock, by Gould to various petitioner corporations and the subsequent transfer of such property by those corporations to other petitioner corporations are valid sales or nontaxable exchanges within the purview of section 351(a), I.R.C. 1954. [7] *154 Relevant to this issue we must also determine the fair market value at the time of transfer of a substantial portion of the conveyed property. Alternatively, if such transfers are determined to be valid sales then we must decide whether the gain realized on the sales by Gould to the corporations is taxable as ordinary income or capital gain. [8] Such a determination necessitates a decision relevant to whether Gould held such property for sale to customers in the ordinary course or a trade or business as noted in section 1221(1). (2) Whether the Clin Clara property sold by Gould to Philip Shore, an unrelated party, on July 1, 1959, was property held for sale to customers in the ordinary course of Gould's *155 trade or business. Such a determination will lead us to a conclusion relevant to the character of the gain recognized as a result of the transaction. 9 (3) Whether the Taladen Co. should be recognized as a separate corporation for Federal income tax purposes, or whether the income reported by such corporation should be included in the gross income of petitioners Emil and Estelle Gould. This decision will guide us in our determination regarding Darlington Manor, Inc.'s, Coral Glade Co.'s, and Coral Way Land Co.'s ability to deduct accrued commissions payable to Taladen in 1960, 1962, 1963, 1965 and 1966. If we determine that Taladen is a viable corporate entity, we must then decide whether a portion of the deducted commissions is subject to disallowance under the provisions of section 267(a) (2). Alternatively, if we ignore Taladen's existence but find the commissions to be additional earned income (as opposed to dividend income) of Gould we must also determine the applicability of section 267. [9] *156 (4) Whether advances by the Goulds to Peat Corp. are bona fide debts or contributions to capital. If we determine the existence of a valid indebtedness, we must then decide whether the payments by Peat Corp. 10 to the Goulds from 1963 through 1965 were payments of interest or principal. (5) Whether each corporate petitioner is entitled to a separate surtax exemption as provided in section 11 or, on the other hand, whether such exemptions must be disallowed due to the language provided in sections 269, 1551 or 1561. (6) Whether Peat Corp. was a personal holding company as defined in section 542 during taxable years ended December 31, 1961 or 1962. [10]
(7) Whether Darlington Manor, Inc. qualified as a subchapter S corporation for the taxable year ended December 31, 1960. Such a decision rests upon our initially determining whether two classes of stock were in fact created. This conclusion is in turn contingent upon our earlier decision regarding the supposed sale *157 versus a section 351 transfer. (8) Whether Emil and Estelle Gould and Coral Glade Co. are liable as transferees for the deficiency, if any, of Coral Way Land Co. 11 (9) Whether Peat Corp. is liable as transferee for the deficiency, if any, of Camden Corp. (10) Whether petitioners are entitled to net operating losses for certain of the years here involved. (11) Whether any of the transferor corporations is liable for the addition to tax provided in section 6651(a). [11]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. General Petitioners Emil J. Gould (sometimes hereinafter referred to as Gould) and Estelle Gould (sometimes hereinafter referred to as Estelle), husband and wife, resided in Miami, Florida as of the date their petition was filed with the Tax Court. They filed joint Federal income tax returns for the taxable years ended December 31, 1959, 1960, 1961, 1962, 1963, 1964 and 1965, with the district director of internal revenue at Jacksonville, *158 Florida. 12 Housing Co. of Florida (not docketed) was incorporated on May 17, 1954 as a land development and construction company. The Goulds were the stockholders having paid in $2,500 each for 10 shares of stock. Emil Gould was president. Sunrise Properties, Inc. was incorporated on August 11, 1955 as a land development company. Its stockholders were as follows: Name
Title
Number of Shares
Amount Paid in Emil Gould
President
75
$6,000
Estelle Gould
-
n12 75
6,000
Burt Hunter
Vice President & Secy.
70
5,600
Daniel Rosen
Asst. Secretary
50
4,000
Harry J. Louis
Treasurer
30
2,400
Coral Glade Co. was incorporated on November 15, 1955 as a land development company. Stockholders of record were as follows: Name
Title
Number of Shares
Amount Paid in Burt Hunter
President
10
$2,500
Emil Gould
Secretary
5
1,250
Estelle Gould
Treasurer
5
1,250
Sans Souci Co. was incorporated on November 17, 1955 as a land development and sales company. Stockholders of record were as follows: 13 Name
Title
Number of Shares
Amount Paid in Emil J. Gould
President
7.5
$225
Estelle Gould
Treasurer
7.5
225
Burt Hunter
Secretary
10
300
Daniel Rosen
-
5
150
On *159 March 26, 1956, Harbour Development Co. was incorporated. Its stockholders consisted of the following: Name
Voting Shares
Non-voting Shares
Total Subscription Price Dorothy Meyer
10
-
$750.00
Emil J. Gould
7.5
90
292.50
Estelle Gould
7.5
90
292.50
Burt Hunter
7
84
273.00
Daniel Rosen
5
60
195.00
Harry J. Louis
3
36
117.00 Sunrise Harbour, Inc. was incorporated on March 26, 1956. Its stockholders were as follows: Name
Voting Shares
Non-voting Shares
Total Subscription Price Mildred Wallach
10
-
$750.00
Emil J. Gould
7.5
90
292.50
Estelle Gould
7.5
90
292.50
Burt Hunter
7
84
273.00
Daniel Rosen
5
60
195.00
Harry J. Louis
3
36
117.00
Peat Corp. was incorporated on April 4, 1956 as a land development company. Stockholders of record were as follows: Name
Title
Number of Shares
Amount Paid in Emil Gould
Asst. Secretary & Treasurer
9
$675
Estelle Gould
-
9
675
Warren Wepman
President
9
675
Dr. Nathan Schacher
-
10
750
Harry J. Louis
Vice President
6
450
Rose Kaplan
-
9
675
Paul Burnham, Jr.
Secretary
8
600
On April 6, 1956, Luxor Corp., Trenton Corp., Camden Corp., Dalton Corp., Bay Homesites, Inc. and Harbour Properties, Inc. were organized. Their stockholders were represented as follows: Name
Title
Voting Shares
Non-voting Amount Paid in Shares
Estelle Gould
-
7.5
90
$292.50
Emil Gould
President
7.5
90
292.50
Burt Hunter
Secy.-Treasurer
7
84
273.00
Harry J. Louis
-
3
36
117.00
Daniel Rosen
-
5
60
195.00
Various others [13]
-
10
-
750.00
We *160 find it difficult to determine the value assigned to the voting and nonvoting stock. For example in Trenton Corp. Daniel Rosen, Harry Katzen and Henrietta Tauber each purchased 5 voting shares of of stock. In addition Daniel Rosen purchased 60 nonvoting shares. Yet Katzen and Tauber each paid $375 to the corporation for their stock while Rosen only paid $195. The Taladen Co. (not docketed) was incorporated on December 17, 1958. It had issued an outstanding 25 shares of capital stock for which $2,500 was paid into the corporation. The shareholders of record were as follows: Year Ended September 30th Name
1959
1960
1961
1962
1963
1964 Emil J. Gould
6
4
4
2
2
2
Estelle Gould
5
4
4
2
2
2
Katherine Freedman
3
3
3
3
3
3
Dennis Gould
4
5
5
5
5
5
Cathie-Ellen Bould Beber
4
5
5
5
5
5
Lauren Gould
2
3
3
3
3
3
Perley M. Noll
1
1
1
1
2
2
Robert Freeman
1
1
1
Ethel Goldstein
2
2
2
Mina Gaines
1
25
25
25
25
25
25 Darlington Manor, Inc. was incorporated on January 26, 1959 as a land development company. Stockholders of record were as follows: Name
Title
Number of Shares
Amount Paid in Emil Gould
President
5
$5,000
Estelle Gould
Vice President & Treasurer
5
5,000
Rose G. Kaplan
Secretary
15
15,000
Housing Engineers of Florida, Inc. was incorporated as a construction company *161 on August 26, 1959. Emil and Estelle Gould owned all of its capital stock for which they paid in $25,000. Emil Gould served as president. 16 Southern Rock and Fill Co. was incorporated on September 3, 1959 for the purpose of dredging, filling and grading land. Emil and Estelle Gould owned all of its capital stock for which they paid $5,000. Its president was Emil Gould. Coral Way Land Co. (not docketed) was incorporated on September 17, 1959. Its stockholders and officers were as follows: Name
Title
Number of Shares
Amount Paid in Emil Gould
President
25
$7,500
Estelle Gould
Secretary-Treasurer
25
7,500
Perley Noll
Asst. Secretary
-
-
Sunrise Sales Co. (not docketed) was incorporated in 1959. Prior to that time it was a partnership which acted as sales agent for certain corporations selling land in the Sunrise Point, Sans Souci and Sunrise Harbour area. Stock interest may be reflected as follows: Name
Percentage of Stock Ownership Gould
50
Rosen
16-2/3
Hunter
23-1/3
Rosen
10
All corporate petitioners filed their Federal income tax returns for the years here in issue with the district director of internal revenue at Jacksonville, Florida. Their methods of accounting and taxable years to the *162 17 extent ascertainable may be reflected as follows: Petitioner
Taxable Year
Method of Accounting Emil J. and Estelle Gould
December 31
cash
Sunrise Properties, Inc.
February 28, (29)
accrual
Sans Souci Co.
February 28 (29)
accrual
Peat Corp.
December 31
accrual
Harbour Development Co.
March 31
-
Sunrise Harbour, Inc.
February 28 (29)
-
Bay Homesites, Inc.
May 31
-
Dalton Corp.
August 31
-
Harbour Properties, Inc.
August 31
-
Luxor Corp.
July 31
-
Trenton Corp.
September 30
-
Coral Glade Co.
March 31
accrual
Coral Way Land Co. (not docketed)
-
accrual
Darlington Manor, Inc.
December 31
accrual
Sunrise Sales Co. (not docketed)
-
-
Housing Co. of Florida (not docketed)
-
-
Taladen (not docketed)
September 30
cash
Housing Engineers of Florida, Inc.
April 30
cash
Southern Rock and Fill Co.
March 31
cash The following recorded conveyances of real estate are involved in these cases: Dates
Grantor
Grantee
Property
Lot or Tract
Sales Price
May 5, 1945
Athene H. Pitt
Emil J. Gould
Sans Souci
Tract A, B & C
Sunrise Point [15]
June 1, 1946
Tahiti Reality Corp.
Emil J. Gould
Sunrise Harbour Lots
1-3, 14-16, Tract A
Carrie R. Sapiro
Sunrise Point
1, 2, 6, 10-17, 19-23 Tract B
Sans Souci [14] *163 1-7, 9-15, 18-20 Tract C
1-4 Tract D
1-14, 16, 17 Tract E
1-21 Tract F
May 25, 1955
Carrie R. Sapiro
Emil J. Gould
Sunrise Harbour
Lots
1-3, 10, 11, 14-16 Tract A
Sunrise Point [16]
Partition Sunrise Point
1, 2, 6, 10 (east), Sans Souci
11-17, 19-23 Tract B
1-7, 9-15, 17-20 Tract C
1-4 Tract D
Tract 5, 6 (west), 7 (east)
Sunrise Harbour [17]
Tract 2, 3 & 4 A & C
Sans Souci
May 25, 1955
Emil J. Gould
Carrie R. Sapiro
Sunrise Harbour
Lots
1-14, 16 & 17 Tract E
Sunrise Point
Partition
Sunrise Point
1-21 Tract F
Tract 4, 6 (east), 7 (west)
Sunrise Harbour [18]
out
Lots
6-21, 1-26 Block 1
1-83 Block 2
1-6 Block 3
August 31, 1955
Carrie R. Sapiro
Burt Hunter
Sunrise Harbour
Lots
1-14, 16 & 17 Tract E
Sunrise Point
$315,360.00
Harry Louis
Sunrise Point
1-21 Tract F
Daniel Rosen
Tract 4, 6 (east), 7 (west)
Sunrise Harbour
out
Lots
6-21, 1-26 Block 1
1-83 Block 2
1-6 Block 3
Dates
Grantor
Grantee
Property
Lot or Tract
Sales Price
August 31, 1955
Emil J. Gould
Sunrise Properties, Inc.
Sunrise Point
Lots
1-3, 10, 11, 14-16 Tract A
Surrise Point
$600,000
Sunrise Harbour 1, 2, 6, 10 (east),
Sans Souci
11-14, 19-23 Tract B
1-7, 9-15, 1720 Tract C
1-4 Tract D
Tract 7 (east)
Sunrise Harbour
Tract 2, 3& 4
Sans Souci
340,000
A, B & C
November 17, 1955
Sunrise Properties, Inc.
Sans Souci Co.
Sans Souci
Tract 2, 3 & 4,
Sans Souci
A B & C
April 1, 1956
Sylvania Corp. [19] *164 Coral Glade Co.
Coral Glade Heights
240,000
April 10, 1956
Burt Hunter
Peat Corp.
Sunrise Point
Lots
1-14, 16, 17 Tract E
Sunrise Point
585,000
Harry Louis
Sunrise Harbour
1-21 Tract F
Daniel Rosen
out
Lots
6-21, 1-26 Block 1
Sunrise Harbour
1, 2, 6-79, 80 (east) Block
1-6 Block 3
April 10, 1956
Sunrise Properties, Inc.
Peat Corp.
Sunrise Harbour
Tract 7 (east)
Sunrise Harbour
128, 500
April 11, 1956
Burt Hunter
Peat Corp.
Sunrise Harbour
Lots
3, 4, 5, 80, (west) Block 2
Sunrise harbour
128,500
Harry Louis
81-83
Daniel Rosen
April 11, 1956
Peat Corp. [20]
Burt Hunter
Sunrise Harbour
Tract 7 (east)
Sunrise Harbour
125.000
Harry Louis
Daniel Rosen
April 11, 1956
Peat Corp.
Harbour Development Co.
Sunrise Point
Lots
9-14, 16, 17 Tract E
26,750
April 11, 1956
Peat Corp.
Sunrise Harbour, Inc.
Sunrise Point
Lots
1-8 Tract E
26,750 Dates
Grantor
Grantee
Property
May 10, 1957
Peat Corp.
Harbour Development Co.
Sunrise Harbour
May 10, 1957
Peat Corp.
Harbour Properties, Inc.
Sunrise Harbour
May 10, 1957
Peat Corp.
Camden Corp.
Sunrise Harbour
May 10, 1957
Peat Corp.
Trenton Corp.
Sunrise Harbour
May 10, 1957
Peat Corp.
Luxor Corp.
Sunrise Harbour
May 10, 1957
Peat Corp.
Dalton Corp.
Sunrise Harbour
May 10, 1957
Peat Corp.
Bay Homesites, Inc.
Sunrise Harbour
May 10, 1957
Peat Corp.
Sans Souci Co.
Sunrise Harbour
May 10, 1957
Peat Corp.
Sunrise Harbour, Inc.
Sunrise Harbour
August 22, 1957
Sylvania Corp. [22]
Coral Glade Co.
Coral Gardens
April 29, 1959
Housing Co. of Florida [23]
Darlington Manor, Inc.
Darlington Manor
November 10, 1959
Coral Glade Co.
Coral Way Land Co.
Coral Gardens Dates
Lot or Tract
Sale Price May 10, 1957
Lot 11 Block 1
$122,500
13, 22, 31, 40, 48, 56, 64, 72, 80, 88, 96 [21] Block 2
May 10, 1957
Lots 10, 15 Block 1
148,500
2, 9, 14, 24, 32, 38, 41, 57, 65, 73, 81, 89, 97 Block 2
May 10, 1957
Lots 9, 16 Block 1
149,500
3, 8, 15, 25, 33, 42, 50, 58, 66, 74, 82, 90, 98 Block 2
May 10, 1957
Lots 8, 13, 17 Block 1
144,250
7, 16, 26, 34 43, 51, 59, 67, 75, 83, 91, 99 Block 2
May 10, 1957
Lots 1, 7, 14, 18 Block 1
144,500
6, 17, 27, 35 44, 52, 60 68, 76, 84, 92 100 Block 2
May 10, 1957
Lots 2, 6, 12,19 Block 1
141,500
5, 19, 28, 36 45, 53, 61, 69 77, 85, 93, Block 2
May 10, 1957
Lots 4, 5, 20 Block 1
142,500
4, 10,20, 29 37, 46, 54, 62 70, 78, 86, 94, 102 Block 2
May 10, 1957
Lots 11, 18, 23, 39 Block 2
36,000
May 10, 1957
11, 12, 21, 30 47, 49, 55, 63 71, 79, 87, 95 Block 2
111,500
August 22, 1957
670,000
April 29, 1959
587,500
November 10, 1959
Lots 1-20 Block 1 1-29 Block 2 [24]
507,150
1-24 Block 3 1-20 Block 4 1-5 Block 4A 1-22 Block 5 1-26 Block 6 1-15 Block 7
*165 22 Valuation Three individuals appraised part of all of the property in issue. Robert R. Coopman and Theodore C. Slack represented the respondent and Marion C. McCune represented the petitioners. Their valuations may be reflected as follows: 23 Date of Grantor
Grantee
Property in Issue [25]
Transfer
8/31/55
Gould
Sunrise Properties,
Block A, B, C & D Sunrise Point Inc. Sans Souci
Block 7 Sunrise Harbour
1/17/55
Sunrise, Inc.
Sans Souci Co.
San Couci
4/1/56
Sylvania
Coral Glade Co.
Coral Glade Heights
4/10/56
Hunter
Peat Corp.
Block E & F Sunrise Point
Louis
Block 1, 2&3 Sunrise Harbour
Rosen
(less 7 lots in Block 2)
4/11/56
Hunter
Peat Corp.
7 lots Block 2
Louis
Rosen
8/22/57
Sylvania Corp. & Gould
Coral Glade Co.
Coral Gardens
4/29/59
Gould
Darlington Manor, Stock of Housing Co. of Florida
Inc. (containing Darlington Manor subdivision)
1/10/59
Coral Glade Co.
Coral Way Land Co.
161 lots in Coral Gardens
*166 Date of McCune
Coopman
Slack
Value Claimed by Petition Transfer
8/31/55
$600,000
$294,000
$344,350
$600,000
1/17/55
not appraised [26] 166,400 156,000 340,000
4/1/56
not appraised 100,000 110,000 240,000
4/10/56
not appraised 283,500 585,000 341,300
4/11/56
not appraised 11,000 128,500
Rosen
302,500 330,000 670,000
8/22/57
632,500 [27]
302,500 330,000 670,000
4/29/59
not appraised 334,250 358,125 587,500 [28]
1/10/59
not appraised 507,150 595,700 507,150
Loans involved in the instant cases may be reflected as follows: Date of Lender
Borrower
Amount of
Interest Loan
Loan
Rate% 8-31-55
Emil Gould
Sunrise Properties, Inc.
550,000
5Purchase money mortgage.
8-25-55
Daniel Rosen
Sunrise Properties, Inc. note payable
38,000
10
9-23-55
Emil Gould
Sunrise Properties, Inc.
38,000
10
11-17-55
Sunrise Properties, Inc.
Sans Souci Co.
340,000
5
11-17-55
Emil Gould
Sans Souci Co.
10,000
10
11-17-55
Daniel Rosen
Sans Souci Co.
10,000
10
8-31-55
Carrie Sapiro
Hunter, Louis & Rosen
240,000
5
4-10-56
Daniel Rosen, Burt Hunter and Harry J. Louis
Peat Corp.
330,000
5
4-10-56
Sunrise Properties, Inc.
Peat Corp.
13,500
5
4-10-56
Hunter, Louis & Rosen
Peat Corp.
125,000
5
6-1-56
Dr. Nathan Schacher
Peat Corp.
12,500
10
9-56-
12-64
Gould
Peat Corp.
783,500
10
4-11-56
5-10-57
Peat Corp.
Harbour Properties, Inc.
147,500
5
Luxor Corp.
143,500
5
Trenton Corp.
143,000
5
Sunrise Harbour, Inc.
136,000
5
Camden Corp.
148,500
5
Dalton Corp.
140,500
5
Bay Homesites, Inc.
141,500
5
Harbour Development Corp.
147,000
Total
1,147,500
3-23-56
Gould
Coral Glade Co.
1,000
?Open account
3-23-56
Hunter
Coral Glade Co.
1,000
4-1-56
Gould
Coral Glade Co.
235,000
5
8-22-56
Gould
Coral Glade Co.
590,000
5
8-22-57
Gould
Coral Glade Co.
5,000
5
5-18-61
Hunter
Coral Glade Co.
125,000
10
9-17-61
Gould
Coral Way Land Co.
37,500
4
11-10-59
Coral Glade Co.
Coral Way Land Co.
457,150
6
4-14-59
Rose Kaplan
Darlington Manor, Inc.
15,000
5
4-29-59
Gould
Darlington Manor, Inc.
572,500
6
Prior to 4-59
Carrie Sapiro
Gould
125,000
10
4-29-59
Gould
Darlington Manor, Inc.
572,500
6
224,500
4
4 to 6-60
Gould
Darlington Manor, Inc.
9,000
-
6-15-59
Sapiro
Darlington Manor, Inc.
200,000
10Note
1961
Hunter
Darlington Manor, Inc.
147,000
10
7-1-59
Gould
Phillip Shore
468,500
5
2-14-63
Gould
Ralph Edelstein
200,000
10
3-15-57
Carrie Sapiro
Emil Gould
150,000
-
2-29-56 to 2-24-59 *
Gould
Housing Co. of Florida
379,500
6
*167 Date of Loan
Security
8-31-55
Purchase money mortgage.
8-25-55
Secured
9-23-55
Secured note payable
11-17-55
Agreement for Deed
11-17-55
Unsecured note payable
11-17-55
Unsecured note payable
8-31-55
Purchase money mortgage
4-10-56
Purchase money mortgage
4-10-56
Purchase money mortgage
4-10-56
Note payable
6-1-56
Note payable
9-56-
12-64
Notes payable
4-11-56
Agreements for Deed
5-10-57
Agreement for Deed
3-23-56
Open account
3-23-56
Open account
4-1-56
Purchase money mortgage
8-22-56
Purchase money mortgage
8-22-57
Note payable
5-18-61
Note payable
9-17-61
Note payable
11-10-59
Purchase money mortgage
4-14-59
Note payable
4-29-59
Note payable to Gould for his stock in
Housing Co. of Florida with mortgage Prior to 4-59 Mortgage note secured by land of Housing Co. of Florida 4-29-59
Second mortgage
Second mortgage
4 to 6-60
Open account
6-15-59
Note
1961
-not stated-
7-1-59
Purchase money mortgage
2-14-63
Purchase money mortgage
3-15-57
Mortagage on Clin Clara property
2-29-56 to 2-24-58 *
Unsecured notes payable
*168 Gould's History in Real Estate (exclusive of the property in issue)
From 1936 to the period in question Gould had participated in almost every aspect of the real estate business either in Florida or, during World War II in Portsmouth, Virginia. This included buying and selling land, building and selling houses and apartment houses. Gould very often carried out the above activities under the trade name Housing Engineers of Florida, Inc., which at various times was organized as a sole proprietorship, partnership or a corporation. He also owned and controlled Ocean View Co. and Bay View Co., two home construction corporations. Gould was associated with several building and real estate partnerships, including Coral Homes, Tru Gems, Ltd. (in North Carolina), and Housing Associates of Florida. In the early 1950's Gould was stricken with ulcerative colitis, a chronic disease of the intestinal tract, which became progressively worse. In 1955, Gould's condition required his hospitalization. As a result of the colitis he was advised by his doctor to restrict his work schedule to 4 half-days per week. In the building and real estate field Gould was a member, officer and director of the *169 Builders Assn. of 26 South Florida and the Florida Home Builders Assn. He was a director and is currently an honorary life member of the national board of directors of the National Assn. of Home Builders. He was also Chairman of the Tax Studies Committee of the National Assn. of Home Builders. Gould spoke before various real estate groups on different aspect of land and real estate as well as the effect of certain income tax provisions on the home building industry. Gould was knowledgeable in Federal tax matters and was well known in the real estate field. Acquisitions and Dispositions in issue: The Sunrise properties [29]
On May 7, 1945 Gould purchased property known as Sans Souci, in Coral Gables approximately 7 miles south of downtown Miami. Approximately 1 year later, on June 1, 1946 he joined with Carrie R. Sapiro (hereinafter referred to as Sapiro), the wife of a business associate, Samuel T. Sapiro, [30] *170 to purchase adjacent properties known as Sunrise Point and 27 Sunrise Harbour. Gould and Sapiro took title to the three parcels as tenants in common. [31]
At the time of the acquisition of the Sunrise properties Gould was actively engaged in home building at Sylvania Heights, Bay View and Ocean View Heights, which were closer to downtown Miami or subject to more extensive development. Therefore, Gould did not consider Sunrise ready for immediate development. A balance sheet entitled "Emil & Estelle Gould T/A Housing Engineers of Florida Balance Sheets" for the fiscal year ended August 31, 1949, listed the Sunrise properties under the heading "Investments." Prior to August 31, 1955, neither Gould nor Sapiro attempted to develop or improve this property. It was not listed with brokers or otherwise offered for sale. Description of Property In General The property, specifically Sunrise Point, *171 Sunrise Harbour and Sans Souci, is located in Coral Gables, Dade County, Florida, south of an area of the city of Miami known as Coconut Grove. It is bordered on the north by North Prospect Drive, on the west by Ingraham Highway, on the east by Biscayne Bay and on the south by Coral Gables Waterway. Running north and south through the property is Douglas Road. Prior to and during 1955 the property was largely undeveloped due in large part to the topography of the land which was near, and in many instances, below sea level. (The land west of Douglas Road was higher in elevation than that to the east.) Portions of the real estate were mangrove swamp [32] and a major section of the land was subject to flooding. There were several homes in the area west of Douglas Road, and during the time in issue considerable construction was taking place in Dade County. However, the major portion of this construction was located west of the Sunrise properties since there was a sufficient supply of undeveloped land which could be subdivided without extensive fill requirements. Sunrise Points As of May 25, 1955, Sunrise Point was a *172 subdivision consisting of six tracts or blocks (A through F) [33] which were divided into 112 lots. Gould and Sapiro owned 83 of 29 these lots. They were located south of Sans Souci and north of Sunrise Harbour. The property was zoned entirely for single family dwellings. The topography of the land indicated an elevation of from 15 to 20 feet in the extreme western area adjacent to Ingraham Highway to a low of approximately 4 feet on the eastern and near Biscayne Bay. (Of the land Gould and Sapiro 3wned in this subdivision, only one lot in Block F touched the Bay.) Utilities were available in this area, streets were paved making the property easily accessible and several houses had been constructed on the property west of Douglas Road. The land was however virtually unimproved but was subject to improvement. As of May 25, 1955, Sans Souci was the name applied to a former subdivision consisting of approximately 20.8 acres for which a plat had been recorded in the 1920's but which had subsequently been revoked. As a result, lot lines were eradicated and the *173 property could be sold only as tracts (1, 2, 3, and A, B, and C). It was located immediately north of Sunrise Point and was subsequently platted to denote 5 sections which were divided into 69 lots. The larger portion of the property was situated east of Douglas Road. Elevation of this section ran from sea level at Biscayne Bay [34] to 30 5 feet at Douglas Road. The area west of Douglas Road ran from 5 feet to a maximum of 15 feet. The property was unimproved, covered with pine trees. Like Sunrise Point, it was easily accessible. Utilities were available and the property was zoned exclusively for single family dwellings. Sunrise Harbour Sunrise Harbour, the largest of the three subdivisions containing approximately 70 to 75 acres of land, was located to the immediate south of Sunrise Point. As of May 25, 1955, it was divided into seven tracts or blocks (noted as 107) with Blocks 1, 2 and 3 containing a total of 115 lots. Block 4 through 7 were not further subdivided and contained a total 18.07 acres of land. The property was subsequently *174 replatted at which time the blocks were reduced to a total of five, Block F of Sunrise Point was included, and the number of lots was increased to 122. Topographically a small section of the land, located mainly in Block 1, was above sea level running from 2 feet to a higher elevation at the extreme western end adjacent to Ingraham Highway. However, substantially all of the property was at or below sea level with more than 7 acres being a part of Biscayne Bay and the remaining 60 or so acres being mangrove swamp. 31 While the major portion of the property was accessible by road, a sizable area was approachable only by boat. Development was impossible without extensive dredging, filling and the construction of a sea wall. Utilities were available. As of May 25, 1955 the property was zoned as follows: [35]
(1) Lots 1-9,
Block 1
Lots 6-79,
Block 2
single family residence
Lots 1-6,
Block 3
(2) Lots 10-26,
Block 1
Lots 1-5,
Block 2
multifamily dwelling
Lots 80-83,
Block 2
Block 7
Block 4,5 and 6
business
By deeds dated May 25, 1955, and recorded August 31, 1955, Gould and Sapiro partitioned their interest in the *175 Sunrise properties. Pursuant to a deed from Sapiro, as grantor, to Gould, as grantee, Gould obtained the Sans Souci property, 46 lots in Blocks A-D of Sunrise Point (all situated west of Douglas Road) and Block 5, the western portion of 6 and the eastern portion of block 7 in Sunrise Harbour which consisted of approximately 10 acres zoned for commercial and multifamily use. (See page 18 to determine the precise lot and tract allocation.) Pursuant to a deed from Gould as grantor to Sapiro, as grantee, Sapiro received 37 lots in Blocks E and F of Sunrise Point (all located east of Douglas Road), the 115 lots in Blocks 1, 2 and 3 and Tract 4, the eastern part of Tract 6 and the western portion of tract 7 all in Sunrise Harbour. Twenty-six of the 115 lots in the first three blocks were zoned for multiple dwelling, Blocks 4 and 6 were zoned for business and Block 7 was zoned for multi-family housing. The three latter tracts contained approximately 8 acres in area. The above allocation was accomplished by a division of the property between the parties along the lines determined by them to be both equitable and equal in value. Each individual felt competent to determine a proper allocation *176 and each believed he had received one-half the value of the entire tract. No attempt was made to verify this allocation through the use of a independent appraisal or offers to buy from unrelated independent third parties. Sale by Sapiro to Hunter, Louis and Rosen Burt Hunter (hereinafter referred to as Hunter) is, and during the times in issue, was a resident of Miami, Florida. During the early and mid-1950's Hunter and Harry J. Louis (hereinafter referred to as Louis) owned and managed Concrete Structures, Inc., a corporation which 33 sold precast concrete joists. Both Hunter and Louis had little, if any, knowledge of the real estate and home building field. Gould, a social acquaintance of Hunter's, spoke of possible real estate investments. It was in such a situation that Gould informed Hunter of the impending partition of the Sunrise properties and of Sapiro's desire to sell his interest in such property. Hunter, during the summer of 1955, approached Sapiro with an offer to purchase his property. The price of approximately $315,000 [36] was set by Sapiro and accepted by Hunter without negotiation. The parties entered into a contract which required $75,000 cash at closing *177 and a note of $240,000 secured by a purchase money mortgage. Hunter, unable to raise all the necessary cash, contacted Louis who with a New York friend, Daniel Rosen (hereinafter referred to as Rosen), contributed the additional required cash. Rosen was an attorney who knew little or nothing about the real estate business. Hunter, Louis and Rosen consummated the purchase of Sapiro's property on August 31, 1955. Neither Sapiro, 34 nor Hunter, Louis or Rosen were related to Gould or to each other. Sale by Gould to Sunrise Properties, Inc. During this same period of time Hunter, representing Louis, Rosen and himself, and Gould discussed and agreed upon the formation of a corporation and the conveyance of Gould's Sunrise property to the corporation with the intention of undertaking development. In this regard Sunrise Properties, Inc. (hereinafter sometimes referred to as Sunrise, Inc.) was incorporated on August 11, 1955. The shareholders and officers were as follows: Name
Title
Number of Shares
Amount Paid in Emil Gould
President
75
$6,000
Hunter
Vice-President & Secy.
70
5,600
Rosen
Asst. Secretary
50
4,000
Louis
Treasurer
30
2,400
On *178 August 10, 1955, a deposit receipt agreement was prepared pursuant to which Gould agreed to convey [37] to Sunrise, Inc. his 46 lots in Sunrise Point, all of Sans Souci and the eastern portion of Tract 7 in Sunrise Harbour (Gould retained his interest in Tract 5 and the westerly portion of 35 Tract 6) [38] for a total consideration of $650,000 ($100,000 in cash and a note covering the remaining $550,000 with interest payable at 5 percent). Subsequently on August 25, the parties amended this agreement [39] *179 to reflect a reduced purchase price of $600,000 with a cash down payment of $50,000. This alteration was in response to an appraisal prepared by Adrain and Marion Clyde McCune (hereinafter referred to as McCune) who valued the property in issue at $600,000. The sale was consummated on August 31, 1955 with the execution of a warranty deed from Gould to Sunrise, Inc. for a total consideration of $600,000; $50,000 in cash and an installment note representing the remaining $550,000 with interest payable semiannually at 5 percent, secured by a purchase money mortgage. [40] The principal and interest 36 due and paid on the note may be reflected as follows: [41] Payable
Amount Due
Fiscal Year Paid
Principal Paid
Interest Paid
Balance Due 8/31/56
$50,000
2/29/56
$1,575
$14,548.16
$548,425
2/28/57
"
2/28/57
217,790
22,957.94
330,635
8/31/57
"
2/28/58
"
2/ 28/58
35,415
10,800.16
295,220
8/31/58
"
2/28/59
"
2/28/59
35,505
9,215.81
259,715
8/31/59
"
2/28/60
"
2/29/60
93,735
16,022.81
165,980
8/31/60
150,000
$ 550,000
2/28/61
146,595
19,385
2/28/62
4,500
14,885
2/28/63
3,500
(unpaid)
[42] *180 11,385 Interst on the note was waived by Gould pursuant to a letter dated August 31, 1959. On August 24, 1960, Gould agreed to extend the maturity date of the obligation for a 3 year period. As of August 31, 1963 the unpaid balance on the note was $4,885. 37 Gould treated the transfer of the realty to Sunrise, Inc. as a installment sale on his 1955 Federal income tax return as follows: Contract price 8/30/55
$600,000.00
Cost 1945 and 1946
$61,914.53
Expenses
660.00
-62,574.53
Long Term Capital Gain
$537,425.47
1955 collections
$50,000.00
Percent of profit
89.5709%
1955 Long Term Capital Gain
$44,785.45
Activities of Sunrise Properties, Inc. The bylaws of Sunrise, Inc. required the affirmative vote of persons owning 95 percent of the outstanding shares to pass upon matters appropriate for stockholders' meetings. Each shareholder was entitled to representation on the board of directors and unanimity of directors was required for the board to pass a resolution. Being the only knowledgeable person in the real estate field, Gould was employed by Sunrise, Inc. as general manager *181 for a 5 year period. (He supervised the activities of all the corporations hereinafter mentioned.) Lot prices were theoretically determined by the shareholders with Gould having the authority to vary those prices by up to 10 percent. On August 25, 1955, Rosen advanced $38,000 to Sunrise, Inc. in exchange for a note, guaranteed by the other shareholders and secured by pledge of their stock in the 38 corporation. The loan payment was due 5 years from the date of issue and carried an interest rate of 10 percent per annum. The proceeds of the loan were applied by Sunrise, Inc. to the cash down payment in the acquisition of Gould's Sunrise properties. Rosen advanced the funds to Sunrise as a loan, rather than as additional capital, because Gould and Hunter did not offer Rosen additional equity but rather requested to borrow money. Rosen considered the loan to be adequately secured and the interest rate to be a better yield than available elsewhere. Sunrise, Inc., on September 23, 1955, needing additional funds to improve the land for sale, obtained $19,000 each from Emil and Estelle Gould. The transaction was rendered on the corporate books as a loan with terms identical to those *182 of the Rosen transaction. Sunrise, Inc. refused a loan offer of $50,000 from Rosen as Gould's repayment terms were more beneficial to the corporation. The Gould loans were repaid in full by the close of the corporate year ended February 28, 1961, in accordance with the terms of the agreement. On the same day, namely September 23, Estelle Gould purchased 75 shares of Sunrise, Inc. stock for a total consideration of $6,000, bringing the total number of 39 shares outstanding to 300, the division of which may be reflected as follows: Shareholder
Number of Shares
Paid in Capital Emil Gould
75
$6,000
Estelle Gould
75
6,000
Hunter
70
5,600
Rosen
50
4,000
Louis
30
2,400
Estelle Gould's role in Sunrise, Inc., as well as other corporations in which she owned stock, was passible. As of September 23, 1955, the capital and debt structure of Sunrise, Inc was as follows: Capital Stock
$24,000
Purchase money mortgage due Gould
$550,000
Notes payable - Goulds
38,000
Note payable - Rosen
38,000
$626,000
Within a relatively short period of time after its incorporation Sunrise, Inc. initiated a sales program in an attempt to sell its lots in Sunrise Point. With the incorporation of Sans Souci Co. (infra at 43) at about *183 this same period of time a partnership, Sunrise Sales Co., was formed and designated exclusive sales agent for all of the Sunrise properties held by the various corporations. The partnership interest of Sunrise Sales may be reflected as follows: 40 Partner
Percentage of Interest Gould
50
Rosen
16-2/3
Hunter
23-1/3
Louis
10
This organization was incorporated in 1959 with the same percentages of stock ownership. The first lots in Sunrise Point were not sold until 1956. By 1960 however the corporation through Sunrise Sales had sold 32 of the 46 lots available. [43] *184 Four of the remaining 14 were dedicated to park land while the other 10 were adversely affected by their close proximity to garden apartments. As a result of these sales Sunrise, Inc. was eventually (though not timely) able to repay substantially all of the outstanding obligation owed Gould(supra, at 36). Hunter, Louis and Rosen received neither salary nor dividend distributions from Sunrise. Sale by Sunrise Properties, Inc. to Sans Souci Company Sunrise Inc. owned, in addition to the Sunrise Point lots, the Sans Souci tracts. Since the former subdivision 41 plat had been revoked it was incumbent upon Sunrise, Inc. to prepare and file a new plat prior to any lot sales. In addition, this land, like Sunrise Point, needed improvements with regard to drainage, roads, etc. (Note, also, Blocks A&D of Sunrise Point were west of Douglas Road with an elevation of 5 to 20 feet while Tracts B and C of Sans Souci were east of Douglas Road with an elevation of sea level to 5 feet.) Gould, Hunter and Rosen with Louis abstaining decided to convey this property a new corporation wherein the land would be improved, platted and then sold. In this regard Sans Souci Co. was incorporated on November 17, 1955. The shareholders and officers of the corporation were as follows: Name
Office
Number of Shares
Paid in Capital Emil Gould
President
7.5
$225
Estelle Gould
Treasurer
7.5
225
Hunter
Secretary
10
300
Rosen
-
5
150
Immediately *185 following incorporation Sunrise, Inc. executed an "Agreement for Deed" with respect to the Sans Souci property which conveyed such property to Sans Souci Co. The stated purchase price was $340,000, $7,275 down and the balance of $332,725 in eight semiannual installments of $25,000 and a final installment of $132,725 due May 17, 1960, together with 5 percent interest on the unpaid balance. The above noted agreement also contained a release clause pursuant to which Sunrise, Inc. agreed to deliver deeds to lots designated by San Souci Co. upon payment of specified prices. The agreement was duly recorded December 28, 1955. Payments by Sans Souci Co. to Sunrise, Inc. pursuant to the "Agreement for Deed" were as follows: Fiscal Year Ended February 28 (29)
Principal
Interest 1956
$ 8,850 [44]
$ 20.64
1957
75,915
16,379.17
1958
66,510
11,783.99
1959
37,005
8,818.22
1960
68,100
7,416.33
1961
81,275
2,356.19
1962
-0-
443.22
1963
500
-0-
1964
1,845
104.96
$340,000
Sunrise, Inc. reported the transfer as an installment sale treating the gain recognized as ordinary income from the sale of inventory. The pertinent figures include: Installment sales price
$340,000.00
Cost
320,191.59
Gross Profit (5,826%)
19,808.41
Activities *186 of Sans Souci Company On the day of incorporation, November 17, 1955, Gould and Rosen each transferred $10,000 to Sans Souci Co. in 43 exchange for notes due 5 years from the date of issue, together with interest of 10 percent per annum payable quarterly. The proceeds of the loans were applied to the down payment due Sunrise, Inc. and necessary improvements on the property. As of November 17, Sans Souci's capital and debt structure was as follows: Capital stock
$900
Contract payable to Sunrise, Inc.
$332,725
Notes payable:
Gould
10,000
Rosen
+10,000
$352,725
The $20,000 of notes payable was unsecured while the contract payable was secured by Sunrise, Inc's retention of legal Co. appointed Sunrise Sales Co. as exclusive sales months later on January 5, 1956, Gould was designated general manager of Sans Souci Co. The salary for such position was paid to Housing Engineers of Florida, a corporation wholly owned by Gould. On this same day a new plat, creating 69 lots in 5 blocks (1-5), was prepared and recorded February 16 of the same year. The necessary improvements were completed and lot sales began. All but one of the 69 lots were sold by 1960. Sans Souci Co. reported these sales on *187 the installment method which reflected a gross profit of from 33 to 40 percent. As it sold lots Sans Souci made payments to Sunrise, Inc. in satisfaction of its obligation which was fully paid by the end of the 1965 fiscal year. See supra, at 42. [45]
Neither Hunter nor Rosen received salary or dividend distributions from Sans Souci Co. Peat Corporation Peat Corp. was organized on April 4, 1956 as a land development company. Stockholders of record were as follows: Name
Title
Number of Shares
Amount Paid in Emil Gould
Assistant Secretary & Treasurer
9
$675
Estelle Gould
-
9
675
Warren Wepman
President
9
675
Dr. Nathan Schacher
-
10
750
Harry J. Louis
Vice President
6
450
Rose Kaplan
-
9
675
Paul Burnham, Jr.
Secretary
8
600 Warren Wepman is the son of Gould's attorney, Herman Wepman. Dr. Nathan Schacher is Rosen's brother-in-law. Rose Kaplan is Hunter's mother. On April 10, 1956, Hunter, Louis and Rosen conveyed to Peat Corp. the 37 lots in Block E and F of Sunrise Point (east of Douglas Road), Lots *188 1-26 of Block 1, Lots 1, 2, 6-79, eastern portion of Lot 80 in Block 2 and Lots 1-6 of Block 3, all in Sunrise Harbour. The transaction was reported as a sale with a total purchase price of $855,000 consisting of $15,000 in cash, assumption of a mortgage of $240,000 payable to Sapiro, the initial seller, and the issuance of a second mortgage note to the sellers in the amount of $330,000. On the same day Peat Corp. acquired from Sunrise, Inc. (which Sunrise, Inc. had initially received from Gould) the eastern portion of Tract 7 in Sunrise Harbour (which had been zoned for multifamily use) reported as a sale for a total consideration of $128,500, $3,500 in cash, assumption of an $111,500 mortgage payable to Gould and the issuance of a purchase money obligation in the face amount of $13,500. [46] The following day, April 11, 1956, Peat Corp. conveyed the eastern portion of Tract 7 in Sunrise Harbour to Hunter, Louis and Rosen and simultaneously received from them, Lots 46 3, 4, 5, 80 (west), 81, 82 and 83, Block 2 of Sunrise Harbour. [47] *190 The purchase price of the first *189 noted tract was $125,000, which consisted of the assumption by Hunter, Louis and Rosen of two mortgages, the first, in the face amount of $111,500 payable to Gould and the second totaling $13,500 with Sunrise, Inc. as mortgagee. The latter portion of real estate was conveyed to Peat for a total consideration of $128,500 consisting of $3,500 in cash and a note payable to Hunter, Louis and Rosen in the amount of $125,000. [48] Hunter, Louis and Rosen had in the two transactions of April 10 and 11 conveyed to Peat Corp. all the property initially acquired from Sapiro except Tract 4, 6 (east) and 7 (west). Upon their acquisition of 7 (east) they owned 47 Tracts 4, 6 (east) and all of 7 with Gould owning 5 and 6 (west). (The various corporations in the final outcome owned none of the unplatted tracts in Sunrise Harbour.) The purchase money mortgage and note given by Peat Corp. to Hunter, Louis and Rosen on April 10 in the amount of $330,000 carried interest of 5 percent per annum. Twenty-five thousand dollars ($25,000) was to be paid on April 10 of each year from 1957-1960 with a final payment of $230,000 on April 10, 1961. A total of $32,200 was paid as of December 31, 1965 with an outstanding balance of $297,800. Interest was paid until *191 October 1958 at which time the three sellers waived all interest. Peat Corp. did however fully pay the $240,000 obligation owed Sapiro by the end of 1960. As of April 11, 1956, the capital and debt structure of Peat Corp. was as follows: Capital Stock
$4,500
Notes Payable: Hunter, Louis, Rosen
$330,000
" " "
125,000
$455,000
Mortgage payable: Sapiro
+240,000
$695,000 All of the outstanding obligations were secured by mortgages on Peat Corp.'s real estate assets. 48 Activities of Peat Corporation Peat Corp. held property in both the Sunrise Point and Sunrise Harbour subdivisions. It disposed of the Sunrise Point lots immediately after incorporation in the following manner: Harbour Development Co. and Sunrise Harbour, Inc. were both incorporated on March 26, 1956 (9 days before the formation of Peat Corp.) Stockholders of record of the two corporations were as follows: Harbour Development Co. Name
Voting
Percent
Nonvoting
Paid-in Capital Emil J. Gould
7.5
18.75
90
$292.50
Estelle Gould
7.5
18.75
90
292.50
Burt Hunter
7
17.50
84
273.00
Harry J. Louis
3
7.50
36
117.00
Daniel Rosen
5
12.50
60
195.00
Dorothy Meyer
10
25.00
-
750.00
40 [49] *192 100.00
360
$1,920.00 The identity of Dorothy Meyer cannot be ascertained from the record. Sunrise Harbour, Inc. Name
Voting
Percent
Nonvoting
Paid-in Capital Emil J. Gould
7.5
18.75
90
$ 292.50
Estelle Gould
7.5
18.75
90
292.50
Burt Hunter
7
17.50
84
273.00
Harry J. Louis
3
7.50
36
117.00
Daniel Rosen
5
12.50
60
195.00
Mildred Wallach
10
25.00
-
750.00
40
100.00
360
$1,920.00
Mildred Wallach is the sister of Hunter's accountant. On April 11, 1956, 1 day after acquisition, Peat Corp. executed two "Agreements for Deed" pursuant to which it contracted to deliver eight lots to Harbour Development Co. and eight lots to Sunrise Harbour, Inc. The 16 lots were located in Block E of Sunrise Point and necessitated less improvement than was required in the Sunrise Harbour subdivision. The records reflected a selling price in both cases of $26,750 due in installments over a 3 year period at 5 percent interest. Shortly thereafter (in April of 1956) Peat Corp. sold one lot in Sunrise Harbour to Ignacio Ross *193 for $7,650. The Sunrise Harbour property required substantial improvement before it could be sold as finished lots. In this regard Gould was employed by Peat Corp. as general manager to supervise the improvement and sale of the Sunrise Harbour subdivision. In this capacity he first directed the creation of a new plat for this area which created 122 lots in two blocks (20 in Block 1 and 102 Block 2) in 50 place of the 136 lots formerly contained in Blocks 1, 2 and 3 of Sunrise Harbour and Block F of Sunrise Point. This new plat was filed May 10, 1957. Sunrise Harbour, as noted earlier at 30, was for the most part at or below sea level. The improvements required, so as to be able to sell the lots for home building, included among other things the dredging of canals, filling of the land to raise the grade level and the construction of sea walls. Peat Corp. estimated the total cost of these improvements at $368,927.33 and added such amount to the cost basis of the property-showing a total cost of $1,082,427.33 ($585,000, plus $128,000, plus $368,927.33). [50] *194 In order to finance and construct the required improvements Peat Corp., on June 1, 1956, borrowed $12,500 at 10 percent interest from Dr. Nathan Schacher, a shareholder of Peat Corp. All interest was timely paid and the principal was repaid in 1962. It entered into an agreement with Seward Dredging Co. (hereinafter referred to as Seward Co.), a subcontractor, whereby Seward Co. agreed to finance a portion of the work being done. The corporation borrowed $150,000 from stock and LeVay. In addition, beginning in September of 51 1956, Gould began transferring funds to Peat Corp. These conveyances were treated as loans with notes being issued, maturing in 3 to 5 years with an interest rate of 10 percent. The notes payable from Peat to Gould and repayments thereon may be summarized as follows: Calendar Year
Amounts
Balance End Transferred
Amounts Repaid of Year
Interest Paid 1956
$ 30,000
$ None
$ 30,000
$ None
1957
125,000
75,000
80,000
3,948.12
1958
71,500
37,500
114,000
5,147.92
1959
63,500
62,500
115,000
18,5 02.14
1960
97,000
78,000
134,000
4,741.80
1961
177,500
98,000
213,500
None
1962
105,000
None
318,500
33,083.20
1963
90,000
44,000
364,500
None
1964
24,000
87,500
301,000
None
1965
None
124,500
176,500
None
$783,500
$607,000
*195 Peat Corp., an accrual basis taxpayer, accrued and deducted interest on the notes issued to Gould in the following amounts: 1/1/63 Balance * $12,274.36
Net addition
37,358.69
12/31/63 Balance
$49,633.05
Net addition
33,894.20
12/31/64 Balance
$83,527.25
Net addition
11,095.99
12/31/65 Subtotal $94,623.24 12/31/65
$94,623.24 *Balance 1/1/63 per above
12,274.36
Erroneous debit balance on books
228.33
Accrued Interest Payable per books 1/1/63
$12,046.03
By December 31, 1967, $213,523.63 had been expended on improvements. Such improvements, though initially intended to be completed by May of 1958, were not completed until December of 1962. Peat Corp. did not itself sell at retail the Sunrise Harbour lots. Rather on May 10, 1957, the day the subdivision was replatted and prior to the completion of the major portion of the required land improvements, Peat Corp. conveyed these lots to nine corporations which will be set out immediately below. Harbour Development, Inc. and Sunrise Harbour, Inc. have been described above (supra at 48). Sans Souci Co. has also been discussed earlier at 41. Bay Homesites, Inc. was incorporated on April 6, 1956. Stockholders of record were as follows: Name
Voting
Percentage
Nonvoting
Paid-in Capital Emil J. Gould
7.5
18.75
90
$ 292.50
Estelle Gould
7.5
18.75
90
292.50
Burt Hunter
7
17.50
84
273.00
Harry J. Louis
3
7.50
36
117.00
Daniel Rosen
5
12.50
60
195.00
Perley M. Noll
10
25.00
-
750.00
40
100.00
860
$1,920.00
*196 Perley M. Noll is Gould's office manager and bookkeeper. Camden Corp., now dissolved, was incorporated on April 6, 1956. Stockholders of record were as follows: Name
Voting
Percentage
Nonvoting
Paid-in Capital Emil J. Gould
7.5
18.75
90
$292.50
Estelle Gould
7.5
18.75
90
$ 292.50
Burt Hunter
7
17.50
84
273.00
Harry J. Louis
3
7.50
36
117.00
Daniel Rosen
5
12.50
60
195.00
Ethel Goldstein
10
25.00
-
750.00
40
100.00
360
$1,920.00
Ethel Goldstein is Gould's mother. Dalton Corp. was incorporated on April 6, 1956. Stockholders of record were as follows: Name
Voting
Percentage
Nonvoting
Paid-in Capital Emil J. Gould
7.5
18.75
90
$ 292.50
Estelle Gould
7.5
18.75
90
292.50
Burt Hunter
7
17.50
84
273.00
Harry J. Louis
3
7.50
36
117.00
Daniel Rosen
5
12.50
60
195.00
Herman Wepman
10
25.00
-
750.00
40
100.00
360
$1,920.00 Herman Wepman was Gould's attorney. Harbour Properties, Inc. was incorporated on April 6, 1956. Stockholders of record were as follows: Name
Voting
Percentage
Nonvoting
Paid-in Capital Emil J. Gould
7.5
18.75
90
$292.50
Estelle Gould
7.5
18.75
90
292.50
Burt Hunter
7
17.50
84
273.00
Harry J. Louis
3
7.50
36
117.00
Daniel Rosen
5
12.50
60
195.00
Thomas Reilly
10
25.00
-
750.00
40
100.00
360
$1,920.00
Thomas Reilly was a business associate of Hunter. Luxor Corp. was incorporated *197 on April 6, 1956. Stockholders of record were as follows: Name
Voting
Percentage
Nonvoting
Paid-in Capital Emil J. Gould
7.5
18.75
90
$292.50
Estelle Gould
7.5
18.75
90
292.50
Burt Hunter
7
17.50
84
273.00
Harry J. Louis
3
7.50
36
117.00
Daniel Rosen
5
12.50
60
195.00
Bertha Weinberg
10
25.00
-
75 .00
40
100.00
360
$1,920.00
The identity of Bertha Weinberg cannot be ascertained from the record. Trenton Corp. was incorporated on April 6, 1956. Shareholders of record were are follows: Name
Voting
Percentage
Nonvoting
Paid-in Capital Emil J. Gould
7.5
18.75
90
$292.50
Estelle Gould
7.5
18.75
90
292.50
Burt Hunter
7
17.50
84
273.00
Harry J. Louis
3
7.50
36
117.00
Daniel Rosen
5
12.50
60
195.00
Henrietta Tauber
5
12.50
-
375.00
Harry Katzen
5
12.50
-
375.00
40 100.00
360
$1,920.00 The identity of Henrietta Tauber and Harry Katzen cannot be ascertained from the record. Gould was aware of the Federal income tax benefit to be derived from the formation of multiple corporations. The bylaws of Bay Homesites, Inc., Camden Corp., Dalton Corp., Harbour Properties, Inc., Luxor Corp. and Trenton Corp. required the affirmative vote of persons owning 95 percent of the outstanding voting stock to pass resolutions as to matters appropriate for stockholders meetings. Each *198 stockholder was entitled to be represented on the board of directors and the presence of all directors was required for a quorum. These restrictions did not apply to Harbour Development Co. or Sunrise Harbour, Inc. which had been incorporated several days earlier. On May 10, 1957, as noted above, Peat Corp. transferred 121 of the 122 lots in Sunrise Harbour (the one remaining lot had been sold earlier to Ignacio Ross) to the nine corporations. The transactions were treated as sales and may be reflected as follows: Purchaser
Date
Number State
Down of
Purchase Payment
Balance
Term
Interest
Lots
Price
Rate
Bay Homesites
5/10/57
16
$142,500
$1,000
$141,500
4
5%
Dalton Corp.
5/10/57
16
141,500
1,000
140,500
4
5
Luxor Corp.
5/10/57
16
144,500
1,000
143,500
4
5
Camden Corp.
5/10/57
15
149,500
1,000
148,500
4
5
Trenton Corp.
5/10/57
15
144,250
1,250
143,000
4
5
Harbour Development Co.
5/10/57
12
122,500
1,500
121,000
4
5
Harbour Properties, Inc.
5/10/57
15
148,500
1,000
147,500
4
5
Sunrise Harbour, Inc.
5/10/57
12
111,500
1,500
110,000
4
5
Sans Souci Co.
5/10/57
4
36,000
1,000
35,000
4
5
Payment of principal and interest with respect to the above noted transactions was received by Peat Corp. as follows: Calendar Year
Principal
Interest 1956
$ 53,500.00
$ -0-
1957
39,450.00
7,653.13
1958
28,350.00
33,738.87
1959
98,500.00
44,580.47
1960
18,500.00
45,226.12
1961
44,000.00
39, 624.88
1962
3,500.00
5,979.10
1963
35,233.36
13,766.64
1964
51,750.00
21,801.74
1965
60,600.69
27,775.89
$433,384.05
Each *199 agreement contained a release clause providing that the purchaser could require Peat Corp. to deliver deeds to designated lots upon the purchaser's payment of the release price specified in the contract for the designated lots. They also stated that Peat Corp. covenanted and agreed to improve and develop the lots it contracted to sell "by filling the property to grade, cutting the waterways, installing a precast concrete sea wall, installing water mains, paving the roads and constructing drainage structures" in conformity with the 1957 plat. Improvements were to be completed by May of the following year. Sunrise Sales Co. was designated the exclusive sales agent for the Sunrise Harbour lots. It conducted a unified 58 sales program on behalf of all owners of land in the Sunrise subdivisions (including Sunrise, Inc. and Sans Souci Co.) allocating a pro rata portion of the marketing costs to each. The lots in Sunrise Harbour were sold to unrelated persons as follows: Year
Number of Lots 1956
5
1957
15
1958
23
1959
12
1960
4
1961
6
1962
1
1963
7
1964
9
1965
1
83
As As a result of these sales Peat Corp. received principal payments of $433,384.05 by December 31, 1965. [51] *200 Peat Corp.'s inability to complete the improvements within the time limit first specified hindered the purchasing corporations' ability to sell the lots which in turn limited their ability to pay Peat Corp. In 1961 Peat Corp. granted extensions of due dates for a period of 3 years, and waivers of interest from December 31, 1960 to Camden Corp., Harbour Properties, Inc., Bay Homesites, Inc. and Trenton Corp. Extensions of due date for 3 years and waiver of interest from August 31, 1961 was granted *201 to Dalton Corp.
Peat Corp. repossessed the eight remaining lots held by Camden Corp. on December 30, 1963, in cancellation of Camden's deferred payment obligations. As of that date the fair market value of the lots was $120,902.50. Camden Corp.'s remaining asset $1,075.87 in cash, was distributed in liquidation to the corporation's shareholders pro rata. Camden was legally dissolved on June 30, 1967. The shareholders (other than Gould) [52] received neither salary nor dividend distributions from the various corporations. Death of Arthur Vining Davis Arthur Vining Davis (hereinafter referred to as Davis) retired as chairman of the board of directors of Alcoa Corp. and moved to Dade County, Florida, in the early 1950's. At that time, he purchased a great deal of unimproved property in the Miami area in order to engage in large scale land development activities. In 1952, he acquired a tract now known as Gables Estates, situated 1 mile south of Sunrise Harbour, on Biscayne Bay. Because the Gables Estates property was lower in elevation than *202 Sunrise Harbour, construction of lots required more extensive dredging and larger quantities of fill, resulting in wider waterways. In addition, the lots in Gables Estates were more irregularly shaped and larger in size than those in Sunrise Harbour, making Gables Estates, in Gould's opinion, "the most outstanding subdivision in Dade County." Davis died at the end of 1962. Lot prices in Gables Estates after his death ranged from a low of $14,000 to a high of $65,000. The major number of these lots, however, was priced between $16,000 and $22,000. Prior to Davis' death lot prices in this subdivision were somewhat higher. The reason for the reduction in price cannot be ascertained with certainty from the record. Further, we cannot determine the effect of this reduction on Sunrise Harbour sales. [53]
Coral Glade Heights and Coral Gardens Subdivisions General On December 1, 1950, Gould, through Sylvania Corp., a nominee, acquired 70 acres of land from John Post (hereinafter referred to *203 as Post) for a total consideration of $40,047. Approximately 1 year later Gould, again through a nominee, Herman Wepman, his attorney, acquired 80 acres of land from P. H. Koblegard (hereinafter referred to as Koblegard) for $68,000. (Sixteen days later Wepman conveyed his interest in the property to Gould.) Gould, prior to 1956, did not attempt to improve or develop these properties. The 150 acres is located approximately 5.5 miles west of downtown Coral Gables and about 10 miles southwest of Miami. The northern portion of the property borders on Coral Way, the western boundary is 97th Avenue, the southern nexus is S.W. 34th Street. Running through the property is S.W. 32nd Street. South of this street is situated 40 of the 150 acre tract. It is commonly referred to as the Coral Glade Heights subdivision. The 110 acres located north of 32nd Stree is referred to as Coral Gardens. [54]
During the period in issue, 1956 and 1957, the property was unimproved with scattered trees, shrubs and grass located thereon. The adjacent streets were paved *204 and the property's elevation was approximately 8 feet. Utilities were located in the area and water was being supplied to nearby developments. Sewage facilities were available to Coral Glade Heights in the form of septic tanks in 1956 while sewers were made available to Coral Gardens during 1957. The property was initially zoned for agricultural purposes but was plated during the late fifties for single family dwellings. The plat for Coral Glade Heights was recorded December 26, 1956, creating 160 lots. The Coral Gardens plat recorded May 14, 1959 contained 337 lots with approximately 20 acres zoned for a school site. During Gould's hospitalization in 1955 he received an offer to sell Coral Glade Heights from Thomas Ruddy. Gould accepted the offer but the sale was never consummated due to the buyer's loss of financing. The proposed sale price was approximately $5,000 per acre. Shortly thereafter Gould decided to undertake development and sale of the tract. In this regard he organized Coral Glade Company on November 16, 1955. Stockholders of record were as follows: Name
Title
Shares
Amount Paid-in Hunter
President
10
$2,500
Emil Gould
Secretary
5
1,250
Estelle Gould
Treasurer
5
1,250
On *205 April 1, 1956, Coral Glade Co. acquired Coral Glade Heights from Gould by the delivery of a warranty deed from Sylvania Corp., as nominal grantor. The transaction was treated as a sale with a purchase price of $240,000 paid $5,000 in cash and a note secured by a purchase money mortgage covering the remaining $235,000, payable as follows: Due Date
Amount April 1, 1957
$ 25,000.00
April 1, 1958
25,000.00
April 1, 1959
25,000.00
April 1, 1960
25,000.00
April 1, 1961
135,000.00
Interest was payable at a rate of 5 percent per annum. The mortgage provided for partial releases on each payment of $6,500. Payment of principal on the $235,000 obligation was made as noted below: Payment
Balance Balance 4/1/56
$ - $235,000
Year ended 3/31/57
12,000
223,000
Year ended 3/31/58
38,000
185,000
Year ended 3/31/59
1,650
183,350
4/1/59-12/31/63
-0-
183,350
1964
147,500
35,850
1965
35,850
-0-
$235,000
Coral Glade Co. accrued interest on the obligation. Gould waived interest after November 1, 1960. He included interest from Coral Glade Co. on his Federal income tax return as follows: [55] *206 Calendar Year
Amount 1956
None
1957
$11,788.93
1958
9,391.01
1959
10,645.22
1960
29,830.73
1961
4,261.62
1962 [56]
1,544.45
Gould elected to treat the sale of Coral Glade Heights as an installment sale. Sale price
$240,000.00
Basis
23,308.71
Long term capital gain
$216,691.29
Collection in year of Sale
$5,000.00
Reported gain
$4,511.44 Activities of Coral Glade Company Hunter and Gould each conveyed $1,000 to Coral Glade Co. on March 23, 1956. Such amounts were treated as loans. On December 26, 1956, Coral Glade Co. recorded a plat for Coral Glade Heights creating 160 lots in 10 blocks. The corporation paved interior streets, installed water mains and utilities and graded a portion of the property. The cost of improvements to this subdivision was approximately $500 per lot. These improvements were made with Gould's supervision by Housing Engineers of Florida, Inc. and Southern Rock and Fill Co., two corporations whose stock was owned entirely by the Goulds. (These businesses subcontracted the work out to other corporations.) [57] *207 Beginning in March 1957, Coral Glade Co. entered into contracts with unrelated home building corporations for the sale of its lots in Coral Glade Heights. These sales may be reflected as follows: Purchaser
Date
Number of Purchase
Down Balance
Lots
Price
Payment Tara Homes, Inc.
3/29/57
20
$60,000
$5,000
[58] $39,000
Freemar Builders, Inc.
5/2/58
40
[59] *208 120,000
10,000
110,000
Centerbrook Construction Co., Inc.
6/22/59
88
286,000
20,000
266,000
148
$466,000
The deferred payment obligations carried interest at 6 percent and were secured by purchase money mortgages on the lots sold. The mortgages contained subordination and release clauses providing for the subordination of the Coral Glade Co. mortgage to institutional lenders' mortgages, for the purpose of financing the construction of homes on the lots and, the release of designated lots by payment of a specified amount per lot. Centerbrook Construction Co., Inc., in 1961 or 1962, defaulted on its contract. It financed the construction of homes but never completed the construction. As a result Coral Glade Co. was not paid for the lots, but found itself subordinated to the defaulted first mortgagee. The default reduced Coral Glade Co.'s expected profit and adversely affected its cash flow. On August 22, 1957, Coral Glade Co. acquired Coral Gardens from Gould. The transaction was characterized as a sale with the delivery of warranty deeds from Sylvania Corp. as nominee and Gould as grantor to Coral Glade Co. for a total consideration *209 of $670,000 paid $5,000 in the form of a note, assumption of a $75,000 mortgage payable to Harold Thurman and the issuance of a promissory note for the remaining $590,000 payable as follows: Due Date
Amount 8/22/58
$ 50,000
8/22/59
50,000
8/22/60
50,000
8/22/61
50,000
8/22/62
390,000
$590,000 Interest was payable at a rate of 5 percent per annum. The note was secured by a purchase money mortgage on the property. The mortgage contained a release clause providing for partial releases upon payment of $9,000 per acre in 10 acre multiples. In addition, the mortgage deed contained the following provision: The mortgagees will waive all or part of the first principal payment in the event that the mortgagor makes improvements to said property. Such waiver of principal will be made on the basis of $1.00 principal payment waived for each $1.50 of improvements made. Any such waiver will be added to the amount due on the due date of the mortgage. Payments of principal were made by Coral Glade to Gould as follows: Calendar Year
Amount 1965
89,150
1966
149,500
1967
39,000
1968
103,000
1969
12,500
1970
5,000
1971
24,500
(To date of trial)
$422,650
The unpaid principal balance at date of trial was $167,350. Gould waived *210 all the interest except $5,269.79 (this amount was included as income by Gould, supra at 64). Gould elected to treat the sale of Coral Gardens as an installment sale. Sale price
$670,000.00
Basis
85,104.12
Long term capital gain
$584,895.88
Collection in year of sale
[60] 5,000.00
Long term capital gain taken into account
$4,915.09
As of August 1957 the capital and debt structure of Coral Glade Co. may be reflected as follows: Mortgage payable - Gould
$223,000
Mortgage payable - Gould
590,000
Mortgage payable - Thurman
75,000
Note payable - Gould
5,000
[61] $893,000
Capital stock
$5,000
When Coral Glade Co. attempted to record a plat for the Coral Gardens subdivision, the Dade County Board of Public Instruction refused to approve the plans. Instead, the Board determined *211 that a site for two schools was required in the proposed subdivision. An order was entered for condemnation of 22.51 [62] acres in the center of the 110 acre tract. After trial of the issues before a jury in April 1959, it was found and ordered by the Circuit Court of the Eleventh Judicial Circuit of Florida, in and for Dade County, that Coral Glade Co. was entitled to compensation of $139,562 ($6,200 per acre) for the Board's acquisition of the property. McCune appraised the property condemned by the Board at the request and on behalf of Gould. He valued it as 70 of April 15, 1959 at $8,100 per acre. McCune prepared two appraisal reports neither of which was introduced into this record. The remaining portion of Coral Gardens was not significantly different from the condemned property. Coral Glade Co. recorded a plat for Coral Gardens on May 14, 1959 wherein 337 lots were outlined in a total of 13 blocks. In *212 addition the subdivision included 1.81 acres of park land and 20.54 acres set aside for a school site. The Coral Gardens subdivision required more extensive improvements than were necessary for Coral Glade Heights. The cost of these improvements totaled approximately $1,000 per lot which included land elevation, installation of water mains, utilities, and sewer lines and construction of streets. [63] These improvements were again, with Gould's supervision, carried out by Housing Engineers of Florida, Inc. and Southern Rock and Fill Co. (As noted earlier, supra at 65, these two corporations subcontracted the work to various other corporations) In 1959 Coral Glade Co., through Taladen Co. (discussed infra at 92), began selling lots in Coral Gardens to unrelated home building corporations. The record discloses the 71 following pertinent facts: Purchaser
Date
Number Purchase Down Balance of Lots
Price
Payment
Monterey Builders, Inc.
8/1/59
36 $138,272.50
$24,668.35
[64] *213 $107,172.50
Monterey Builders, Inc.
3/25/60 35 125,317.50
5,362.94
120,317.50
71 $263,590.00 The deferred payment obligations carried interest at 6 percent and were secured by purchase money mortgages on the lots sold. The mortgages contained subordination and release clauses providing for the subordination of the Coral Glade Co. mortgage to institutional lenders' mortgages, for the purpose of financing the construction of homes on the lots and the release of designated lots by payment of a specified amount per lot. Hunter received neither salary nor dividend distributions from Coral Glade Co. Coral Way Land Company Coral Way Land Company (sometimes referred to as Coral Way Co.) was incorporated on September 17, 1959. [65] *214 Stockholders 72 of record were as follows: Name
Shares
Amount Paid-in [66]
Emil Gould
25
$7,500
Estelle Gould
25
7,500 Simultaneously with incorporation Gould transferred an additional $37,500 to Coral Way Co. which was recorded on the books as "loans payable." The note was due 2 years from issuance bearing 4 percent interest. It was paid in full by August 31, 1962 (the close of Coral Way Co.'s fiscal year). Gould advanced additional funds totaling $11,430.28 in 1961 and 1962. These were repaid by October 31, 1962. Gould reported interest in 1961 only, of $3,004.95. On September 18, 1959 Coral Way Co. lent $50,000 to Coral Glade Co., receiving as partial consideration therefor, 73 an option to purchase certain land from Coral Glade Co. On November 10, 1959, Coral Way *215 Co. exercised the option and obtained a deed to 161 lots in Blocks 1-4 4A and 5-7 of Coral Gardens for a total consideration of $507,150. The $50,000 previously loaned constituted the down payment with the balance of $457,150 represented by a note bearing 6 percent interest secured by a purchase money mortgage. The note was payable as follows: Due Date
Amount
June 1, 1961
$ 75,000
August 15, 1962
382,150
$457,150
Payments were made as noted below: Date
Payment
Balance $457,150.00
3/31/60
$ 15,000.00
3/31/61
-0-
3/31/62
9,000.00
4/1/62-1/15/63
27,531.20
51,531.20
$405,618.80 The minutes of Coral Glade Co. state that the sale price was to be "[On] the wholesale basis * * *". The corporation was to realize approximately a $20,000 profit. [67] *216 As of November 10, 1959, the debit and capital structure of Coral Way Co. was reflected on its books as follows: Mortgage payable - Coral Glade Co.
$457,150
Note payable - Gould
37,500
Total debt
$494,650
Capital stock
$5,000
Paid in surplus
10,000
Total capital
$15,000
Coral Way Co. through Taladen Co. (infra at 92) offered its lots for sale to unrelated home builders. On December 18, 1959, it sold 31 lots to Rafkind Development Corp. for a total consideration of $125,000. Coral Way Co. 75 received a purchase money mortgage, bearing 6 percent interest, containing subordination and release clauses, for the full amount of purchase price. In addition, it received $15,000 for two options to buy an additional 62 lots in Coral Gardens for a total purchase *217 price of $211,600. The options were not exercised. Israel Rafkind suffered a heart attack shortly after the purchase of the first 31 lots. He asked to be relieved of his obligation, set forth in the option contracts, to construct houses on the lots and requested return of the $15,000 option price, rather than forfeit it. Coral Way Co. completely exonerated Rafkind Development Corp. [68] On June 6, 1961, Coral Way Co. entered into a contract for the sale of 88 lots to Heritage, Inc. at a price of $421,080. Under this agreement Coral Way Co. took back a noninterest bearing note for the entire amount of the purchase price by a purchase money mortgage. The mortgage contained release and subordination clauses which permitted Heritage, Inc. to finance, construct and sell homes on the lots. Notwithstanding the favorable terms, Heritage was 76 forced to rescind the agreement and Coral Way Co. reacquired the property. It subsequently sold the land to other purchasers. On March *218 5, 1962 Coral Way Co. sold 3 lots to Beautyline Investment Corp. for a total consideration of $11,925. By January of 1963, Coral Way Co. had sold most of the lots initially acquired from Coral Glade Co. It paid $72,735.67 to Coral Glade Co., characterizing such as a payment of accrued interest. As of January 15 its principal remaining assets were mortgage receivables totaling $420,618.80 received from the buyers of the various lots and a small amount of cash. Its liabilities consisted of the unpaid portion of the note due Coral Glade Co. and commissions owing to Taladen Co. These figures may be reflected as follows: Cash
$ 14,505.93
Mortgages Receivable from customers
420,618.80
Total Assets
$435,124.73
Commission payable - Taladen (a related corporation)
$ 15,000.00
Mortgage payable - Coral Glade
405,618.80
Capital stock
$ 5,000
Paid-in surplus
10,000
15,000.00
Earned surplus
(494.07)
Total liabilities and capital
$435,124.73
On January 15 it transferred its mortgage receivables to Coral Glade Co., characterizing such payment as the satisfaction of the unpaid note and the assumption by Coral Galde Co. of the commissions owed Taladen Co. Simultaneously it liquidated, transferring the remaining *219 cash to the Goulds. Gould reported a loss of $494.07 on the distribution. Coral Way Co. was formally dissolved on February 14, 1963. Coral Glade Co. - Post 1959 On May 18, 1961, Hunter, individually and as trustee for the benefit of his children, transferred $125,000 to Coral Glade Co. The transaction was treated as a loan with interest payable at 10 percent per annum. Interest was paid and the loan was fully discharged by September of 1963. Substantially all the lots in Coral Glade Heights and Coral Gardens were sold by 1963. Subsequently, Coral Glade Co. has principally engaged in collection of principal and interest payments on the notes generated by the sale of the various lots. Darlington Manor Subdivision Housing Company of Florida was incorporated on May 17, 1954 as a land development and construction company. Emil and Estelle Gould were the sole shareholders having each paid $2,500 for the 10 authorized and issued shares of stock. 78 On May 18, 1955 Gould purchased from Helms Construction Co. the Daughters and Dade County Development subdivisions (name apparently later changed to Tropical Gardens Estates). He conveyed this property on December 14, 1955 to Housing *220 Co. of Florida. Thereupon, Gould entered into a joint venture with nine other individuals to develop, build homes on and sell this property. Before completion of the Tropical Gardens project Housing Co. of Florida contracted to purchase from Helms Construction Co. the property situated immediately south of and across the street from Tropical Gardens. It totaled 103-1/2 acres in area and was acquired in two separate acquisitions on December 31, 1955 and October 29, 1956. The property which became known as the Darlington Manor subdivision is located 11 miles southwest of Miami and 6 miles southwest of Coral Gables and is between Miller Road on the north, Sunset Drive on the south, S.W. 97th Street on the west and Galloway Road on the east. The land was unimproved with an elevation of approximately 8 feet. The area in general was somewhat less developed than the Coral Glade region. The property was platted in 1959 for 412 single family dwellings. The books of Housing Co. of Florida reflect the following: Basis in Hands of Housing Company of Florida
Date
12/31/55
Original purchase
83-1/2 acres
$255,000.00
10/29/56
Exercise of option
20 acres
60,000.00
2/28/59
Sewer construction
33,283.52
Total
$348,283.52
1/15/59
Sale of 8 acres [69] *221 26,920.48
Balance April 29, 1959
$321,363.04
Housing Co. of Florida purchased the property with the intention of continuing the home building operation initiated at Tropical Gardens. Due to a subsequent change in health regulations septic tanks were prohibited which prevented home building. Because of this inability to construct and sell homes, Housing Co. had a rather difficult time meeting its obligations under the purchase agreement. From February 28, 1956 through April 29, 1959, Gould transferred $379,500 to Housing Co. (treated as a loan on corporate books - $30,000 was repaid) a portion of which 80 was apparently used to meet the purchase obligation. [70] *222 In 1959 the developers of Miller Heights, a subdivision immediately north of Darling Manor and adjacent to Tropical Gardens, extended sewer lines to its property. At that point it became feasible to develop the Darlington tract. To carry out this development Darlington Manor, Inc. was incorporated on January 26, 1959. It filed an election to be taxed as a subchapter S corporation for the taxable year 1959. Such election was in effect for 1959 and 1960 only. The shareholders of record were as follows: Name
Shares
Amount Paid-in Rose G. Kaplan
15
$15,000
Emil Gould
5
5,000
Estelle Gould
5
5,000
Rose Kaplan (hereinafter referred to as Kaplan is Burt Hunter's mother. (While Darlington was a small business corporation she reported her share of the corporation's income; subsequently she received a nominal salary of approximately $1,500.) Kaplan advanced Darlington Manor, Inc. $15,000 on April 14, 1959. The note was payable in 3 years *223 with interest at 5 percent per annum. Interest was paid and principal was fully discharged by April 1962. On April 29, 1959, Gould transferred all of the outstanding stock of Housing Co. of Florida to Darlington Manor, Inc. The transaction was recorded as a sale with a purchase price of $587,500 payable $15,000 in cash and a promissory note secured by a mortgage paying interest at 6 percent per annum covering the remaining $572,500. Payment on the note was to be made as follows: Due Date
Amount 4/29/60
$ 75,000
4/29/61
75,000
4/29/62
75,000
4/29/63
75,000
4/29/64
272,500
$572,500
No interest was ever paid or accrued on this note. Principal payments were made as follows: Calendar Year
$572,500 Note 1961
5,000
1962
5,000
1963
5,000
1964
20,000
1965
112,500
1966
111,000
1967
98,500
1968
95,500
1969
114,500
1970
5,500
$572,500
Gould reported the transaction as an installment sale. Sale price
$587,500
Stock basis
5,000
Long term capital gain
$582,500
1959 collection
$15,000
Long term capital gain 1959
$14,872.35
99.149%
Darlington Manor, Inc. immediately after the stock acquisition liquidated Housing Co. of Florida, receiving the following assets and liabilities (book value listed): Cash
$3,014.07
Mortgage receivable
45,000.00
Land
321,363.04
Other assets
2,745.48
Total assets
$372,122.59
Note payable - Gould
$349,500.00
Other liabilities
18,061.54
Total liabilities
$367,561.54
Net book value [71]
$4,561.05
*224 Darlington Manor, Inc. took over the assets and liabilities of Housing Co. of Florida at book value, except the land, the basis of which Darlington increased to $904,301.99 on the theory that section 334(b) (2) applied. The basis figure noted immediately above was arrived at as follows: Original basis of land in hands of Housing Co. of Florida
$321,363.04
Purchase price of stock by Darlington
$587,500.00
Net book value of assets (see above)
4,561.05
Excess over net book value
582,938.95
Revised basis of land on books of Darlington [72] *225 $904,301.99
Housing Co. of Florida was formally dissolved on July 1, 1959. At the time of liquidation, a journal entry dated April 29, 1959, on the books of Darlington Manor, Inc., split up the item described on Housing Co.'s books as an obligation of $349,500 owed to Gould as follows: Mortgage payable - Gould
$224,500
Mortgage payable - Carrie
Sapiro
125,000
$349,500
The *226 reasoning behind such adjustment is stated below. Prior to April 1959, Gould had borrowed $125,000 from Sapiro. The obligation was secured by the execution of a mortgage on the property held by Housing Co. of Florida. [73] The minutes of Darlington Manor, Inc. indicate that Gould and Darlington agreed that the latter was to assume the obligation due Sapiro and further that the $349,500 obligation due Gould was to be reduced by a commensurate amount. As of April 29, 1959, the books of Darlington Manor, Inc. reflected a total indebtedness owed to Gould of $797,000 consisting of the following: Note (acquired stock)
$572,500
Liability remaining from Housing Co. of Florida
224,500
$797,000 86 A mortgage on the Darlington Manor subdivision was A mortgage on the Darlington Manor subdivision was issued to secure the entire obligation. The mortgage was however subordinate to the mortgage given to Sapiro on the assumed indebtedness of $125,000. The note for $224,500 bore interest at 4 percent and payments were due *227 as follows: Due Date
Amount 4/29/60
$25,000
4/29/61
25,000
4/29/62
50,000
4/29/63
50,000
4/29/64
74,500
$224,500
Interest was accrued and paid. Principal payments were made as follows: Year
Principal Payments
Balance 4/29/59
$ 224,500.00
1959
-0-
224,500.00
1960
-0-
224,500.00
1961
197,500.00
27,000.00
1962
27,000.00
-0-
Total Payments
$244,500.00
The Sapiro note for $125,000 was paid in the following manner: Year
Principal
Interest 1959
$14,250.00
$-0- 1960
38,750.00
10,043.19
1961
72,000.00
872.69
Total
$125,000.00 87 From April to June 1960 Gould transferred $9,000 to Darlington Manor, Inc. for working capital. This amount was treated as a loan and repayment was made in 1961. Interest was paid timely. A recapitulation of all principal payments or on behalf of Gould with respect to the obligations previously discussed may be reflected as follows: Items Described on Various Corporate Books as Gould Notes
Total
Gould Notes
Sapiro Notes Year
$572,500
$224,500
$9,000
$806,000
$125,000
1959
-0-
-0-
-0-
14,250
1960
-0-
-0-
-0-
-0-
38,750
1961
-0-
202,500
9,000
211,500
72,000
1962
10,000
22,000
32,000
1963
5,000
5,000
1964
20,000
20,000
1965
112,500
112,500
Amount Repaid
$147,500
$224,500
9,000
$381,000
125,000
Activities of Darlington Manor, Inc. Darlington Manor, *228 Inc., immediately after the land acquisition, began an extensive subdividing and land improvement program including grading, installation of streets, sewage and water utilities, etc., which ultimately cost over $400,000. (This work, as with the earlier corporations, was contracted out to Southern Rock and Fill Co. and Housing Engineers of Florida, both owned 100 percent by Gould. These two corporations subcontracted the work out.) In order to finance the above described improvements, Darlington Manor, Inc. borrowed $200,000 from Sapiro on June 15, 1959, issuing a 3 year promissory note in that amount, bearing 10 percent interest. The obligation was paid in full by March 1962. As noted above, between April and June 1960, Gould advanced $9,000 to Darlington Manor, Inc., which was repaid, with interest, in 1961. Hunter, as trustee of trusts for the benefit of his children, loaned $147,000 to Darlington Manor, Inc. on February 14, 1961, which was repaid by September 1963, with interest at 10 percent per annum. The debt-to-equity ration reflected on the corporate books as of June 1959 was as follows: Debt:
Note payable - Rose Kaplan
$15,000
Mortgage payable - Gould
797,000
Mortgage payable - Sapiro
125,000
Note payable (improvements) - Sapiro
200,000
Total long term debt
$1,137,000
CAPITAL STOCK AND PAID-IN SURPLUS:
Gould
$10,000
Kaplan
15,000
Total capital
$25,000
Several *229 months after the acquisition of the Darlington Manor subdivision the corporation, through Taladen Co. (infra at 92), began to sell the various lots. On June 30, 1959, Darlington Manor, Inc. entered into an agreement of sale with 89 Arthur Litt and Daniel Cravitt, unrelated persons who agreed to purchase 50 lots in the Darlington subdivision for a price of $210,000. The sale was consummated on September 25 by Malibu Homes, Inc. (hereinafter referred to as Malibu) a corporation controlled by Litt and Gravitt. The purchasing corporation issued a promissory note for the full amount of the purchase price, bearing 5-1/4 percent interest secured by a mortgage. The mortgage contained subordination and release clauses permitting the purchaser to finance the construction of homes on the lots. Gould granted a release on the $797,000 mortgage equivalent to the 50 lots sold without receiving any payment (other than the note from Malibu to Darlington Manor, Inc.). Simultaneously with the above sale Darlington Manor, Inc. granted to Malibu for $65,000 an option to purchase the remaining 362 lots in the subdivision for a total purchase price of $1,339,500. On March 28, 1960, Malibu exercised *230 the option and issued its promissory note bearing interest at 5-1/4 percent payable in installments through November 1962. The note was secured by a purchase money mortgage on the lots. Malibu completed construction of 250 homes in the Darlington Manor subdivision. Nevertheless, it was not capable of meeting its obligations under the purchase money mortgages described above. It failed to make timely payments 90 of principal and interest on the notes, and requested that Darlington Manor, Inc., reacquire a portion of the lots that it was not capable of carrying. Ultimately Malibu and Litt went into bankruptcy. The construction lender, to whom Darlington Manor, Inc. was subordinated, foreclosed. Darlington Manor, Inc. was thus forced to arrange for the sale by Malibu of 85 lots to Greenbriar, Inc. and to reacquire the remaining 77 lots and resell them to other builders. Housing Engineers of Florida, Inc., and Southern Rock and Fill Company Housing Engineers of Florida, Inc. was incorporated on August 26, 1959, as the successor to the partnership of Emil J. and Estelle Gould, which since the 1940's had undertaken Gould's home building and other activities. Emil J. and Estelle *231 Gould owned all of the stock of Housing Engineers for which they paid $25,000. Gould was the corporation's president. During the years 1956-1965, Housing Engineers, both as a partnership and as a corporation, was principally engaged as the general contractor for land improvements to the Coral Gardens and Darlington Manor subdivisions, including contracting for the installation of water mains, sewer lines, 91 paving streets and curbs, landscaping, and the like. With the exception of relatively nominal amounts received from related corporations, Housing Engieers' receipts were principally derived from Coral Glade Co. and Darlington Manor, Inc. The contracts totaled over $800,000. The work under these contracts was subcontracted to other, unrelated parties by Housing Engineers. The corporation's assets consisted primarily of cash, receivables from Coral Glade and Darlington, work in process and equipment. The maximum amount of tangible property owned was $31,906.06.
Southern Rock and Fill Co. (hereinafter sometimes referred to as Southern Rock) was incorporated on September 3, 1959. Emil J. and Estelle Gould owned all the stock of the corporation for which they paid $5,000. *232 Southern Rock, like Housing Engineers, was formed for the purpose of undertaking land improvements including grading and fill operations. Southern Rock and Fill Company rendered services principally to Coral Glade Co. and Darlington Manor, Inc. Its assets consisted primarily of cash receivables from Coral Glade Co. and Darlington Manor, Inc. and work in process. Southern Rock owned no equipment and claimed no depreciation other than a single unidentified asset costing $384.75. It subcontracted out all the work it received. Both Southern Rock and Housing Engineers were on the cash basis while Coral Glade Co. and Darlington Manor, Inc. were on the accrual method of accounting. The contracts with Coral Glade and Darlington called for payment as work progressed. No dates of completion were set. Taxable income (or loss) as reported is as follows: Taxable Income Fiscal Year Ended [74]
Southern Rock
Housing Engineers 1960
$24,635.09
$ 25,101.53
1961
23,981.35
24,219.64
1962
20,878.39
20,749.38
1963
2,776.76
1,877.94
1964
(12,013.95)
(17,358.41)
1965
(21,059.54)
[75] *233 (12,993.87)
Taladen Company The Taladen Co. was incorporated on December 17, 1958. It described its principal business activity as the merchandising and promoting of lot sales (specifically for Coral Glade Co., Coral Way Land Co. and Darlington Manor, Inc.). Its balance sheets indicate a paid-in capital of $2,500, representing a total of 25 authorized and issued shares of stock. The stockholders of record were as follows: Year Ended September 30th Name
Relationship to Gould
1959
1960
1961
1962
1963
1964 Emil Gould
6
4
4
2
2
2
Estelle Gould
5
4
4
2
2
2
Katherine Freedman
Estelle's mother
3
3
3
3
3
3
Dennis Gould
son
4
5
5
5
5
5
Cathie-Ellen Gould (Beber)
Daughter
4
5
5
5
5
5
Lauren Gould
Daughter
2
3
3
3
3
3
Perley M. Noll
Secretary
1
1
1
1
2
2
Robert Freeman
Estelle's nephew
1
1
1
Ethel Goldstein
Mother
2
2
2
Mina Gains
1
Total Shares Outstanding
25
25
25
25
25
25
Gould performed all the corporate activities. Taladen made a timely election to be treated as a small business corporation, and filed Forms 1120-A for the years ended September 30, 1959 through September 30, 1964. It reported gross receipts and taxable income (subject to distribution to the shareholders) as follows: Taxable year ended September 30
Gross receipts
Taxable income 1959
$20,608.63
$ 19,506.16
1960
31,250.00
24,719.98
1961
43,500.00
26,969.93
1962
37,658.98
25,175.89
1963
22,333.03
21,093.15
1964
17,695.00
16,711.18
All *234 gross receipts of Taladen Co. for all years were commissions received from Coral Way Land Co., Darlington Manor, Inc. and Coral Galde Co., on their sales of real estate. Taladen Co. was on the cash receipts and disbursements method of accounting while all the payor corporations were on the accrual method. 94 Darlington Manor, Inc., Coral Glade Co. and Coral Way Co. accrued and deducted commissions payable to Taladen Co. in the amounts and for the years set forth below as follows: Taxable Year Ending In Taxpayer
1960
1962
1963
1965
1966 Darlington Manor, Inc.
$94,175.00
Coral Glade Co.
12,874.51
5,717.09
3,746.44
3,000
6,660
Coral Way Land Co.
8,250.00
21,587.60
1,500.00
The $94,175 deducted by Darlington Manor, Inc. on its 1960 return was paid to Taladen Co. as follows: Year
Paid by Darlington
1960
$31,500
1961
35,000
1962
17,675
1963
10,000
$94,175
Coral Way Co. owed Taladen Co. $16,955.40 in accrued commissions as of January 15, 1963 (date of its liquidation). One thousand nine hundred and fifty-five dollars and 40 cents ($1,955.40) of this amount was paid in January 1963 and the balance of $15,000 was assumed by Coral Glade Co. Payment of the Coral Glade Co. commissions was as follows: Coral Glade FY
Amount in Issue
Paid on or before June 15 3/31/60
$12,874.51
$ 6,608.63
3/31/62
5,717.09
5,717.09
3/31/63
3,746.44
3,746.44
3/31/65
3,000.00
-0-
3/31/66
6,660.00
2,825.00
$31,998.04
$18,897.16
Gould *235 either performed the selling activities personally or hired independent brokers to promote the lot sales. Taladen paid commissions to unrelated third party brokers. It paid a small amount each year for state corporate franchise tax and an intangible tax as well as costs to circularize local builders to promote lot sales. It also paid and claimed as an expense office rental expense payments made to Housing Engineers of Florida, Inc. (wholly owned by Gould). Sale of Clin Clara Property On March 24, 1954, Gould acquired 160 acres of land from Clin Clara Company (hereinafter referred to as the Clin Clara property) at a total cost of $181,655.59. The property is situated approximately 11 miles southwest of downtown Miami. Between 1954 and 1959, Gould took no steps to develop or improve or list it for sale. 96 In 1959 Philip Shore (hereinafter referred to as Shore), an unrelated person, offered to purchase a portion of the Clin Clara property. On July 1, 1959, Gould conveyed 137-1/2 acres of that parcel to Shore for a total purchase price of $628,500, payable to $10,000 in cash, assumption of a $150,000 mortgage note due Sapiro and the balance covered by a promissory note payable *236 within a 4 year period. The note, with interest payable at 5 percent, was secured by a purchase money mortgage which provided release and subordination clauses permitting the purchaser to finance construction and sale of homes. Shore substantially complied with the terms of the agreement. Gould elected to treat the sale as an installment sale, as follows: Sales price
$628,500.00
Basis:
Land
$156,114.81
Expenses
1,083.85
157,198.66
Gain
$471,301.34 Gould reported long term capital gain, on the basis of a gross profit ratio of 74.988 percent, with respect to collections of principal on Shore's promissory note. 97 OPINION Recognizing that even most diligent of tax lawyers probably has not thoroughly and carefully read and studied the morass of facts heretofore enunciated, we will attempt to summarize quickly the pertinent facts prior to launching into our hopefully lucid, and hopefully shorter, opinion. It is appropriate to acknowledge here the substantial help the Court received from the briefs filed by both parties. We were particularly impressed by the candor of petitioners' brief in discussing the relevant cases. Beginning in the early 1930's through 1955, Gould was involved in the *237 real estate business (predominantly home building). During the 1940's and early 1950's he acquired unimproved property in various areas of Dade County, Florida near the cities of Miami and Coral Gables. These parcels included, among others, the Sunrise properties (including Sunrise Point, Sans Souci and Sunrise Harbour), Coral Glade Heights and Coral Gardens, Darlington Manor and the Clin Clara property. In 1955 Gould and Sapiro (the co-owner of the Sunrise properties) partitioned the land, each taking half. Sapiro conveyed his portion of the property (consisting basically of Sunrise Harbour) to three individuals - Hunter, Louis and Rosen - none of whom had any knowledge of the real estate 98 business. Gould formed a corporation with himself, Hunter, Louis and Rosen, as shareholders and "sold" the Sunrise Point, Sans Souci and a section of Sunrise Harbour to the corporation taking back notes. The Sunrise Point lots were thereafter improved and sold to independent third parties. The Sans Souci subdivision was "sold" to Sans Souci Co., which had been incorporated by Gould, Hunter and Rosen at approximately this same period of time. Sans Souci Co. subdivided and improved the *238 land and likewise sold it to third parties. Several months later Gould and Louis formed Peat Corp. whereupon Hunter, Louis and Rosen "sold" their Sunrise Harbour property to the corporation taking back notes. The Sunrise Harbour property needed extensive improvement as it was, for the most part, either mangrove swamp or completely underwater. To make such improvements Gould "loaned" approximately $800,000 to the corporation. Approximately 1 year later Peat Corp. "sold" this property to nine different corporations which had been formed in or about the same period of time by Gould, Hunter, Louis, Rosen, and several other individuals. These corporations thereupon attempted to sell the lots to third parties. Coral Glade Co. was incorporated in November of 1955 with Gould and Hunter as its shareholders. In April of 99 1956 and August of 1957, Gould "sold" Coral Glade Heights and Coral Gardens to the corporation. It in turn was to subdivide, improve, develop, and sell the lots. In 1959 Coral Glade Co. "sold" a portion of Coral Gardens to Coral Way Land Co.; a newly formed corporation whose stock was owned entirely by Gould. It in turn sold the lots to third parties. In 1959 Gould *239 and Kaplan (Hunter's mother) formed Darlington Manor, Inc., whereupon Gould "sold" the stock of Housing Co. of Florida (a corporation whose main asset was the Darlington Manor subdivision and whose predominant liability was approximately $400,000 of notes owed Gould for earlier advances) to Darlington Manor, Inc. Darlington Manor, Inc. immediately liquidated the corporation, acquired the land, subdivided and improved it and attempted to sell such property to third parties. The sales activities for the Sunrise Sales Co., a partnership (later incorporated) whose interest was owned by Gould, Hunter, Louis and Rosen. The sales activity for Coral Glade Co., Coral Way Co. and Darlington Manor, Inc. was carried on by Taladen Co., a corporation owned by Gould and his family. The improvement activities required by the various subdivisions were contracted to Housing Engineers of Florida, Inc. and 100 Southern Rock and Fill Co., both of whose stock was owned entirely by Gould. These corporations in turn subcontracted the work out. The following diagram attempts to pictorially illustrate the above: [Diagram in original omitted here] Issue 1 - Section 351 vs. Sale Respondent asserts that *240 the formalistic sales to the various corporations were in substance section 351 exchanges, [76] *241 which, contends respondent, requires a section 362(a) carryover basis to the corporations, and section 301 dividend treatment (to the extent of earnings and profits) to the transferors on receipt of the supposed repayments. Petitioners, on the other hand, argue that the various transactions 103 were valid sales producing a cost basis to the purchasing corporations and capital gains [77] and interest income to the sellers. The applicability of section 351 is dependent on the existence of three factors. The conveyance of property to a corporation, receiving in return stock or securities, with control of the corporation immediately thereafter in the hands of the transferors. [78] *242 It is apparent that the real estate conveyed to the corporations constitutes property. Therefore, remaining for decision is whether the notes received in exchange for the property were in fact valid debt as petitioners urge or 104 stock or securities as respondent contends, and further, if such are determined to be stock or securities, whether control existed immediately thereafter. Turning first to the age-old question of stock versus debt the Court of Appeals for the Second Circuit, in Commissioner v. O.P.P. Holding Corp., 76 F. 2d 11, 12 (C.A. 2, 1935), in attempting to describe the basic difference stated: [The] vital difference between the shareholder and the creditor [is that the] shareholder is an adventurer in the corporate business; he takes the risk, and profits from success. The creditor, in compensation for not sharing the profits, is to be paid independently of the risk of success, and gets a right to dip into the capital when the payment date arrives. Such a distinction is a question of fact to be determined from all the evidence presented. Fin Hay Realty v. United States, 398 F. 2d 694 (C.A. 3, 1968); Gooding Amusement Co. 23 T.C. 408 (1954), Affd. 236 F. 2d 159 *243 (C.A. 6, 1956). No one factor is controlling. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). Initially we note that while the form of the purported debt is important, it is the substance of the transaction which determines the applicable tax consequences. United States v. Henderson, 375 F. 2d 36 (C.A. 5, 1967); 1432 Broadway Corporation, 4 T.C. 1158 (1945), Affd. 160 F. 2d 885 (C.A. 2, 1947). Though most courts view this as looking 105 to the parties' true intent, the Fifth Circuit (the circuit wherein appeal lies in the instant cases) states it somewhat differently: [We] think the problem is not one of ascertaining "intent," since the parties have objectively manifested their intent. It is a problem of whether the intent and acts of these parties should be disregarded in characterizing the transaction for federal tax purposes. United States v. Snyder Brothers Company, [79]367 F. 2d 982-83 (C.A. 5, 1966). While there have been numerous cases listing a variety of *244 tests to be applied in determining the true nature of a transaction; [80] see Tomlinson v. 1661 Corporation, 377 F. 2d 291 (C.A. 5, 1967); Montclair, Inc. v. Commissioner, 318 F. 2d 38 (C.A. 5, 1963); Fin Hay Realty, supra, we feel the concise description enunciated in Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), Affd. 254 F. 2d 51 (C.A. 7, 1958), lists the more pertinent of these requirements. The Court therein stated: Was the capital and credit structure of the new corporation realistic? What was the business purpose, if any, of organizing the new corporation? Were the 106 noteholders the actual promoters and entrepreneurs of the new adventure? Did the noteholders bear the principal risks of loss attendant upon the adventure? Were payments of "principal and interest" on the notes subordinated to dividends and to the claims of creditors? Did the noteholders have substantial control over the business operations; and if so, was such control reserved to them as an integral part of the plan under which the notes were issued? Was the "price" of the properties, for which the notes were issued, disproportionate to the fair market value of such properties? Did the noteholders, when *245 default of the notes occurred, attempt to enforce the obligations? [27 T.C. at 59] Looking to the instant cases, it is our opinion that no debtor-creditor relationship ever existed in any of the transfers. The supposed debt instruments were in fact equity interests. It must be emphasized that we carefully scrutinized the factors relating to each individual exchange and while there is some degree of variation between the numerous transactions the similarities running throughout the series of exchanges were so apparent as to necessitate a consistent result. Before a discussion of each particular transfer some general conclusions relevant to the entire situation will be of assistance. Gould dominated the various transactions before us. He desired to subdivide various parcels of land but he wanted to avoid dealer status. Gould was the only party with any knowledge of the real estate business. He *246 had built and sold both private homes and commercial property, invested in and improved undeveloped real estate, purchased and rented apartment buildings. 107 He managed the activities of each corporation, personally guaranteed loans from various parties to the different corporations, and was the only person, with two exceptions, to receive any form of income from the assorted entities either in the form of salary or repayments on the supposed sales. [81] With the exception of Sunrise Harbour (which will be discussed infra), Gould supplied all the real estate. He was familiar with the tax aspects of the real estate business. Hunter, Louis, Rose and the various other shareholders, on the other hand, knew nothing of the real estate business. (Rosen was an attorney from New York, Hunter and Louis were in the cement business.) Their investments in the various corporations were, with the exception of Peat Corp., nominal from the standpoint of financial contributions and completely void with regard to actual participation in the various transactions. In short, though the stock interest may reflect otherwise, there was nothing arm's length about any of the various transactions. Gould *247 supplied the knowledge, the property and the major portion of the financing required to carry out his intention of systematically subdividing, improving 108 and selling the land through corporation entities. The other shareholders had little or no economic interest in the entire affair. [82] Secondly, with the exception of the property transferred by Peat Corp. to the nine corporations and the conveyance *248 from Coral Glade Co. to Coral Way Co. the sale prices of the various parcels were substantially in excess of fair market value. The price in essence anticipated the profits to be derived from the subdivision, improvement and sale of the various lots. Each and every corporation was substantially undercapitalized with Gould having knowledge of the fact that additional capital would be needed to make the required improvements prior to sale. Repayment of the supposed notes was contingent completely on the successful sale of the individual lots. Payment of principal and interest was never completed on time and legal action was never initiated to require payment. 109 Sunrise Properties, Inc. The debt to equity ratio of Sunrise, Inc. as of September 23, 1955 was 26 to 1, consisting of $24,000 of equity and $626,000 of debt. Sunrise, Inc. was organized with $18,000 of paid-in capital. Immediately thereafter Gould transferred Sunrise Point, Sans Souci and a portion of Tract 7 located in Sunrise Harbour to the corporation for a total consideration of $600,000 consisting of $50,000 cash and a note covering the remaining $550,000. The $50,000 down payment could only be made by borrowing *249 an additional $38,000 from Rosen, leaving the corporation with cash on hand of $6,000 ($18,000 + $38,000 - $50,000 = $6,000). See In re Indian Lake Estates, Inc. v. Stewart, 448 F. 2d 574 (C.A. 5, 1971). Undercapitalization is further indicated by the corporation's inability to commence business operations without further borrowing. That is, before the land could be sold, certain improvements were required. Burr Oaks Corp., 43 T.C. 635, 646-47 (1965), affd. 365 F. 2d 24 (C.A. 7, 1966); Lewis L. Culley, 29 T.C. 1076, 1087-88 (1958). To acquire the funds necessary the corporation borrowed an additional $38,000 from the Goulds and received a capital contribution of $6,000 from Estelle Gould. The corporation's only asset was the land. Payment of the note was contingent solely on the sale of this land. [83] Though a portion of the real estate needed only limited improvement prior to sale [84] (Sunrise Point) the Sunrise Harbour tract was either underwater or covered by mangrove requiring extensive improvements indicating the uncertainties of the operation. [85] As we noted in Burr Oaks Corp., supra: If payment to the transferor is dependent solely upon the success of an untried, undercapitalized *250 business, the prospects of which are uncertain, the transfer of property raises a strong inference that it is, in fact, an equity contribution. [43 T.C. at 647] Gould dominated the corporation. Not only was he the president, but he also was the general manager in charge of daily business operations. Gould was the only person knowledgeable in the real estate area. He was very well known the *251 Sunrise properties were commonly referred to as the Gould subdivision. The other shareholders were simply passive investors with very little economic interest in the corporation. [86]
The sales price greatly exceeded the properties' fair market value at the time of conveyance. On May 25, 1955 Gould and Sapiro partitioned the Sunrise properties, each taking what in his opinion was land representing one-half the value of the entire subdivision. Both parties were extremely knowledgeable and experienced in the real estate business; Gould had been building homes and acquiring land since the early 1930's while Sapiro, also involved in land acquisition and home building, had been an active and inactive real estate broker for approximately 25 years at the time of the partition. Three months later Sapiro sold his entire portion of the Sunrise properties to Hunter, Louis and Rosen for a total consideration of $315,360. On the same day, Gould sold his portion of the subdivision, less two tracts located in Sunrise Harbour, to Sunrise, Inc. for a total sales *252 price of $600,000. It is our opinion that the discrepancy is due substantially to Gould's overvaluation of the real estate. "The inflation of the "sales price" to petitioner served to extend the period during which * * * [the transferors] could participate in petitioner's business as "creditors' and increased the amount which they could withdraw as "principal" if the venture proved successful." Burr Oaks Corp., supra, at 649. See Emanuel N. (Manny) Kolkey, supra; Bruce v. Knox, 180 F. Supp. 907 (D. Minn., 1960). In further support of this judgment we point to the two appraisal reports prepared by Coopman and Slack in which they assign values of $294,000 and $344,350 respectively to the land in question. We find both their testimony and reports to be reasonably candid and accurate. Substantial work was obviously done in preparing the reports. They included a history and description of the surrounding area, precise characteristics of the specific real estate in question, and most important a substantial number of comparative sales. Petitioners urge however that the reports are inaccurate. They specifically point to improper zoning and erroneous land elevations specified in the *253 appraisals. They also submit an appraisal prepared by McCune at the time of sale valuing the properties at $600,000. There was in fact a Zoning error. However it was not in reference to property conveyed by Gould to Sunrise, Inc. and therefore is of no consequence. [87] *254 With regard to the elevation of the land we note that petitioners did not demonstrate error in respondent's appraisals, but rather, merely showed that the topography maps used to ascertain the heights had been prepared approximately 15 years prior to the sale and therefore the elevation in the interim could have changed. Furthermore, even if such were the case McCune, petitioners' appraiser, used the same maps. As to McCune's appraisal we note that while it values the various parcels and includes the legal and physical description of the real estate it includes no comparative sales upon which the valuation is based. During cross examination McCune could not remember any of the sales considered nor any of the parties from whom he acquired the information. [88] *255 It is therefore our conclusion that the price imposed by Sapiro and the appraisals prepared by Coopman and Slack must take precedent in arriving at our valuation. Finally, in light of our conclusion that the various transactions were not at arm's length, the parties' supposed reliance on the appraisal in determining the sale price loses validity. Petioners, in support of their position, argue that the substantial payment of the note, disproportionate holdings of stock and debt and the success of the sales substantiate the validity of the debt. We agree that timely payment of a supposed debt instrument certainly is an indicia supporting debt treatment. There are however several factors which tend to neutralize this treatment. One hundred and fifty-four thousand, five hundred and ninety-five dollars ($154,595) of the $550,000 note was paid after August 31, 1960, the due date of the final payment. In august of 1959 Gould extended the maturity date an additional 3 years and simultaneously waived interest. Four thousand, eight hundred and eighty-five dollars ($4,885) still remains unpaid. The theory of disproportionate interests is based on a presumption that a party who is a creditor will, *256 to the detriment of the shareholders, enforce his interest if the debtor fails to make payment. Such theory has, in the Court's opinion, little applicability to the present set of facts. Gould was the only party with a true economic interest in the transaction, i.e. there was nothing disproportionate. He desired to subdivide property and at the same time obtain capital gain rates on the appreciated value. Foreclosure in the event of nonpayment would simply have returned Gould to his earlier position. What he was most interested in was the promotion of the sale of the land, i.e. an equity interest. With regard to the success of the venture we note that only 32 of 46 lots in Sunrise Point were sold between 1955 and at least 1960. In our opinion this does not represent unbridled success. However, assuming the transaction was successful, petitioners have failed to demonstrate that such was reasonably certain at the time of the initial transfer. [89]Piedmont Corporation v. Commissioner, 388 F. 2d 886 (C.A. 4, 1968), revg. a Memorandum Opinion of this Court; Aqualane Shores, Inc. v. Commissioner, 269 F. 2d 116 (C.A. 5, 1959), affg. 30 T.C. 519 (1958). Rather, as is noted in the facts *257 a major portion of the buyers of the various parcels defaulted for one reason or another. Sans Souci Company The equity factors are equally or even more apparent in the transfer to Sans Souci Co. On November 17, 1955, 2-1/2 months after the initial transfer from Gould to Sunrise, Inc., Sunrise, Inc. transferred the Sans Souci subdivision to Sans Souci Co. The sale price was very nearly the same as had been assigned to this land on the initial transfer from Gould, [90] *258 thereby substantially eliminating the gain recognizable by Sunrise, Inc. [91] There was no business purpose for the transfer other than the reduction of income taxes through the use of a multi-surtax exemption. [92]
The corporation was so thinly capitalized as to be transparent (a ratio of 392 to 1). It was incorporated with a paid-in capital of $900. Immediately thereafter it purchased the Sans Souci subdivision for a total consideration of $340,000, consisting of $7,275 in cash and a note covering the remaining $332,725. Simultaneously, in order to meet the required down payment and improve the land prior to sale, Gould and Rosen each transferred an additional $10,000 to the corporation. Though the required payments were made they were not completed until 4 years after the due date. As in Sunrise, Inc., the payment of the purchase price was contingent solely on the successful sale of the property. *259 And the expectation of success was even more uncertain since the Sans Souci subdivision required more significant improvements than were necessary in Sunrise Point. Further, Sunrise, Inc. could cast little light on the probability of success since Sunrise, Inc. did not register a sale until sometime in 1956, several months after the conveyance to Sans Souci Co. Peat Corporation During the summer of 1955 Gould informed Hunter of the impending partition with Sapiro. Several months later Hunter, Louis and Rosen purchased Sapiro's portion of the Sunrise properties, including the major portion of Sunrise Harbour and a small portion of Sunrise Point. The property, to a great extent, was either underwater or covered with mangrove and therefore needed massive improvement before it could be sold. None of the three purchasers had any knowledge of the real estate field. These facts, coupled with the prior ventures, lead to a logical conclusion that neither Hunter, Louis nor Rosen would ever have purchased the property without a prior "gentlemen's agreement" from Gould that he would improve and sell the land. Such is exactly what occurred. Peat Corp. was incorporated on April 4, 1956 *260 with a paid-in capital of $4,500. Immediately thereafter it purchased Sunrise Harbour and the small portion of Sunrise Point (for purposes of brevity we will refer to both as Sunrise Harbour unless otherwise indicated) for a total 119 consideration of $713,500 consisting of $18,500 in cash, the assumption of a mortgage totaling $240,000 due Sapiro, and the execution of a note covering the remaining $455,000. [93] Thus immediately after incorporation its debt to equity ratio was $695,000 to $4,500 or 154 to 1. [94] *261 The shareholders were well aware that the corporation would need substantial additional funds to improve the land before it could be sold, and in fact Peat Corp. received $12,500 from Dr. Nathan Schacher and $783,500 from Gould. Finally, although this Circuit has rejected the notion that thin capitalization will alone justify the commissioner in designating indebtedness as capital, Rowan v. United States, 219 F. 2d 51 (5th Cir. 1955), it is very strong evidence in a case such as this where (1) the debt to equity ratio was high to start with, (2) the parties understood that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations. United States v. Hunderson, 375 F. 2d 36, 40 (C.A. 5, 1967). The above quoted language is clearly applicable to the instant transaction. Like its two predecessors, Peat Corp.'s only asset was the land. Payment of the note was contingent solely on the sale, and as noted above, before sales could be *262 made extensive development was required, further indicating the creation of equity rather than debt. Aqualane Shores, Inc., supra; Burr Oaks Corp., supra. Looking next to the history of payment we note that while the entire $240,000 obligation owed Sapiro was timely paid, only $32,200 of the $455,000 owed Hunter, Louis and Rosen was ever paid. In addition, interest was waived after October 1958. As in Sunrise, Inc. the sales price greatly exceeded the property's fair market value at the time of conveyance. Recalling our earlier discussion we noted that Hunter, Louis and Rosen acquired Sunrise Harbour from Sapiro for a total consideration of $315,360. Seven months later they sold most 121 (not all-retaining the westerly portion of Tract 7, Tract 4 and Tract 6 (east)) of this property to Peat Corp. for $713,500. This enormous increase is due to the parties' over-valuation of the property, i.e. the anticipation of profits to be derived from extensive development. Piedmont Corp., supra, at 890; Burr Oaks Corp., supra. Such was, as we have noted earlier, consistent with the parties' desires to obtain substantial capital gain treatment while at the same time subdividing and selling *263 the property at nominal ordinary gain. Our decision with regard to over-valuation is once again substantiated by the appraisals of Coopman and Slack which valued the property at $294,000 and $344,350, respectively (petitioners submitted no appraisal). While there could conceivably be an error in the valuation, such could not exceed $400,000. Lastly, we note that while Hunter and Rosen were not shareholders of Peat Corp. they, along with Louis, were shareholders of the nine corporations which acquired the Sunrise Harbour property. [95] It is therefore apparent that any possible problem created by this formalistic void of 122 creditor-shareholder continuity [96] is removed when we look to the entire substance of the transaction. Transfer to Eight Corporations We are in this instance concerned with the transfer by Peat Corp. of the Sunrise Harbour property to eight of the nine corporations. [97] Initially we held that the conveyance of property to the various organizations was done, at least primarily, for the purpose of reducing taxes. However this factor alone should *264 not convert debt to equity if in fact debt exists. It is our determination however that in substance no such debt was ever created. Looking first to capitalization we note that the eight corporations were formed with a total of $15,360 of paid-in capital. Immediately thereafter these eight corporations purchased the Sunrise Harbour property for a total price of 123 $1,104,750, paying $9,250 at the time of sale and thereby leaving an unpaid balance of $1,095,500. [98] *265 These figures reflect a debt to equity ratio of approximately 71 to 1. We recognize that the extreme debt equity ratio is of less significance in this instance because the eight corporations were not required to make additional capital expenditures, but rather, were simply going to sell the purchased lots. Therefore Peat Corp. could at first blush reasonably expect payment in a relatively short period of time. Piedmont Corp., supra, at 890. However, that in reality was not the true situation. The eight corporations were given equitable title to property which could not be sold until Peat Corp. made substantial improvements. Therefore, it is manifest that Peat Corp. could expect no payment until it improved the land. As it turned out, such improvements were not completed until December 1962, 5-1/2 years after the sale. As we noted earlier, a factor considered in determining the existence of debt or equity is the transferor's expectation of payment, i.e. payment regardless of *266 the transferee's success. Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957). It is quite apparent that Peat Corp. could not be paid until the land was sold and the land could not be sold until Peat Corp. completed the extensive improvements. See Aqualane Shores, Inc., supra; Burr Oaks Corp., supra. The note issued by the eight corporations were due and payable 4 years after issuance. As of December 31, 1961, 4-1/2 years after issuance, Peat Corp. had received $228,800 of the unpaid $1,130,500. [99] As of December 31, 1965, Peat Corp. had received an additional $151,084 bringing the total to $379,884. During 1960 and 1961, Peat Corp. extended the due dates 3 years and waived all interest. Demand for payment was never made and suit was not brought to force payment. Lastly we note that as of December 31, 1965, the eight corporations had sold 83 of 121 lots and, as noted above, *267 Peat Corp. had received $379,884. We seriously doubt that 125 the shareholders and directors of Peat Corp. expected to receive an additional $750,000 from the sale of the remaining 38 lots. In short, the conglomeration of these factors removes any possible belief that Peat Corp. could have reasonably expected payment within the time initially specified, i.e. there was clearly no debtor-creditor relationship created. Coral Glade Company For purposes of clarity we note initially that whether the two transfers of property are considered together or separately they are both in our opinion exchanges by Gould in return for an equity interest. See infra, footnote 100. In the interest of brevity the transfers are discussed together. Coral Glade Co. was incorporated on November 16, 1955, with a paid-in capital of $5,000. Shortly thereafter it purchased from Gould (through Sylvania Corp., a nominee of Gould), the Coral Glade Heights subdivision at a total cost of $240,000 - $5,000 in cash and a note reflecting the balance - thereby creating a debt equity ratio of 47 to 1. Approximately 17 months later in August 1957, Coral Glade Co. purchased from Gould the Coral Gardens subdivision. *268 The sale price was $670,000 including $5,000 in cash, the 126 assumption of a $75,000 mortgage and the issuance of a note for the remaining $590,000. [100] *269 A further indication of the corporation's under capitalization is the land improvements required before the two subdivisions could be sold. The estimated cost of such improvements totaled $412,000 ($80,000 for Coral Glade Heights and $337,000 for Coral Gardens). To help finance these expenditures Coral Glade Co. borrowed $6,000 from Gould and $126,000 from Hunter. The Court of Appeals for the Fifth Circuit in Aqualane Shores, Inc. v. Commissioner, supra at 120 noted: 127 In the Sun Properties case the income from the property transferred was such as to require the conclusion that the obligation could be paid from it leaving the capital assets unimpaired. Here the property was not income producing and required expenditure of development costs to make it subject to profitable sale. The contract obligations clearly represented risk capital. This language is quite obviously applicable to the present situation. The notes issued with regard to the Coral Glade Heights property were due and payable in 1961. However as of the *270 date of the trial only $51,650 had been paid. The remaining balance was conveyed to Gould in 1964 and 1965. Interest was waived after 1960. Coral Gardens was no different. The notes were due during 1962 but no payment was made until 1965. As of the date of trial $167,350 remained unpaid. No interest except approximately $5,000 was ever paid. Adding to the already obvious conclusion that the notes are in fact equity, it is our conclusion that the "selling price" exceeded the properties' fair market value. This decision is based on the appraisal reports prepared by Coopman and Slack, which valued the two parcels as follows: Coopman
Slack
Selling Price Coral Glade Heights
$100,000
$110,000
$240,000
Coral Gardens
302,500
330,000
670,000 128 While we readily admit that petitioners' counsel did an excellent job of "punching holes" in these appraisal reports, we find such holes to be of relatively little consequence when compared to the obviously thorough appraisal prepared by the above two named individuals. Petitioners, however, did introduce a condemnation award issued by the Circuit Court of the Eleventh Judicial Circuit of Dade County, Florida, for a portion of the Coral Gardens subdivision *271 which they assert demonstrates the erroneous valuations reported by Coopman and Slack. Initially we point out that condemnation awards are normally not used in determining a property's fair market value. Cf. American Society of Appraisers, Appraisal and Valuation Manual, vol. 7, 1962-63. Further, the condemnation award was in regard to approximately 22 acres within Coral Gardens; it did not value a 150 acre tract. Finally, and most importantly, the condemnation award was issued during the month of April, 1959 almost 2 and 3 years after the transfers in issue. With these factors in mind, we find the disparity 129 to be far less significant than petitioners would have us believe. [102] *272 However, to the extent there may remain a question as to the properties' value at transfer we note that over-valuation is not a requirement in determining the existence of equity. Aqualane Shores, Inc., supra. Coral Way Land Company Coral Way Land Co. is no different than any of the other corporations heretofore mentioned except that the tax avoidance motives causing its formation are perhaps more apparent. [103]The corporation was thinly capitalized. Immediately after formation it borrowed additional funds. Insignificant payments were *273 made on the notes. Substantial land improvements were required. Payment of the sale price was contingent solely on the sale of the various lots and such sales were far from certain. Coral Way Co. was incorporated on September 17, 1959, with Emil and Estelle Gould as its only two shareholders. The paid-in capital totaled $15,000. Immediately thereafter Gould loaned Coral Way Co. $37,500. Coral Way Co. in turn loaned $50,000 to Coral Glade Co. taking back an option on a large section of the Coral Gardens subdivision. It exercised the option and "purchased" the property for a total consideration of $507,150 with the $50,000 loan acting as the down payment. The debt equity ratio was therefore $494,650 to $15,000, or 33 to 1. Noted in one of the land contracts entered into between Coral Way Co. and a buyer, Rafkind Development Corp., was the following: As part of this transaction, the Seller obligates itself at the time of closing, and such obligation shall survive the closing, to do the following things: 1. To cause the land covered by this contract to be brought *274 to the grade of the crown of the finished road facing it. 131 2. To pave the streets as indicated on the plat surrounding, facing, or abutting the property being sold hereunder.
3. To bring and install drainage structures, including the digging of swales, sanitary sewers, and water mains, water lines, and water meters to each of the lots being sold hereunder. 4. To provide access from Coral Way to the property upon which building is to be undertaken for purposes of transmittal of materials, and further, to provide ready access for prospective purchasers. The above clearly indicates the substantial amount of improvements required. Such provisions were included in sales contracts executed up to and through March of 1962. The notes required payment by August of 1962, yet by January 15, 1963, $51,531.20 of the $457,150 unpaid purchase price had been paid. Payment of the purchase price was obviously contingent on the sale of the lots and such sales were far from certain. [104]
Darlington Manor, Inc. Darlington *275 Manor, Inc. was incorporated on January 26, 1959, with a total capital contribution of $25,000. Several 132 months later Gould sold his stock of Housing Co. of Florida to Darlington Manor, Inc. (Housing Co. of Florida's only substantial asset was the Darlington Manor subdivision) for a total consideration of $587,500 with a cash down payment of $15,000 and notes covering the remaining $572,500. Darlington Manor, Inc. immediately liquidated Housing Co. of Florida, acquired its sole asset and its liability which included notes payable to Gould of $349,500 and $18,061 of other liabilities. (The $349,500 notes payable was reallocated $224,500 to Gould, $125,000 to Sapiro who had earlier loaned Gould a comparable amount of money.) The debt equity ratio immediately after liquidation was $922,000 to $25,000, or 37 to 1. The parties were well aware of the fact that the real estate needed substantial improvement before sales could commence. These improvements ultimately cost over $400,000. To finance this necessary work, Darlington Manor, Inc. was again forced to borrow money. Within the next 2 or 3 years after incorporation, Darlington Manor, Inc. borrowed $371,000 consisting of the *276 following: $ 15,000 Kaplan
9,000 Gould
200,000 Sapiro
147,000 Hunter
$371,000 133 Once again quoting from United States v. Henderson, 375 F. 2d at 40: Finally, although this Circuit has rejected the notion that thin capitalization will alone justify the commissioner in designating indebtedness as capital, Rowan v. United States, 219 F. 2d 51 (5th Cir. 1955), it is very strong evidence in a case such as this where (1) the debt to equity ratio was high to start with, (2) the parties understood that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations. The facts enunciated above manifest applicability of the quoted language. The notes evidencing the purchase of the real estate were due and payable by April of 1964. As of that date however only $35,000 had been paid. The remaining $537,500 was paid between 1965 and 1970. No evidence was presented regarding interest and therefore we assume none was paid. Payment of the purchase price was contingent completely on the sale of the subdivided real estate and such sales, as can be seen from the record of payment, were far *277 from certain. Further evidence of the equity character of the notes can be ascertained from the inflated sales price assigned to the Housing Co. of Florida stock. [105] Such price clearly anticipated the appreciated value of the real estate to be brought about by the required improvements. Burr Oaks Corp., supra; Bruce v. Knox, 180 F. Supp. 907 (D. Minn., 1960). Summary The numerous facts enunciated above demonstrate the lack of bona fide debt. Rather, what was established was the intent to obtain undue capital gain treatment through the conveyance of property to various closely held corporations at excessively high prices and continued participation therein in the hopes of obtaining the desired benefit. We therefore conclude that the purported debt is in fact a stock interest. [106] *278 Having determined that the supposed debt was in fact an equity interest it becomes unnecessary to determine whether the notes were securities. The last requisite to the application of section 351 is the existence of the required "control" of the corporation in the hands of the transferors "immediately after" the 135 transfer. Section 368(c) defines "control" for purposes of section 351 as meaning "ownership of stock, possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." With the exception of the transfer by Gould of Coral Gardens to Coral Glade Co. there can be little question regarding the existence of control. Each shareholder upon the formation of the various corporations transferred cash and in return received stock. "It is settled law that *279 money constitutes property for purposes of section 351." Burr Oaks Corp., 43 T.C. at 650; American Bantam Car Co., 11 T.C. 397 (1948), affd. per curiam 177 F. 2d 513 (C.A. 3, 1949). Simultaneously with or shortly thereafter the various transferors exchanged their property for notes which we have previously characterized as equity. This Court in Burr Oaks Corp., 43 T.C. at 651, speaking to this precise point noted: Although Elkind, Watkins, and Ritz may not have received their preferred stock interests in petitioner at exactly the same time as the common stock was issued to Ritz" brothers and the respective wives of Elkind and Watkins, it seems clear that the transfers of cash and the Burr Oaks property to petitioner were integral parts of a unified transaction. * * * On the basis of the record before us, it appears to us that Elkind, Watkins, and Ritz, together with Ritz" brothers, Elkind's wife, and Watkins' wife, were in control of petitioner, as defined in section 368(c), immediately after their transfer of property to it. The situation in the instant case is identical to that presented in Burr Oaks Corp. and we therefore conclude that the requisite control is present. While *280 the Coral Gardens transfer presents a more difficult problem, due to the lapse of time between the corporate formation and the exchange, there can be little doubt that this transfer was also integrally related to the earlier exchange. Gould initially acquired the land as one parcel of property (it was not divided into two subdivisions until the separate conveyances to the corporations). He intended to subdivide, improve and sell the entire area. However, while it was always his intent to transfer the entire property to Coral Glade, he was prevented from carrying out this intent in one step by reason of the fact that acceptable sewage facilities were not immediately available on 110 of the 150 acres. Accordingly he transferred immediately the 40 acres on which proper sewage facilities existed and then, after appropriate facilities became available on the remaining 110 acres, he completed his original plan by transferring this acreage to the corporation. Both parcels were improved and a joint sales program commenced. That Gould dominated the corporation seems clear. The section 351 "control" requirement is met. While we recognize that 17 months is a substantial delay we hasten *281 to point out that multi-transfers need not occur simultaneously. Burr Oaks Corp., supra. Further, the Court of Appeals for the Sixth Circuit affirming per curiam a District Court decision in Stanley, Inc. v. Schuster, 421 F. 2d 1360 (C.A. 6, 1970), affg. 295 F. Supp. 812 (S.D.Ohio, 1969), determined the transfer of land for notes (which it re-characterized as equity) to be interrelated with the purchase of stock even though such transfer occurred 4 years after the initial purchase. We therefore conclude that the necessary control existed with regard to the Coral Gardens transfer as well. Having determined that the nonrecognition provisions of section 351 apply to the transfer of the various properties, [107] the corporate basis in the property is limited to a carryover basis from the transferors plus gain recognized. Section 362(a) (1). [108] *282 138 To the extent subsequent distributions were made to the transferors, such are determined to be taxable as dividends to the extent of corporate earnings and profits. [109] *283 138 a Issue 2. Dealer vs. investor Having determined that the transfers to the various corporations were nontaxable section 351 exchanges, we need only decide the character of the gain recognized on the sale of the Clin Clara property. [110] *284 Such will depend on our determination as to whether Gould held the real estate primarily for sale to customers in the ordinary course of business or as an investment. This, of course, is a question of fact. W. T. Thrift, Sr., 15 T.C. 366 (1950). Faced with this question on innumerable occasions, the courts have adopted several well-recognized tests. These tests include: (1) The purpose for which the asset was acquired; (2) the frequency, continuity, and size of the sales; (3) the activities of the seller in the improvement and disposition of the property; (4) the extent of improvements made to the property; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held during the taxable years. William B. Howell, 57 T.C. 546, 554 (1972). 139 Applying these tests to the facts of the instant cases it seems clear that the Clin Clara property was held for investment. The land, consisting of 160 acres, was acquired in March 1954 for a total consideration of $181,655.59. In July of 1959, over 5 years later, Gould sold 137-1/2 acres of this property to Shore, an unrelated third party. The sale price totaled $628,500. During the period between acquisition and disposition the land was neither subdivided nor improved. Gould did not advertise the property for sale but rather was approached with regard to its sale. The gain recognized *285 was due solely to appreciation. Respondent raises two contentions however which deserve reply. First, he points to Gould's activity in the various areas of the real estate field and argues that this demonstrates his dealership characteristics. He further contends that a piece of property may be held primarily for sale to customers in the ordinary course of business though such is not indicated from the above enunciated tests, as for example the conveyance of unimproved land to a closely held corporation which in turn subdivides, improves and sells the property. Turning to respondent's first contention we note that the case law is replete with decisions which hold that a person may be both a dealer and an investor. William B. Howell, 57 T.C. at 557; Real Estate Corp., 35 T.C. 610 (1961), 140 affd. 301 F. 2d 423 (C.A. 10, 1962); Charles E. Mieg, 32 T.C. 1314 (1959). Therefore it is not the individual's characteristics which are determinative but rather the characteristics of each individual parcel of property. The above noted factors indicate that the Clin Clara property was held for investment. With regard to the second assertion, this Court recognizes that there have been *286 decisions holding an individual to be a dealer as to a particular parcel of property though he did little to improve, subdivide, or sell the land but rather conveyed such property to a closely held corporation to carry out such desires. See Burgher v. Campbell, 244 F. 2d 863 (C.A. 5, 1957); Royce W. Brown, 54 T.C. 1475 (1970), Affd. 448 F. 2d 514 (C.A. 10, 1971). These, and other cases cited by respondent, are factually distinguishable from the present transaction especially in light of the ultimate purchaser of the Clin Clara property. Issue 3. Taladen Company The Court must next consider whether the income of Taladen Co. is taxable to Gould. 110a In arriving at such a decision we are required to determine whether Taladen Co. was a sham or, in the alternative if the corporation was a viable entity, whether Gould was the true earner of the income. 141 In American Savings Bank, 56 T.C. 828, 838 (1971), this Court noted: It is clear that a corporation, even though duly organized *287 under the laws of a State, is subject to attack and the concomitant consequences if it is found to be no more than a vehicle for tax avoidance and void of any other legitimate business purposes. Gregory v. Helvering, 293 U.S. 465 (1935); Aldon Homes, Inc., 33 T.C. 582 (1959). It is equally true, on the other hand, that a corporation formed for a legitimate business purpose and conducting business activity must be recognized as a separate taxable entity. Moline Properties v. Commissioner, 319 U.S. 436 (1943); Ernest H. Weigman, 47 T.C. 596 (1967) affirmed per curiam 400 F. 2d 584 (C.A. 9, 1968); Sam Siegel, 45 T.C. 566 (1966). It is apparent from the evidence presented that the corporation was organized for no other reason than the obtaining of tax benefits. It carried on no business activities and therefore did not earn the income in question. Though a legal entity in form, the clear substance necessitates a conclusion that Taladen Co. was a sham and must be disregarded. To substantiate this decision we note as background that Taladen Co. was created and controlled by Gould with stock ownership in himself and his family. He alone could perform the supposed activities of the *288 corporation. Taladen Co.'s only occupation was as sales agent for three corporations in which Gould had a substantial interest, Coral Glade Co., Coral Way Co. and Darlington Manor, Inc. Gould, beside being in effective control of these corporations, was responsible for carrying out their everyday activities, 142 which we conclude would logically include selling activities. Thus, the corporate responsibility of Taladen Co. was, in substance, simply to reproduce the activities required of Gould in his role as manager of the three other corporations. The various selling activities were performed by Gould and several outside unrelated brokers. The commissions were not paid timely. In short, the formation of Taladen Co. was required for no other reason than the spreading of income and the creation of another surtax exemption. [111] *289 Further, had we determined Taladen to be a viable entity it is manifest that Gould and not the corporation earned the income and therefore, under the ever-present theory of "assignment of income," [112] he would be subject to the tax thereon. Lucas v. Earl, 281 U.S. 111 (1930); United States v. Basye, U.S. (1973) 73-1 U.S.T.C. par. 9250; Jack E. Morrison, 54 T.C. 758 (1970); Jerome J. Roubik, 53 T.C. 365 (1969). 143 Having determined that Taladen Co. is a sham it is our further opinion that the income payable to such corporation is additional compensation rather than dividend income to Gould. We base our conclusion on the simple fact that Gould carried out a necessary function for which he reasonably could be compensated. Our characterization of the income payable to Taladen Co. as compensation to Gould would logically imply an equivalent deduction to the various corporations. However, respondent contends otherwise. A substantial portion of the income was not paid to Taladen *290 in the year earned or within 2-1/2 months of the following year. Coral Glade Co., Coral Way Co. and Darlington Manor, Inc. were on the accrual method while both Gould and Taladen were cash basis. Respondent therefore contends that section 267(a) (2) denies such deduction to the extent not timely paid.
Section 267(a) (2) provides: SEC. 267. (a) Deductions Disallowed. - No deduction shall be allowed - * * * (2) Unpaid Expenses and Interest. - In respect of expenses, otherwise deductible under section 162 or 212, * * * (A) If within the period consisting of of the taxable year of the taxpayer and 2-1/2 months after the close thereof (i) such expenses or interest are not paid, and (ii) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and 144 (B) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (C) If, at the close of the taxable year of the taxpayer or at any time within 2-1/2 months thereafter, both the taxpayer and *291 the person to whom the payment is to be made are persons specified within any one of the paragraphs of subsection (b). The facts clearly indicate the applicability of subsections 267(a) (2) (A) and (B). The remaining question concerns the necessary relationship required in subsection 267(a) (2) (C) which in turn refers to 267(b). In the instant case, since we are dealing with a corporation and its shareholder, subsection 267(b) (2) would be the appropriate provision. It states: (b) Relationships. - The persons referred to in subsection (a) are * * * (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual. Gould owned all of the stock of Coral Way Co. [113] and therefore there can be no doubt as to the relevance of the above quoted provision. 145 Coral Glade Co. and Darlington Manor, Inc. are more difficult. The stock ownership of these corporations, as reflected in the facts, indicates *292 Gould holding 50 percent of Coral Glade Co. and 40 percent of Darlington Manor, Inc. Manifestly such is not "more than" 50 percent. However, we initially characterized the notes received by Gould from the corporations on the sale of the various parcels of property as stock. Therefore, it is apparent that Gould did in fact own more than 50 percent in value of the capital of the corporations and thus the requirements of subsection 267(b) (2) are satisfied. [114] We find support for this position in a recent Fifth Circuit decision, In re Indian Lake Estates, Inc. v. Stewart, 448 F. 2d 574 *293 (C.A. 5, 1971), wherein the Court characterized purported loans as an equity interest and thereupon determined that the sales of property to the corporation at a discount were between related taxpayers and disallowed the deduction. The Court stated: 146 We conclude * * * that the financial input of the Lake Wales Group, Mr. and Mrs. Edelen and the Barmit Group was equity capital and not loans. The determination that the Lake Wales Group were equity investors who owned more than 50 percent of the capital of the corporation means that the Commissioner correctly determined that the discount sales by Indian Lake Estates of its land purchase installment contracts to the same individuals were sales between a corporation and a controlling stockholder. Therefore, the expense of these discounts was not allowable under Section 267 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 267. [448 F. 2d at 580] The requisites of section 267 are met and therefore the three corporations are denied a deduction to the extent payment was not timely made. Issue 4. Advances by Gould to Peat Corporation Debt vs. Equity From 1956 through 1964 Gould advanced $783,500 to Peat Corp. Respondent contends *294 that such advances were not bona fide debts but rather a series of capital contributions. Alternatively respondent argues that if we determine the conveyances to be a series of loans the repayments must first be allocated to interest and then principal. We disagree with both assertions. It is our opinion that Gould did in fact intend the creation of a debtor-creditor relationship. In support of this conclusion we note that all formal debt requirements were met. While, as indicated earlier, this is far from controlling, it is 147 certainly relevant. Baker Commodities, Inc., 48 T.C. 374 (1967), affd. 415 F. 2d 519 (C.A. 9, 1969). Having characterized the Sunrise Harbour transfer as an equity contribution, the debt equity ratio is now supportive of the taxpayers' position. [115] *296 Additional loans were made to Peat Corp. by independent creditors as well as another shareholder of the corporation, reflecting the economic reality of the transaction. Jack Daniel Distillery v. United States, 379 F. 2d 569, 582 (Ct. Cl. 1967); Fin Hay Realty Co. v. United States, 398 F. 2d at 697. The various corporations, including Peat Corp., had a history of borrowing from various shareholders. Of *295 the $783,500 borrowed over the 10 year period $607,000 of this amount was contemporaneously repaid as compared with $32,200 paid Hunter, Louis and Rosen on the supposed sale of the property, further indicating the validity of the debt. As we noted in C. M. Gooch Lumber Sales Co., 49 T.C. 649, 657 (1968): 148 We think it of some significance that the advances were reflected in a "running" rather than "static" open account between petitioner and Harriston Lumber. Petitioner actually collected the net proceeds of sales which it made on behalf of Harriston Lumber. Instead of remitting such proceeds to Harriston Lumber, however, petitioner applied them against the then outstanding balance in the "running" account. This procedure is markedly different from the situation in which straight cash advances are allowed to build up without any repayments. Therefore, while it is clear that the successful sale of the Sunrise Harbour subdivision was far from certain and that the advances made were done in an attempt to improve the possibility of success, it is the opinion of this Court that in the present instance Gould was more concerned with his status as a creditor than as a shareholder. Alternatively, respondent contends that Gould should be required to allocate the repayment first to interest and then to principal. This assertion is based solely on the accrual of the interest expense by Peat Corp. which, argues respondent, constitutes an allocation of the future payments to be made between interest and principal by the debtor. We cannot agree. The accrual of an expense or deduction is not necessarily controlling with respect to how the future payment of such item should be allocated. The order or allocation of a payment should more properly be governed by the pertinent facts which specifically bear upon such allocation including among others, a mutual agreement of the 149 parties or the treatment of such *297 payment on the debtor's books. See George R. Newhouse, 59 T.C. 783 (1973); Henry M. Rodney, 53 T.C. 287, 312-13 (1969); Estate of Daniel Buckley, 37 T.C. 664, 670 (1962). In the instant cases, the only evidence presented is a stipulated chart which indicates the amount of money transferred by Gould and the amount of principal and interest repaid by Peat Corp. [116] Without additional facts we cannot take it upon ourselves to reallocate what seems to have already been done by the debtor. There are no facts presented which refute the apparent allocation indicated by the stipulated material. 150 Issue 5. Multiple Surtax Exemption The next issue to be decided is whether the various corporations are entitled to separate surtax exemptions. Respondent, for years prior to 1964, applying the provisions *298 of sections 1551 and/or 269, has disallowed the exemptions applicable to Sans Souci Co., Coral Way Co. and the eight corporations which acquired property from Peat Corp. For this same period respondent has disallowed the surtax exemptions of Southern Rock and Fill Co. and Housing Engineers of Florida, Inc., through the application of section 269.For years 1964 and later he has allocated one surtax exemption among the entire group of corporations [117] on the theory that all are part of a controlled group as defined in sections 1561 and 1563. Preliminarily we note that petitioners concede the disallowance of the surtax exemptions to the eight corporations which acquired land from Peat Corp. We therefore turn our attention first to the applicability of section 1551 to Coral Way Co. and Sans Souci Co. 151 Section 1551 provides in pertinent *299 part: SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT. (a) In General. - If - (1) any corporation transfers, on or after January 1, 1951, and on or before June 12, 1963, all or part of its property (other than money) to a transferee corporation, (2) any corporation transfers, directly or indirectly, after June 12, 1963, all or part of its property (other than money) to a transferee corporation, * * * and the transferee corporation was created for the purpose of acquiring such property or was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor or transferors are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then for such taxable year of such transferee corporation the Secretary or his delegate may * * * disallow the surtax exemption (as defined in section 11(d)), * * * unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. (b) Control. - For purposes of subsection (a), the term "control" means (1) With respect *300 to a transferee corporation described in subsection (a) (1) or (2), the ownership by the transferor corporation, its shareholders, or both, of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock; or (c) Authority of the Secretary Under This Section. - The provisions of section 269(b), and the authority of the Secretary under such section, shall, to the extent not inconsistent with the provisions of this section, be applicable to this section.
It is apparent from the above quoted statute that if (1) property (other than money) is transferred by one corporation to another and (2) the corporation was created for the purpose of acquiring the property, and (3) the 152 transferor corporation, its shareholders or both were in control of the transferee corporation, then the transferee corporation's surtax exemption will be disallowed unless the taxpayer establishes by the clear preponderance of the evidence that the securing of this attribute was not a major purpose of the transfer. [118] *302 Such is a question of fact, New England Foundry Corp., 44 T.C. 150, 157 (1965). *301 There can be little doubt that the three requisites have been established. Sunrise, Inc. transferred land to 153 Sans Souci Co. and Coral Glade Co. transferred a portion of its property to Coral Way Co. [119] *303 The two corporations were created to acquire the various parcels of real estate. And the transferor corporations and their shareholders owned 100 percent of the stock of Sans Souci Co. and Coral Way Co. [120] Therefore, the only remaining factor is petitioners' demonstration that securing an additional surtax exemption was not a major purpose of the transfer. In our opinion they have not done so. Rather, the facts clearly demonstrate that at least the dominant motive for the creation of the two corporations was to obtain additional surtax exemptions. Gould conveyed Sunrise Point and Sans Souci to Sunrise, Inc. Shortly thereafter Sunrise, Inc. conveyed the Sans Souci subdivision to Sans Souci Co. The two subdivisions were adjacent to each other. Similar improvements were required. Both parcels of property were subdivided and sold for the construction of single family homes. All shareholders were the same except for Louis. Gould was the general manager of both 154 corporations and was in effective control of the entire operation. All the land was sold through a single entity. Petitioners argue however that the creation of Sans Souci Co. was necessary because Louis refused to agree to the improvement and sale of the Sans Souci subdivision due to the additional required costs. However, we note that Louis was a member of the partnership which was created to sell all the Sunrise properties including Sans Souci. He was a shareholder in Peat Corp. and the *304 eight corporations which acquired the land from Peat Corp. These entities were required to improve and sell Sunrise Harbour, a development necessitating far more extensive improvements due to its sub-sea level location and therefore containing a far greater risk of loss. As to Coral Way Co. petitioners argue it was created because Coral Glade Co. needed money due to the default of Centerbrook Construction Co. and Hunter refused to advance the required funds. Here we note, first, that Coral Way was formed in 1959 and Centerbrook defaulted in 1961 or 1962. Secondly Hunter, following the instant transaction, loaned Coral Glade Co. $125,000. In addition, Coral Glade Co. received comparatively little money from Coral Way Co. Of further interest is the fact that Gould owned both the Coral Gardens and Coral Glade Heights subdivisions yet he 155 conveyed them to a corporation with Hunter as a 50 percent shareholder, though Hunter had little if any knowledge of the real estate business. Thereafter a portion of this same property was conveyed to Coral Way Co., an entity owned completely by Gould. It is difficult to divine the purpose of such transfers. The property conveyed was merely *305 a portion of the subdivision held by Coral Glade, Co. All such property was subdivided and sold for a similar purpose, single family dwellings. Gould was in effective control of both corporations and supervised the improvements and sales. Beacon Auto Radiator Repair Co., 52 T.C. 155 (1969); House Beautiful Homes, Inc. v. Commissioner, 405 F. 2d 61 (C.A. 10, 1968), affg. a Memorandum Opinion of this Court. We recognize that a substantial change in stock ownership (Gould and Hunter each owned 50 percent of the Coral Glade Co. stock while Gould owned 100 percent of Coral Way Co. stock) could tend to reflect a bona fide transfer. However, in the instant cases, in light of the fact that the various transfers were not arm's length, and further that Hunter, as a shareholder, never received any economic benefit from any of the corporations, including Coral Glade Co., we find such equity differential to be of relative insignificance. 156 We therefore conclude that petitioners have not demonstrated by the clear preponderance of the evidence that the securing of additional surtax exemptions was not a major purpose for the transfers, and we therefore disallow these exemptions.
Having determined *306 section 1551 applicable it becomes unnecessary to consider the relevance of section 269. We must next turn our attention to respondent's disallowance of surtax exemption to Southern Rock and Fill Co. and Housing Engineers of Florida, Inc., two corporations wholly owned by Gould, through the application of section 269. Initially we note that section 1551 is not the exclusive weapon used to deny a surtax exemption; section 269 is equally applicable. See section 1551(c); James Realty Co. v. United States, 280 F. 2d 394 (C.A. 8, 1960); Coastal Oil Storage Co. v. Commissioner, 242 F. 2d 396 (C.A. 4, 1957), affirming in part and reversing in part 25 T.C. 1304 (1956). Section 269 provides in part as follows: SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate *307 157 may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. It is well established that the formation of a new corporation is an acquisition for purposes of section 269. Your Host, Inc., 58 T.C. 10 (1972). Further, there can be little doubt about Gould's control. Therefore, the only remaining question is whether the corporations were created to avoid tax through the acquisition of a deduction not otherwise available. Such is a question of fact. While we have some reservations with regard to the intentions behind the formation of both corporations, [121] *308 it is our conclusion that only one of the two entities was formed for the principal purpose of creating an additional surtax exemption. 158 In support of our conclusion we need only point out that both entities were incorporated almost simultaneously to perform precisely the same work. [122] Each executed identical functions for the same corporations. And the income reported by the two corporations reflects an attempt to allocate to each an equal portion thereof no greater than $25,000. [123]
Gould introduced no substantive evidence to negate the above disclosed facts. Rather his case as to this issue rests solely on the subject intent *309 ascertainable from his testimony. As we noted in Your Host, Inc., 58 T.C. at 30, 159 "the existence of a principal non-tax-avoidance purpose for forming the corporations can better be proven with evidence of objective facts rather than with subjective evidence of intent provided by the principals." We therefore disallow the surtax exemption claimed by Southern Rock & Fill Co. Joe (Joseph) Dillier, 41 T.C. 762 (1964), affd. per curiam sub. nom. Made Rite Investment Co. v. Commissioner, 357 F. 2d 647 (C.A. 9, 1966); Concord Supply Corp., 37 T.C. 919 (1962). The final question presented concerns the propriety of respondent's allocation of one surtax exemption to the entire group of corporations for years subsequent to 1963. Such allocation is based on the conclusion that the numerous entities are a controlled group [124] as defined in section 1563 and therefore are permitted, under the language of section 1561, only one surtax exemption. Section 1561 provides: 160
SEC. 1561. (a) General Rule. - If a corporation is a component member of a controlled group of corporations on a December 31, then for purposes of this subtitle the surtax exemption of such corporation for the taxable *310 year which includes such December 31 shall be an amount equal to - (1) $25,000 divided by the number of corporations which are component members of such group on such December 31, or (2) if all such component members consent (at such time and in such manner as the Secretary or his delegate shall by regulations prescribe) to an apportionment plan, such portion of $25,000 as is apportioned to such member in accordance with such plan. The sum of the amounts apportioned under paragraph (2) among the component members of any controlled group shall not exceed $25,000. Respondent's entire theory rests upon two initial determinations. First, that the debt created on the supposed sales of land to the various corporations is in fact stock, thereby creating the requisite control necessary in applying section 1563. [125] *312 And secondly, that such stock *311 is not 161 nonvoting and limited and preferred as to dividends for stock characterized in this manner is excluded when determining section 1563 control. [126]
While we have characterized the various notes *313 as stock it is our further conclusion that for purposes of section 1563 such stock is nonvoting and limited and preferred as to dividends. Cf. Erie Lighting Co. v. Commissioner, 93 F. 2d 883 (C.A. 1, 1937); Pioneer Parachute Co. v. 162 Commissioner, 162 F. 2d 249 (C.A. 2, 1947); Vermont Hydro-Electric Corp., 29 B.T.A. 1006 (1934). See also Burr Oaks Corp., 43 T.C. 635 (1965), affd. 365 F. 2d 24 (C.A. 7, 1966); Sherwood Memorial Gardens, Inc., 42 T.C. 211 (1964), affd. 350 F. 2d 225 (C.A. 7, 1965). Therefore the required control is lacking and the corporations are not a controlled group. Respondent has consistently asserted that the debt was preferred stock. Now he argues that though preferred stock it is not nonvoting and limited and preferred as to dividends. We cannot agree. In support of our conclusion we note that the purported debt contains neither the clear conveyance of voting rights nor any latent corporate control, i.e. the ability to elect directors, voting rights in default, etc. Cf. Rudolph Wurlitzer Co. v. Commissioner, 81 F. 2d 971 (C.A. 6, 1936), affg. 29 B.T.A. 443 (1933); Parker Oil Co., 58 T.C. 985 (1972); Ragland Investment Co., 52 T.C. 867 (1969), affd. *314 per curiam 435 F. 2d 118 (C.A. 6, 1970). [127] Such was unnecessary 163 since Gould was in effective control of the various corporations. The purported promissory notes called for the payment of interest at 5 percent per annum. Such amount clearly is fixed, limited, and constitutes a superior right to the corporate earnings. This Court noted in Burr Oaks Corp., 43 T.C. 649, fn. 10: Although we have found the purported promissory notes to constitute equity interests in petitioner for tax purposes, we believe that the holders of those instruments occupied a preferred position vis-a-vis the holders of the common stock. In the first place, the purported promissory notes called for the payment of interest at 6 percent a year. This provision constituted a prior charge on the earnings *315 of petitioner in favor of the holders of those instruments, not unlike a preferred dividend. Thus, we regard the purported promissory notes as preferred stock. We therefore conclude that section 1561 is not applicable to the instant cases. Issue 6. Peat Corp. - Personal Holding Company We must next decide whether Peat Corp. was a personal holding company as defined in section 542 during the years 1961 and 1962. During the years in issue a corporation was determined to be a personal holding company if (1) at least 80 percent of its gross income was personal holding company 164 income [128] and (2) more than 50 percent of the corporation's outstanding stock was owned by five or fewer shareholders. [129] *316 Petitioners admit applicability of the stock ownership requirements. Further, we initially characterized the sales by Peat Corp. as equity contributions and the payments by the various corporations to Peat Corp. as dividends to the extent of the distributors' earnings and profits. Section 543 defines personal holding company income as including dividends paid. Thus, the provisions of section 542 being met, Peat Corp. is subject to the personal holding company provisions. [130] 165 Issue 7. Subchapter S Corporation - Two Classes of Stock - Darlington Manor, Inc. We must next pass upon respondent's contention that Darlington Manor, Inc. was not a subchapter S corporation in 1960 due to the issuance of a second class of stock. [131] This conclusion *317 is based upon the characterization of the notes received by Gould from Darlington Manor, Inc. on the sale of the Housing Co. of Florida stock as an equity interest which in turn, argues respondent, must be treated as a second class of stock.
Little need be said regarding this issue. This Court in James L. Stinnett, Jr., 54 T.C. 221, 230, 232 (1970), stated: [It] is our opinion that regardless whether the notes in question be considered as "debt" or as "equity" under other provisions of the internal revenue laws, for purposes of section 1371 such notes do not change the character of the common stock so as to give rise to more than one class of stock. 166 We further noted: That is not to say that an instrument *318 called a "note" may not by its very terms be something else. However, where the instrument is a simple installment note, without any incidents commonly attributed to stock, it does not give rise to more than one class of stock within the meaning of section 1371. Estate of William M. Allison, 57 T.C. 174 (1971). Further, the Court of Appeals for the Fifth Circuit (the circuit wherein appeal herein lies) [132] in Amory Cotton Oil Co. v. United States, 468 F. 2d 1046 (C.A. 5, 1972), and Shores Realty Co., Inc. v. United States, 468 F. 2d 572 (C.A. 5, 1972), promulgated on the same day, reaching similar results, but for different reasons, determined that the debt-equity test did not create a second class of stock, and therefore, the small business corporation election was valid. [133] *319 In addition see Portage Plastics Co., Inc. v. 167 v. United States, F. 2d (C.A. 7, 1973), 73-1 U.S.T.C. 9261. The facts in the instant cases, with regard to those items evidencing a second class of stock for purposes of section 1371, are in substance little different from those of Stinnett, Allison, and Amory Cotton and we therefore conclude that for purposes of section 1371 *320 and section 1371 only, one class of stock exists. The subchapter S election was therefore valid. That this holding is patently inconsistent with our prior determination with respect to the attributes of the stock is a tribute to the vagarious demands of subchapter S. [134] 168 Issue 7. Transferee Liability We must next decide whether Coral Glade Co. and the Goulds are liable as transferees for the deficiency *321 of Coral Way Co. and whether Peat Corp. is liable as transferee for the deficiency of Camden Corp. It is our conclusion that they are not. Section 6901 provides a method whereby the Commissioner can obtain payment of a deficiency from the transferee of a deficient party. [135] *322 169 Section 6902 places the burden upon the respondent to demonstrate that the petitioner is liable as a transferee. [136] Satisfaction of this burden requires proof of a transfer, the value of the assets transferred, that such was made while the transfer was insolvent or caused the transferor to be insolvent, and that respondent has made a reasonable effort to collect the amount of tax due from the transferor. Section 301.6902-1 Proced. & Admin. Regs.; Helen R. Albert, 56 T.C. 447, 449 (1971). State law is determinative in ascertaining the existence and extent of the substantive liability of the transferee. Commissioner v. Stern, 357 U.S. 39, 45 (1958). Assuming the parties *323 are transferees we must ascertain whether liability exists under Florida law. It is settled law that a voluntary conveyance by one who is indebted is presumed fraudulent and invalid when attacked by a creditor upon a debt existing at the time of the conveyance. McKeown v. Allen, 37 Fla. 490, 20 So. 556 (1896). It is equally 170 fundamental however that an insolvent debtor may make a valid conveyance of property to a creditor for the purpose of either securing or discharging a pre-existing debt. Jones v. Wear, 111 Fla. 69, 149 So. 345 (1933); Jane E. Nutter, 54 T.C. 290 (1970); 27 C.J. p. 534-537, par. 227 and 228. In the situation before us Coral Glade Co. and Peat Corp. conveyed land to Coral Way Co. and Camden Corp. respectively, taking back notes, each secured by a mortgage. While we determined such to be equity contributions for purposes of Federal tax law, such is clearly not binding on a state court. And after extensive research we can find neither statutory authority nor case law which under Florida law would characterize the notes and mortgages issued herein as anything other than a secured obligation to pay. Scrutiny of the case law points up the following general principles: *324 [In] cases of doubt as to whether the parties intended the transaction as a mortgage or conditional sale, hold it to be a mortgage. Franklin v. Ayer, 22 Fla. 654 (1886). Hull v. Burr, 58 Fla. 432, 50 So. 754 (1909); Thomas v. Thomas, 96 So. 2d 771 (1957). If an instrument is a mortgage when executed its character does not afterwards change, for once a mortgage always a mortgage * * *. Pittman v. Milton, 69 Fla. 304, 68 So. 658, 663 (1915). Nelson v. Watson, 114 Fla. 806, 155 So. 101 (1933). 171 In Nelson v. Stockton Mortgage Co., 100 Fla 1191, 130 So. 764 (1930), the Court noted that there can be no mortgage unless there is a debt to be secured. While this would seem to favor respondent's position, the facts indicate that a mortgage and note was given without receiving any consideration in return while in the instant case the mortgagors received real estate in return for the evidences of indebtedness. Further, in Bank of Miami Beach v. Fidelity & Casualty Co. of New York, 239 So. 2d 97 (1970), the court, commenting on the rule that there could be no mortgage unless there is a debt to be secured, noted that such rule is applicable only where there is no obligation whatsoever *325 by way of debt, loan, assumption of liability or under equitable principles of estoppel. Finally, in Jones v. Wear, 111 Fla. 69, 149 So. at 348 the Florida Supreme Court noted: A pre-existing debt is a good and sufficient consideration for a conveyance or transfer of property by a debtor, either in payment or satisfaction of, or as security for, such a debt, both as against creditors and subsequent purchasers. But the debt which constitutes the consideration must be an obligation for which the debtor is legally liable and which he could be compelled to pay by action. In light of the above there can be little doubt that the note and mortgage would be enforceable as against the mortgagors in the instant case. 172 It is therefore our opinion that Florida law compels us to conclude that the notes and mortgages were valid secured debts under state law. Thus the transfers were in payment of such obligations and did not create transferee liability. [137] Further, *326 we note that respondent's admissions on brief make this issue almost moot. He concedes first that, to prove the existence of liability in the instant case under Florida law, he must prove that the conveyances were fraudulent, and secondly, since the liabilities were in existence and secured prior to the years of deficiency, he must further demonstrate that the fraudulent intent existed at the execution or creation of the mortgage because "the payments would relate back to the mortgage." The burden is on the respondent.
The law presumes the transaction to have been honest, that it was without fraud, that it was for an honest purpose, and the person who asserts that it was of a different character must prove it. Tischler v. Robinson, 79 Fla. 638, 84 So. 914, 917 (1920). 173 Thus burden has not been carried. While the parties may not have acted as creditors (see section 351 issue) such is not the equivalent of an intent to defraud future, presently nonexistent creditors. [138]
We conclude that transferee liability does not exist and therefore the parties are not liable for *327 additional tax under section 6651. Net Operating Loss The determination if required is left to the Rule 50 computations. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Coral Glade Company, Transferee, docket No. 4438-68; Sunrise Harbour, Inc., docket No. 4439-68; Peat Corporation, docket No. 4440-68; Estelle Gould, Transferee, docket No. 4441-68; Harbour Development Company, docket No. 4442-68; Trenton Corporation, docket No. 4443-68; Housing Engineers of Florida, Inc., docket No. 4444-68; Dalton Corporation, docket No. 4445-68; Sans Souci Company, docket No. 4446-68; Emil J. Gould and Estelle Gould, docket No. 4447-68; Southern Rock and Fill Company, docket No. 4448-68; Coral Glade Company, docket No. 4449-68; Sunrise Properties, Inc., docket No. 4450-68; Luxor Corporation, docket No. 4451-68; Peat Corporation, Transferee of assets of Camden Corporation, docket No. 4452-68; Darlington Manor, Inc., docket No. 4453-68; Bay Homesites, Inc., Docket No. 4454-68; and Emil Gould, Transferee, docket No. 4455-68. ↩
2. We very much appreciated petitioners' listing in their brief the deficiencies for each particular petitioner for each year involved. Respondent would do well to follow such practice. ↩
3. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. 4. Coral Way transferred assets to Coral Glade in January 1963. Coral Glade transferred assets to Gould in 1964-66. Respondent has therefore assigned identical deficiencies to both Coral Glade and Gould as transferees. It is apparent, as respondent admits, that the parties are not liable for the duplicate amount. ↩
5. Overpayment. ↩
6. Footnote 4, supra. ↩
7. The transfers in issue are as follows: Date
Grantor
Grantee
8/31/55
Emil Gould
Sunrise Properties, Inc.
11/17/55
Sunrise Properties, Inc.
Sans Souci Company
4/1/56
Emil Gould
Coral Glade Co.
4/10/56
Burt Hunter, et al
Peat Corp.
4/11/56
Burt Hunter, et al
Peat Corp.
4/11/56
Peat Corporation
Harbour Development Co.
Sunrise Harbour, Inc.
5/10/57
Peat Corporation
Harbour Development Co.
Harbour Properties, Inc.
Sunrise Harbour, Inc.
Camden Corp.
Dalton Corp.
Trenton Corp.
Bay Homesites, Inc.
Luxor Corp.
(Peat Corp. also transferred property to Sans Souci Co. However, respondent apparently does not question the validity of this sale.) 8 ↩
Date
Grantor
Grantee
8/22/57
Emil Gould
Coral Glade Co.
4/14/59
Emil Gould
Darlington Manor, Inc.
(Gould transferred the stock of Housing Co. of Florida to Darlington. Darlington in turn liquidated Housing Co. of Florida.)
11/10/59
Coral Glade
Coral Way Land Co.
8. As noted above we are herein dealing only with the sales consummated by Gould. See footnote 7, supra. ↩
9. If the corporate entity is disregarded, it is respondent's position that the income reported by Taladen Co. is in reality a dividend distribution from the payor corporations to Gould. 10. Such a determination is apparently contingent upon our earlier decision relevant to whether the supposed sales by Peat Corp. to eight of the other corporate petitioner were in fact sales or section 351↩ transfers. 11. This issue goes only to the liability of Emil Gould, Estelle Gould and Coral Glade Co. as transferees of Coral Way Land Co. ↩
13. ↩ Name
Corporation
Voting Shares
Amount Paid in Bertha Weinberg
Luxor
10
$750
Harry Katzen
Trenton
5
375
Henrietta Tauber
Trenton
5
375
Ethel Goldstein
Camden
10
750
Herman Wepman
Dalton
10
750
Perley Noll
Bay Homesites
10
750
Thomas Reilly
Harbour Properties
10
750
15. Gould acquired Lots 10 and 11 of Tract A on 2/27/46 from Willard Conrow and Conveyed a 1/2 interest in it to Sapiro.↩
14. Gould conveyed 1/2 his interest in Sans Souci to Sapiro.
16. Gould acquired Lot 17, Block C on 9/18/48 from Harold Baxter. Bould's records indicate no conveyance of Lot 17 to Sapiro. Yet on partition Sapiro conveyed 1/2 interest in Lot 17 to Gould.↩
17. The acquisition of Tracts 5, 6 & 7 is unclear.↩
18. Sunrise Harbour was platted into lots prior to partition. Apparently the 6-21 out lots are in reality included in the 1-83 Lots in block 2.↩
19. Sylvania Corp. is a mere nominee or Emil Gould. He is the true grantor. 20. Gould's personal record of real estate transactions indicate that on April 7, 1956 Hunter, Louis and Rosen conveyed to Gould Tract 4, 6 and 7 and Lots 82 and 83 of Block 2. Further on April 16, 1956 Gould conveyed to Hunter, Louis and Rosen 1/2 of Tract 4 and 6 and all of Tract 7. There is no indication that he reconveyed Lots 82 or 83 to them. We find these conveyances to be in complete conflict with the various deeds and stipulation of facts introduced into evidence; (1) on 8/31/55 Hunter, Louis and Rosen acquired Tract 4, 6 (east) 7 (west) (2) Gould conveyed 7 (east) to Sunrise, Inc. on 8/31/55; (3) on 4/11/56, 4 days after Hunter, Louis and Rosen sold Lots 82 and 83 to Gould, they conveyed them to Peat Corp. On April 10, 1956 Sunrise Point conveyed 7 (east) to Peat Corp. who in turn transferred it to Hunter, Louis and Rosen. ↩
22. Footnote 19, supra. ↩
23. Gould sold Darlington Manor, Inc., stock of Housing Co. of Florida (owner of Darlington Manor Property). Darlington in turn immediately liquidated Housing Co. of Florida. ↩
21. Sunrise Harbour was replatted which increased the number of lots. ↩
24. Platted prior to sale by Coral Glade Co. to Coral Way Land Co. there was a total of 13 Blocks created. Therefore, Coral Way Land Co. received approximately 1/2 of the entire tract. ↩
25. For specific block and lot see charts, supra, pp. 18↩ thru 21. 26. This property was not separately appraised by McCune at 11/17/55. However an estimated value can be ascertained from his appraisal of 8/31/55 (the transfer by Gould to Sunrise Point). Such will be discussed in the opinion. ↩
27. Calculated from McCune's testimony-no formal report submitted. ↩
28. See supra fn. 23. ↩
*. The loans were made as follows: ↩
2-29-56
$ 5,000
6-30-56
55,000
9-30-56
30,000
1-31-57
41,000
3-26-57
65,000
3-27-57
20,000
6-11-57
10,000
7-12-57 10,000
11-14-57
5,000
12-17-57
1,000
2-14-58
5,000
2-19-58
5,000
4-1-58
5,000
5-12-58
8,500
6-6-58
26,500
9-16-58
25,000
10-1-58
3,500
11-28-58
3,000
1-12-59
2,500
2-24-59
53,500
29. The term Sunrise properties is intended to include Sunrise Point, Sunrise Harbour and San Souci subdivisions. ↩
30. Carrie Sapiro was co-owner in name only. Her husband Sam Sapiro held the true interest. We will hereafter refer to them as Sapiro.
Sam Sapiro had been a real estate broker for over 40 years. He was very familiar with real estate in Dade County, Florida, specifically the Sunrise properties. ↩
31. Gould sold Sapiro a one-half interest in Tracts A and C of Sans Souci on May 28, 1945. He conveyed to Sapiro a one-half interest in Tract B on June 1, 1946. ↩
32. Mangrove is a tree which lives and grows only in salt water. ↩
33. With the later revision of Sunrise Harbour, Block F was eliminated and became part of the Sunrise Harbour subdivision. ↩
34. As in Sunrise Point only one lot touched the Bay. The remaining easterly portion of this tract had approximately 2 to 5 foot elevation. ↩
35. The property was rezoned several months later but there were only minor alterations. ↩
36. The parties have stipulated the actual price to be $315,360. ↩
37. Use of such terms as loan, convey, sell, purchase, transfer, etc. connotes only the words applied by the petitioners. It in no way conveys a prejudgment by this Court as to the true nature of the various transactions. ↩
38. See footnote 20, supra. ↩
39. The alterations in the deposit receipt agreement were initialed only by Hunter and Gould. We further note that the only parties signing the agreement were Hunter (for the corporation) and Gould. Rosen's name appears only as a witness and Louis did not sign at all. 40. Lots 1-4, Block D of Sunrise Point were not included as security in the mortgage. ↩
41. Calendar year payment of principal and interest: ↩ Calendar Year
Principal
Interest 1956
$157,895
$ 25,090.19
1957
83,925
17,491.84
1958
35,055
9,058.11
1959
35,865
24,261.10
1960
97,875
1961
124,500
1962
3,500
1963
6,500
$545,115
42. The unpaid balance shown above is $11,385 while the unpaid balance demonstrated in footnote 41 is $4,885. The additional $6,500 was paid subsequent to February 28, 1963. 43. We find it somewhat surprising that Gould, even after checking his records, would have much difficulty determining the number of lots sold and unsold. We further note that the Sunrise Point price list, which Gould indicated was written immediately after the incorporation of Sunrise Point, included Block E, Lots 1-14, 16 and 17 which was not conveyed to Sunrise, Inc., but rather was owned by Hunter, Louis and Rosen until they conveyed it to Peat Corp. on April 10, 1956.
44. Includes $7,275 down payment. ↩
45. We note that, although all but one lot was sold prior to 1960, Sans Souci made payments of $68,100 and $81,275 to Sunrise, Inc. in 1960 and 1961 respectively and payments of $500 and $1,845 in 1963 and 1964. ↩
46. There is no deed in the record evidencing such a conveyance. Rather, the parties stipulated the above noted event. ↩
47. See footnote 20, supra. To reiterate, Gould's personal record of real estate transactions indicates that on April 7, 1956 Hunter, Louis and Rosen conveyed to Gould Tracts 4, 6 and 7 and Lots 82 and 83 of Block 2. Furher, on April 16, 1956, Gould conveyed to Hunter, Louis and Rosen one-half of Tract 4 and 6 and all of Tract 7. There is no indication that he reconveyed Lots 82 or 83 to them. These conveyances appear to be in conflict with the various deeds and stipulations of facts introduced into evidence; (1) on August 31, 1955 Hunter, Louis and Rosen acquired Tract 4, 6 (east), 7 (west); (2) Gould conveyed 7 (east) to Sunrise Inc. on August 31, 1955; (3) on April 11, 1956, 4 days after Hunter, Louis and Rosen sold Lots 82 and 83 to Gould, they conveyed them to Peat Corp. On April 10, 1956, Sunrise, Inc. conveyed 7 (east) to Peat Corp., who in turn transferred it to Hunter, Louis and Rosen. 48. A mortgage executed by Hunter, Louis and Rosen to Sapiro, the initial seller, was retained by the three sellers and Peat Corp. was not obligated to make payments thereon. No question of sec. 1031 like kind exchange was raised. ↩
49. We have had difficulty ascertaining the value of the voting and nonvoting stock in both this and the other corporations which acquired property from Peat. For example, Meyer owned 10 shares of voting stock and paid $750, while Gould owned 7.5 shares of voting stock and 90 shares of nonvoting stock and paid $292.50. 50. The record is void of information relevant to the reduction in basis on the remaining lots due to the sale of the 16 lots in Block E of Sunrise Point. Figures were stipulated, inaccuracy cannot be explained. ↩
51. The purchase price of the 121 lots acquired by the nine corporations was $1,140,750. Ten thousand two hundred and fifty dollars ($10,250) was paid at the time of purchase, leaving an unpaid balance of $1,130,500. As of December 31, 1965, 83 of the 121 lots had been sold to third parties and Peat Corp. had received only $433,384.05 of the unpaid balance. It would clearly be difficult for the $697, 116 from the sale of the remaining 38 lots. Note also that the 1956 payment of $53,500 to Peat Corp., supra at 57, corresponds precisely to the sale price of the 16 Sunrise Points lots sold to Harbour Development and Sunrise Harbour - which would increase even further the amount still owing on the Sunrise Harbour lots. 52. Gould, as in the other corporations, was general manager. We assume therefore that as in the other corporations, he received a salary. ↩
53. In 1962, prior to Davis' death, one lot was sold in Sunrise Harbour, while in 1963 after his death and after the price reduction seven lots were sold and in 1964 the number increased to nine. ↩
54. The names Coral Glade Heights and Coral Gardens were attached only after the properties were platted in 1956 and 1959, respectively. ↩
55. Apparently the interest accrued was included in income by Gould. 56. This interest includes a payment received on a note issued as a result of a second property sale subsequent to the sale of Coral Glade Heights. Infra, at 67.↩
57. Housing Engineers of Florida was incorporated on August 26, 1959. Southern Rock and Fill Co. was incorporated on September 3, 1959; both after the improvements noted above. However as we indicated, supra at 25↩, Housing Engineers of Florida was at various times in the late 1940's and early 1950's a sole proprietorship or partnership which Gould had formed to improve land or build and sell homes. We assume the same situation applies to Southern Rock and Rill Co. and therefore the improvements were made by a noncorporate entity owned by Gould. 58. Coral Glade Co. gave the purchaser a $6,000 credit for construction sidewalks adjacent to purchaser's lots. ↩
59. Petitioners have constantly brought to our attention that the increase in price on sale to the various corporations (Sunrise, Inc., Peat Corp., etc.) was due to appreciation. If this be the case we find it surprising that the sale to Freemar Builders 14 months after the sale to Tara Homes was consummated at the identical price per lot. 60. Represents the instrument described on the corporate books as a note for $5,000 received by Gould. We must assume this note was the equivalent of a "payment" since Gould recognized gain upon it. See sec. 453(b). ↩
61. We cannot ascertain from the record whether the two $1,000 loans had been repaid prior to this time. We must assume so in light of the parties' stipulation which excludes such amount as an existing debt as of August 1957. ↩
62. The plat of this subdivision recorded a month later connotes a total of 22.35 acres condemned for park and school sites. The disparity is obviously due to the approximation of land involved in the condemnation proceeding. The judgment states 22.51 acres "more or less." ↩
63. We note that the corporation agreed to pay somewhat more per acre for the Coral Gardens property than it paid for Coral Glade Heights despite the increased improvement costs. ↩
64. $6,100 credit for installation of sidewalks. The disparity in the balance due is caused by expenses incidental to sale. The figures reflected above demonstrate the amounts of the purchase money mortgages. ↩
65. Gould asserts that Coral Way Co. was formed because Coral Glade Co. needed money due to the default of Centerbrook Construction Co. and Gould agreed to advance the needed funds on the condition he (through a corporation) receive an option to acquire a portion of Coral Gardens. First, Coral Way Co. was formed in 1959 and Centerbrook did not default until 1961 or 1962. Secondly, we find it interesting that Gould would request an option to certain lots (taking title in a corporation wholly owned by him) that he originally owned in his own name and which he had shortly before conveyed to a corporation owned by himself and Hunter. ↩
66. The capital account of Coral Way Co. reflected the following on September 17, 1959: ↩
Outstanding capital stock
$ 5,000
Paid-in surplus
10,000
$15,000
67. We have some difficulty arriving at that result. Coral Glade Co. recorded a purchase price of $670,000 for the 110 acre tract which results in a price of approximately $6,100 per acre. Assuming the property is subdivided into approximately 3.8 lots per acre the per lot cost totals $1.630. One hundred and sixty-one lots (161) at $1,630 per lot is $262,531, well short of the $507,150 sale price. Even if we add the improvement cost of $1,000 per lot or $161,000 assuming they had been made prior to sale. (The contracts executed between Coral Way Co. and independent purchasers indicate the seller's obligation to improve the land. Therefore it is apparent that at least part if not all of the improvements were not completed at time of sale to Coral Way) The total cost is $423,531. Therefore in our opinion from the facts at hand Coral Glade Co. recognized at least $83,619 on the sale. ($507,150 - 423,531.) 68. It is unclear from the record whether Rafkind was relieved of his obligation as to the first 31 lots or only the lots applicable to the two options (i.e., did Rafkind return the 31 lots to Coral Way Co.?). ↩
69. Housing Co. of Florida sold 8 acres on January 15, 1959 5o Howard R. Scharlin, Trustee. Housing Co. basis was reduced by $26,920.48. Darlington Manor, Inc. purchased the 8 acres from Howard Scharlin on April 29, 1959 for $73,052.48. 70. The first advance was made after the first purchase by Housing Co. but before the second. The advances exceeded the total purchase price of all property. The last advance was made after Gould had transferred his stock to Darlington Manor, Inc. and on the same day of Housing Co.'s liquidation. The time and individual amounts of the various loans are: ↩
2/29/56
5,000
6/30/56
55,000
9/30/56
30,000
1/31/57
41,000
3/26/57
65,000
3/27/57
20,000
6/11/57
10,000
7/12/57
10,000
11/14/57
5,000
12/17/57
1,000
2/14/58
5,000
2/19/58
5,000
4/1/58
5,000
5/12/58
8,500
6/6/58
26,500
9/16/58
25,000
10/1/58
3,500
11/28/58
3,000
1/12/59
2,500
2/24/59
53,500
71. Darling Manor, Inc., in paying $587,500 and assuming $367,561.54 of liabilities paid in reality a total of $955,061.54 for one piece of property which had been acquired 3-1/2 years earlier for $315,000 (less the 8 acres sold on January 15, 1959. See supra, p. 79↩). 72. Such would seem to be merely a shortcut method of applying the sec. 334 regulations. As applied here sec. 334(b) (2) notes that the basis of the assets acquired shall be the price paid by Darlington Manor, Inc. for the stock of Housing Co. of Florida. The regulations at 1.334-1(c) (4) (i-v) note however that certain adjustments must be made to this purchase price (which in turn affects the asset basis). Regulation 1.334-1(c) (4) (v) (a) (10 and (b) (1) seem applicable here. They note that such basis shall be increased by unsecured liabilities assumed by the parent and decreased by the amount of cash received. In the situation before us the $349,500 owed to Gould was unsecured. We are uncertain as to the character of "other liabilities"; assuming they also were unsecured the adjustment to the stock purchase price would be as follows: $587,500.00
Less cash
3,014.07
$584,485.93
Plus liabilities
367,561.54
$952,047.47
This amount would then be allocated among all the assets received. Note also that if the "other liability" had in fact been secured it would not increase total bases but rather would be added to the basis of the item secured. See Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, sec. 11.44 at 11-38 (3rd ed.). ↩
73. It seems a little unusual for Gould to secure an obligation with property he did not own. The use of the stock of the corporation as security would seem a more appropriate plan. ↩
74. Southern Rock and Fill Co.'s fiscal year ended March 31; Housing Engineers of Florida fiscal year ended April 30. ↩
75. Filed as a subchapter S corporation. 76. The transfers in issue are as follows: Date
Grantor
Grantee 8/31/55
Emil Gould
Sunrise Properties, Inc.
11/17/55
Sunrise Properties, Inc.
Sans Souci Co.
4/1/56
Emil Gould
Coral Glade Co.
4/10/56
Burt Hunter, et al
Peat Corp.
4/11/56
Burt Hunter, et al
Peat Corp.
4/11/56
Peat Corp.
Harbour Development Co. Sunrise Harbour, Inc.
5/10/57
Peat Corp.
Harbour Development Co.
Harbour Properties, Inc.
Sunrise Harbour, Inc.
Camden Corp.
Dalton Corp.
Trenton Corp.
Bay Homesites, Inc.
Luxor Corp.
(Peat Corp. also transferred property to Sans Souci Co. However, respondent apparently does not question the validity of this sale.)
8/22/57
Emil Gould
Coral Glade Co.
4/14/59
Emil Gould
Darlington Manor, Inc.
(Gould transferred the stock of Housing Co. of Florida to Darlington Manor, Inc. Darlington Manor, Inc. in turn liquidated Housing Co. of
Florida.)
As will be noted infra, he also seems to concede the April 11, 1956 transfers by Peat Corp. to Harbour Development Co. and Sunrise Harbour, Inc. 77. The gain, if any, recognized from the sales by Sunrise Properties, Inc. to Sans Souci Co., Peat Corp. to the nine corporations and Coral Glade Co. to Coral Way Land Co. would be characterized as ordinary income since they were in the business of selling real estate. ↩
78. SEC. 351. (a) General Rule. - No gain or loss shall be recognized if property is transferred to a corporation (including, in the case of transfers made on or before June 30, 1967, an investment company) by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. 79. The quoted language initially appeared in a Second Circuit decision in Kraft Foods Company v. Commissioner, 232 F. 2d 118, 123↩ (C.A. 2, 1956). The Court in Snyder Brothers Co., quoted from it approvingly. 80. Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal", 26 Tax L. Rev. 369, 404-555↩ (1971) (hereinafter referred to as Plumb "Corporate Debt"), lists and discusses the merits and demerits of the various factors applied by different courts. 81. The two exceptions include a minimal salary to Kaplan and Hunter, Rosen, and Louis' receipt of insignificant payments on sale to Peat Corp. The consequence of this factor will be discussed infra. ↩
82. Alternatively, if we were to decide that Hunter, Louis and Rosen did have a true interest in the various transactions such would not convert the transfers into arm's length conveyances. Rather than Gould and Hunter, Louis and Rosen conveying the property to one corporation in the form of a sale (see Burr Oaks Corp., 43 T.C. 635 (1965), Affd. 365 F. 2d 24↩ (C.A. 7, 1966)), Gould conveyed his property to certain corporations and Hunter, Louis and Rosen conveyed theirs to another, each at prices far in excess of fair market value. Such is simply an alteration of the Burr Oaks pattern. 83. Of the three parcels sold to Sunrise, Inc. only one could in fact produce a profit for the corporation, since as Gould himself admitted, the other two parcels were sold to other corporations at only a "nominal profit." ↩
84. Enough improvement, however, to require an additional cash acquisition of $44,000. ↩
85. While we note that the Sunrise Harbour tract was ultimately conveyed to Peat Corp. who thereupon sold it to Hunter, Louis and Rosen, we are assuming, as petitioners request, that the various corporations and their transactions were unrelated and without an ultimate plan. Therefore it seems apparent that the initial transfer of Sans Souci and Sunrise Harbour to Sunrise, Inc. was done with the intention of ultimate development and this would have necessitated substantial improvement costs. ↩
86. Hunter, Louis and Rosen had a total capital contribution of $12,000. As noted earlier, they received neither dividends nor salary. ↩
87. Slack properly zoned the eastern portion of Tract 7 in Sunrise Harbour for multifamily dwellings and valued such at $5,000 per acre. He however valued the western portion of Tract 7, Tract 4 and the eastern portion of Tract 6 as single family dwellings. They were in fact zoned for business and multifamily housing. During cross examination he admitted the error and increased the valuation from $4,000 to $5,000 per acre. The westerly portion of Tracts 7, 4 and 6 (east) were not conveyed to Sunrise Point. We point out, however, that even if applicable such error would be inconsequential for, as the experts note, there was little if any use for multifamily dwellings during the mid-1950's. It would increase the value only slightly. 88. During direct examination McCune testified that he had prepared two appraisals for a portion of the Coral Gardens subdivision. Respondent however introduced two letters from McCune indicating that he had prepared only one. Respondent also demonstrated that McCune, initially called upon by respondent to appraise the Sunrise properties, agreed to do so even though as it turned out he had appraised such real estate on behalf of petitioners some 15 years earlier. It was not until respondent brought this fact to McCune's attention sometime later that he withdrew his consent to appraise the property. 89. We note once again that initially Sunrise, Inc. had acquired Sans Souci, section 7 of Sunrise Harbour, as well as Sunrise Point. Whether the transactions can be considered successful when almost two-thirds of the property is reconveyed at cost is questionable.↩
90. The transfer of the land at a price which produced only "nominal" profits casts further doubt on the validity of the sale in light of the fact that Louis, though a shareholder of Sunrise, Inc., was not a shareholder of Sans Souci Co. and therefore forfeited the potential gain recognizable on the sale of the real estate. 91. It is also worth noting that Sans Souci Co., in purchasing the property did not assume (or take subject to) the portion of the mortgage allocable to the property sold. Rather, Sans Souci Co. acquired the property free of any encumbrances and issued its own note and mortgage payable to Sunrise, Inc. This permitted the use of the installment method by both Gould and Sunrise, Inc. ↩
92. This issue will be discussed infra at 150. ↩
93. We cannot ascertain from where Peat Corp. acquired the money to pay the $18,500 down payment. It had only $4,500 of paid-in capital and did not receive its first loan until June of that year. Peat Corp. at precisely the same time, also purchased the easterly portion of Tract 7 in Sunrise Harbour from Sunrise, Inc. for a total consideration of $128,500 including $3,500 in cash. It sold the next day to Hunter, Louis and Rosen for $125,000 (they merely assumed notes). ↩
94. There are mixed opinions as to whether the total outstanding debt or only the debt held by shareholders should be considered in determining the debt to equity ratio. See Plumb, Corporate Debt, 26 Tax L. Rev. at 513-14. The Fifth Circuit looks to the total liability outstanding. Tomlinson v. 1661 Corporation, 377 F. 2d 291, 299↩ (C.A. 5, 1967). 95. Louis was not a shareholder of Sans Souci Co., one of the nine corporations. ↩
96. See Plumb, Corporate Debt, at 481-82. ↩
97. Respondent concedes the inapplicability of sec. 351 to the transfer of lots to Sans Souci Co. apparently because of the lack of control. Such control is required by the statute. He further seems to concede the inapplicability of sec. 351↩ with regard to the transfer of the Sunrise Point lots to Harbour Development and Sunrise Harbour. This latter concession may be due to the different circumstances involved in the transfer (different land, requiring less improvement, etc.) or simply because the supposed sale and repayment occurred prior to the years in issue. 98. Once again we point out that in selling the real estate to the eight corporations Peat Corp. did not transfer its notes and purchase money mortgages due Hunter, Louis and Rosen, the initial sellers. Rather they conveyed the property free of encumbrances taking back notes to the full extent of the purchase price (less down payment). Footnote 91, supra. 99. We exclude payment of $53,500 received by Peat Corp. in 1956 since such obviously dealt with the payment for the Sunrise Point lots. Note also part of this repayment could stem from Sans Souci Co., the ninth corporation excluded from this discussion. Such applies to the figures noted hereafter as well.↩
100. If the two transfers are considered together the debt-equity ratio would be $900,000 to $5,000 or 180 to 1. If however they are looked at separately, i.e. the second transfer independent of the first, and if it is further assumed that the initial transfer is determined to be equity, as in fact it is, then the debt equity ratio in the latter case would be reduced to approximately 2-1/2 to 1 ($665,000 to $240,000). While this would seem to lessen the likelihood of determining the Coral Gardens transfer to be equity it is this Court's conclusion that in light of the additional factors noted infra, the result would be the same - equity as to both conveyances. To quickly summarize our reasoning: Though the debt equity ratio dropped substantially the added equity consisted of improved land which required $80,000 of improvements before it could be sold. The Coral Gardens subdivision required at least $337,000 of improvements. Little if any payments made as to either purchase and no interest to speak of was ever paid on the Coral Gardens purchase. The payments were contingent solely on the sale of the lots which was far from certain and the property was sold at an overvalued price. 102. The condemnation award valued 22.51 acres of land as of April, 1959 at $139,000 or approximately $6,200 per acre. Coopman and Slack valued the land transferred in 1956 and 1957 at approximately $3,000 per acre. While there is a disparity between these two figures the almost 2 and 3 year gap in time substantially lessens in our mind this disparity. When we look to the sales price applied by petitioners we note that it is almost identical to that determined by the condemnation proceeding though such sales occurred almost 2 and 3 years earlier. We find such a result to be quite remarkable when it is noted that Gould himself stated that during this period of time the surrounding area was rapidly being built up which surely must have sharply increased land prices. Compare Slack's valuation of the portion of the Coral Gardens subdivision transferred to Coral Way Land Co. Finally we note that McCune on direct examination testified that he had appraised the property for the condemnation award. During this testimony he estimated the properties' value at the earlier transfer date. Such value we note is lower than the petitioners' selling price. ↩
103. Such issue will be discussed more fully when we decide the availability of surtax exemption of Coral Way Land Co. ↩
104. Such is evident from the substantial amounts of improvements required, the poor financial condition of Coral Glade Co. and the numerous sale cancellations or forfeitures.↩
105. Coopman and Slack valued the property at $334,250 and $358,125 respectively. The selling price of the stock was in substance $937,000, the $587,500 initially charged plus the $349,500 of notes payable owed Gould by Housing Co. of Florida. ↩
106. We find it unnecessary for purposes of sec. 351 to decide whether such stock interest is the equivalent of a second class of stock. But see Burr Oaks Corp., 43 T.C. 635, 649 (1965), Affd. 365 F. 2d 24 (C.A. 7, 1966); Sherwood Memorial Gardens, Inc., 42 T.C. 211, 230 (1964), affd. 350 F. 2d 225 (C.A. 7, 1965); Foresun, Inc., 41 T.C. 706, 717 (1964), affd. 348 F. 2d 1006 (C.A. 6, 1965); Piedmont Corp., T.C. Memo. 1966-263, revd. 388 F. 2d 886↩ (C.A. 4, 1968). 107. Sec. 351(b)↩ would apply to the extent cash was received on the initial transfer. 108. SEC. 362(a) (1). Property Acquired by Issuance of Stock or as Paid-In Surplus. - If property was acquired on or after June 22, 1954, by a corporation - (1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or * * * then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.↩
109. Petitioners contend that even if we determine the debt to be a stock interest, the payments received with regard to the stock are part of a planned redemption all qualifying under sec. 302(b) (1) as a redemption which is not essentially equivalent to a dividend. We disagree. How can there be a series of planned redemptions when, as we noted earlier, payments on the notes were never timely, and in many cases still remain unpaid? To determine whether a distribution is essentially equivalent to a dividend the Court must determine "whether the distribution has altered the shareholder's control over the corporation or the shareholder's right to future earnings." Stanley F. Grabowski Trust, 58 T.C. 650, 656 (1972). In the instant case it should be apparent that neither criterion has been satisfied. Gould was, is and obviously will remain, "in charge" of the various corporations, and he is the only party having received any substantive economic benefit. The payments have not altered these economic realities to any extent and therefore as the Supreme Court noted in United States v. Davis, 397 U.S. 301 (1970), there simply has not been a "meaningful reduction of the shareholder's proportionate interest in the corporation." See Stanley F. Grabowski Trust, supra. Finally, we note that it would be incongruous in an attempt to prevent tax avoidance, to recharacterize debt as equity and then permit petitioners to obtain the desired tax treatment by fitting the transaction within sec. 302(b) (1). ↩
110. We emphasize that our decision herein is relevant only to the Clin Clara property. 110a. We recognize that Taladen Co. was a subchapter S corporation and therefore its net income was reportable by its shareholders. Respondent contends however that all the income is taxable to Gould. ↩
111. Petitioners point to the corporate books, bank account, paying of office rent and the filing of tax returns as supporting the validity of the corporate entity. We cannot agree. Such are merely formalistic indicia overcome, in this instance, by the other enunciated factors. Note also that the rent was paid to Housing Engineers of Florida, Inc., another corporation controlled by Gould. 112. The applicability of sec. 482 was not raised. CompareRichard Rubin, 51 T.C. 251 (1968), remanded 429 F. 2d 650 (C.A. 2, 1970), and Richard Rubin, 56 T.C. 1155↩ (1971). 113. Gould owned 50 percent of the stock directly and 50 percent by attributions from his wife. See sec. 267(c) (2)↩. Attribution is applicable to Coral Glade Co. and Darlington Manor, Inc. as well. 114. If the debt characterized as stock was determined to be a second class of stock such would have no effect on the result reached herein. The statute requires ownership of 50 percent in value of the outstanding stock not 50 percent in value of each class of stock. Cf. Jacob M. Kaplan, 21 T.C. 134 (1953); Wolf Bergman, 6 T.C. Memo. 1118 (1947). See also Plumb, Corporate Debt, 26 Tax L. Rev. at 396↩; Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, 8-48, fn. 97, 1971 (3rd ed.), wherein the authors note that a simple determination of equity (not deciding if stock) may be sufficient. 115. We recognize that this equity interest did not formally exist at the time of Gould's loans. However, the various factors enunciated earlier demonstrated that in substance the parties did intend the creation of a shareholder and not a creditor interest. Therefore, our equity determination is merely reflective of what the parties truly intended and thus the debt-equity ratio at the time of Gould's conveyances should properly reflect the earlier transfers. 116. ↩ Calendar Year
Amounts Transferred
Amounts Repaid
Balance End Interest
of Year Paid 1956
$ 30,000
None
$ 30,000
None
1957
125,000
$ 75,000
80,000
$ 3,948.12
1958
71,500
37,500
114,000
5,147.92
1959
63,500
62,500
115,000
18,502.14
1960
97,000
78,000
134,000
4,741.80
1961
177,500
98,000
213,500
None
1962
105,000
None
318,500
33,083.20
1963
90,000
44,000
364,500
None
1964
24,000
87,500
301,000
None
1965
None
124,500
176,500
None
$783,500
$607,000
117. The list of corporations includes Sans Souci Co., Coral Way Land Co., Southern Rock and Fill Co., Housing Engineers of Florida, Inc. (subchapter S corporation in 1965 and 1966), Darlington Manor, Inc., Sunrise Properties, Inc., Peat Corp., Coral Glade Co., Sunrise Sales Co. (not docketed) and the 8 corporations acquiring land from Peat Corp. ↩
118. Sec. 1.1551-1(e), provides as follows: (e) Purpose of transfer. In determining, for the purpose of section 1551, whether the securing of the exemption from surtax or the accumulated earnings credit constituted "a major purpose" of the transfer, all circumstances relevant to the transfer shall be considered. For disallowance of the surtax exemption and accumulated earnings credit under section 1551, it is not necessary that the obtaining of either such credit or exemption or both have been the sole or principal purpose of the transfer of the property. It is sufficient if it appears, in the light of all the facts and circumstances, that the obtaining of such exemption or credit, or both, was one of the major considerations that prompted the transfer. Thus, the securing of the surtax exemption or the accumulated earnings credit may constitute "a major purpose" of the transfer, notwithstanding that such transfer was effected for a valid business purpose and qualified as a reorganization within the meaning of section 368. The taxpayer's burden of establishing by the clear preponderance of the evidence that the securing of either such exemption or credit or both was not "a major purpose" of the transfer may be met, for example, by a showing that the obtaining of such exemption, or credit, or both, was not a major factor in relationship to the other consideration or considerations which prompted the transfer. 119. Whether the conveyances are considered sales as characterized by petitioners or a nontaxable exchange as we concluded earlier, both are the equivalent of a transfer. New England Foundry Corp., 44 T.C. 150 (1965); Hiawatha Home Builders, Inc., 36 T.C. 491↩ (1961). 120. If the conveyances are considered sales then the shareholders were in control. If the conveyances are treated as sec. 351↩ exchanges then both the transferor corporations and the preexisting shareholders were in control. 121. It is contended that the two corporations were created to make the necessary improvements required by the various parcels of land before sales could commence. In substance however the corporations merely subcontracted out all the required work. Gould was the general manager, sole shareholder and president of both the corporations in issue. It was he alone who subcontracted out the work. On the other hand, land improvement is a costly and risky business and a separate corporate formation is not uncommon. ↩
122. Housing Engineers of Florida, Inc., prior to incorporation, was a partnership owned by Gould, whose activities during the 1940's and early 1950's consisted principally of home building. ↩
123. ↩ Taxable Income Fiscal Year Ended
Southern Rock
Housing Engineers 1960
$ 24,635.09
$ 25,101.53
1961
23,981.35
24,219.64
1962
20,878.39
20,749.38
1963
2,776.76
1,877.94
1964
(12,013.95)
(17,358.41)
1965
(21,059.54
(12,993.87)
124. We have difficulty in ascertaining how Peat Corp. could be a member of the controlled group since earlier we determined (at respondent's urging) that Hunter, Louis and Rosen's debt interest was in fact an equity interest and sec. 1563(a) (2)↩, for the years in issue required the ownership by one shareholder of 80 percent of the corporate stock. 125. Sec. 1563(a) provides (prior to the 1969 Reform Act) in part: SEC. 1563. (a) Controlled Group of Corporations. - For purposes of this part, the term "controlled group of corporations" means any group of - (1) Parent-Subsidiary Controlled Group. - One or more chains of corporations connected through stock ownership with a common parent corporation if - (A) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations, except the common parent corporation, is owned (within the meaning of subsection (d) (1)) by one or more of the other corporations; and (B) the common parent corporation owns (within the meaning of subsection (d) (1)) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting power or value, stock owned directly by such other corporations. (2) Brother-Sister Controlled Group. - Two or more corporations if stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations is owned (within the meaning of subsection (d) (2)) by one person who is an individual, estate, or trust. (3) Combined Group. - Three or more corporations each of which is a member of a group of corporations described in paragraph (1) or (2), and one of which (A) is a common parent corporation included in a group of corporations described in paragraph (1), and also (B) is included in a group of corporations described in paragraph (2). ↩
126. Sec. 1563(c) (1) provides in part: (c) Certain Stock Excluded. - (1) General Rule. - For purposes of this part, the term "stock" does not include - (A) Nonvoting stock which is limited and preferred as to dividends * * *. Respondent contends that the stock is preferred stock but not nonvoting limited and preferred as to dividends. ↩
127. See also (in the following cases, though held to be debt, each instrument contained some form of voting right) Union Mutual Ins. Co. of Providence, 46 T.C. 842 (1966), affd. 386 F. 2d 974 (C.A. 1, 1967); W. H. Truschel, 29 T.C. 433 (1957)Hemenway-Johnson Furniture Co., 7 T.C. Memo. 380 (1948), affd. 174 F. 2d 793 (C.A. 5, 1949); Helvering v. Richmond, F. & P. R. Co., 90 F. 2d 971↩ (C.A. 4, 1937). 128. The statute was amended in 1964 to read as follows: "At least 60 percent of its adjusted ordinary gross income * * * is personal holding company income." ↩
129. Sec. 542 prior to amendment in 1964, read as follows: DEFINITION OF PERSONAL HOLDING COMPANY SEC. 542. (a) General Rule. - For purposes of this subtitle, the term "personal holding company" means any corporation * * * if - (1) Gross Income Requirement. - At least 80 percent of its gross income for the taxable year is personal holding company income as defined in section 543, and (2) Stock Ownership Requirement. - At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * * ↩
130. We leave for the Rule 50 computations the required adjustments necessitated by the dividends received deduction and other items affecting Peat Corp.'s taxable income. ↩
131. Sec. 1371(a) provides: SEC. 1371. DEFINITIONS.
(a) Small Business Corporation. - For purposes of this subchapter, the term "small business corporation" means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not - (1) have more than 10 shareholders; (2) have as a shareholder a person (other than an estate) who is not an individual; (3) have a nonresident alien as a shareholder; and (4) have more than one class of stock. ↩
132. To the extent the facts are the same, we are bound by such decisions. Jack E. Golsen, 54 T.C. 742 (1970), affd. 445 F. 2d 985↩ (C.A. 10, 1971). 133. The two decisions, promulgated by two different sets of judges, present a most novel situation for this Court. In Amory Cotton the court determined that while the debt was in fact equity it was not a second class of stock. They rejected the contention however that the debt-equity test has no bearing on the issue of a second class of stock. Rather, all the facts and circumstances must be carefully surveyed to determine if the equity is a second class of stock. Such is consistent with the views of this Court. See Stinnett and Allison. Shores Realty, on the other hand, determined that the debt-equity test was not applicable in determining the existence of a second class of stock for purposes of section 1371↩. Jack E. Golsen requires us to follow the decision of the circuit wherein appeal lies. It does not however answer the question as to which decision of circuit we must follow. It would seem logical to follow the decision most closely akin to our own point of view. As noted earlier we find the debt-equity test relevant and we choose to follow Amory Cotton. 134. The Fifth Circuit in Amory Cotton Oil Co. v. United States 468 F. 2d 1046 (C.A. 5, 1972), finds such vagarious demands acceptable. For example, it stated: The consequence of adding to the decisional process factors peculiar to the subchapter S corporation and to its one class of stock requirement will be that debt which for other purposes or in the instance of a non-subchapter S corporation might be recharacterized as stock will not necessarily be a second class of stock for purposes of § 1371(a) (4). Our view also might be said to cause the existence of what might be termed "non-stock equity" or "stock for other purposes but not for § 1371 (a) (4) purposes." [Footnote omitted] [Emphasis supplied] 468 F. 2d at 1051. See also James L. Stinnett, Jr., 54 T.C. 221, 232↩ (1970).
135. Section 6901 provides in part: SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection. - The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, estate, and gift taxes. - (A) Transferees. - The liability, at law or in equity, of a transferee of property - (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), (ii) of a decedent in the case of a tax imposed by chapter 11 (relating to estate taxes), or (iii) of a donor in the case of a tax imposed by chapter 12 (relating to gift taxes), in respect of the tax imposed by subtitle A or B. * * * (h) Definition of Transferee. - As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee, and with respect to estate taxes, also includes any person who, under section 6324(a) (2), is personally liable for any part of such tax.
136. Section 6902 provides: SEC. 6902. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES. (a) Burden of Proof. - In proceedings before the Tax Court the burden of proof shall be upon the Secretary or his delegate to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax. ↩
137. Since under state law the mortgagee would not be a shareholder of the mortgagor the issue raised in Scott v. Commissioner, 117 F. 2d 36 (C.A. 8, 1941) and Powers Photo Engraving Co., 17 T.C. 393, 403↩ (1951) is not before us. 138. At the time the notes and mortgages were issued neither corporation had any other outstanding liabilities. ↩